1  TERRY COLLINGSWORTH (D.C. Bar # 471830)
2  NATACHA THYS (D.C. Bar # 458143)
   DEREK BAXTER (D.C. Bar # 479361)
3  INTERNATIONAL LABOR RIGHTS FUND
   73315th Street, N.W., Suite 920
4  Washington, D.C. 20005
   Tel: (202) 347-4100 / Fax: (202) 347-4885
5
6  PAUL L. HOFFMAN (Cal. S.B. # 71244)
   SCHONBRUN, DeSIMONE, SEPLOW,
7  HARRIS & HOFFMAN, L.L.P.
   723 Ocean Front Walk
8  Venice, California 90291
   Tel: (310) 396-0731 / Fax: (310) 399-7040
9



10              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
11
   John Roe I, John Roe II, John Roe III, John Roe IV, )
12 John Roe V, John Roe VI, John Roe VII, John        )
   Roe VIII, John Roe IX, John Roe X, John Roe XI,    )
13 and John Roe XII, James Roe I, James Roe II,       )  CV05-8158 JFW (FMUx)
   James Roe III, James Roe IV, James Roe            )
14 V, James Roe VI, James Roe VII, James Roe         )
   VIII, James Roe IX, James Roe X, James Roe XI,     )  CASE NO.:
15 James Roe XII, James Roe XIII, James Roe XIV,      )
   James Roe XV, Jane Roe I, Jane Roe II,            )  CLASS ACTION
16 Jane Roe III, Jane Roe IV, Jane Roe V,            )  COMPLAINT FOR
   Jane Roe VI, Jane Roe VII, and Jane Roe VIII       )  INJUNCTIVE RELIEF
17                                                    )  AND DAMAGES
18                                                    )
                        Plaintiffs,                   )
19                                                    )
                                                      )
20 v.                                                 )
                                                      )  JURY TRIAL
21 Bridgestone Corporation, Bridgestone              )  DEMANDED
   Americas Holding Inc., Bridgestone Firestone       )
22 North American Tire, LLC, BFS Diversified          )
   Products, LLC, Firestone Natural Rubber            )
23 Company, Firestone Plantation Co.,                )
   Bridgestone Firestone Corporate Does               )
24 1-10, Daniel J. Adomitis, Charles Stuart,          )
   and Individual Bridgestone Firestone               )
25 Does 11-20,                                        )
                                                      )
26                                                    )
                        Defendants.                   )
27



28

# I. NATURE OF THE ACTION

1. Plaintiffs John Roe I, John Roe II, John Roe III, John Roe IV, John Roe V, John Roe VI, John Roe VII, John Roe VIII, John Roe IX, John Roe X, John Roe XI, and John Roe XII (hereinafter collectively referred to as the "Plantation Workers"); Plaintiffs James Roe I, James Roe II, James Roe III, James Roe IV, James Roe V, James Roe VI, James Roe VII, James Roe VIII, James Roe IX, James Roe X, James Roe XI, James Roe XII, James Roe XIII, James Roe XIV, James Roe XV, Jane Roe I, Jane Roe II, Jane Roe III, Jane Roe IV, Jane Roe V, Jane Roe VI, Jane Roe VII, and Jane Roe VIII (hereinafter collectively referred to as the "Plantation Child Laborers") bring this action on behalf of themselves and all other similarly situated Plantation Workers and Plantation Child Laborers against the Bridgestone Firestone Defendants named herein, as well as any other existing but as yet unnamed Bridgestone Firestone Defendants that are culpable for the wrongful acts alleged herein.

2. The Plantation Workers are now adult workers on what is commonly referred to in Liberia as the "Firestone Plantation" in Harbel, Liberia, which is owned and controlled by the Defendant companies named herein, and is claimed by Defendants to be the largest rubber plantation in the world. These Plantation Workers, most of whom began their working lives as young children forced to work as child laborers on the Firestone Plantation, are now adult workers laboring as "tappers," the labor-intensive job of using primitive tools to tap the raw latex out of the rubber trees assigned to them by the company.

3. The Plantation workers allege, among other things, that they remain trapped by poverty and coercion on a frozen-in-time Plantation operated by Firestone in a manner identical to how the Plantation was operated when it was first opened by Firestone in 1926. The Plantation Workers are stripped of rights, they are isolated, they are at the mercy of Firestone for everything from food to lodging, they risk expulsion and certain starvation if they raise even minor

complaints, and the company makes willful use of this situation to exploit these workers as they have since 1926. While there has been an evolution in thought, law, and humanity since 1926, the Firestone Plantation remains a gulag of misery where little has changed, and there certainly has been no progress. The Firestone Plantation is a testament to the dark side of humanity – what people will do to other people if they can get away with it and they believe that no one is watching. All of the workers are poverty-stricken Africans, enduring extremely inhumane conditions under the constant guard of American and now Japanese overseers who live in the finest homes in Liberia, looking down on the field hands from their verandas and the company's private golf course. Most of the workers have never been off of the plantation and do not even know that the world has moved on and slavery has been abolished.

4.     The Plantation Child Laborers are all minor children whose fathers are Plantation Workers. They are forced by poverty and coercion to work full-time under hazardous conditions with their fathers in order to meet the daily quota of tapped trees that the Defendants impose upon each family knowing that the quota can only be met if children join their fathers, and in many cases, mothers, and work from dawn to dusk. Firestone overseers not only know about the pervasive use of child labor on their Plantation, they actively encourage it. Plantation Workers are told by their overseers that if they can't make their daily quota, which allows them to be paid their pittance of a salary, they should put their children to work. The Plantation Child Laborers begin their day at 4:30 a.m. by cleaning the 1,500 or more tapper cups their family will need to meet their daily quota. They then go to work with their families doing everything from tapping trees with a sharp tool, exposing their eyes to the blinding potential of raw latex, to applying by hand various dangerous pesticides and fertilizers to the rubber trees, to carrying, two at a time, 75-pound buckets filled with the latex that gets their family its food for the day. The Plantation

-2-

1    Child Laborers, like the adult workers, are not given any safety equipment in performing their

2    tasks, nor are they provided with warnings about the chemicals they are required to handle.

3        5.      Both groups of Plaintiffs, on behalf of themselves and others similarly situated,

4    assert claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for forced labor, the

5

6    modern equivalent of slavery. They also bring claims for forced labor and involuntary servitude

7    under the U.S. Constitution, Amendment 13, 18 U.S.C. §§ 1589, 1590, 1595, and under

8    California's Constitution Article 1, Section 6, as well as for recklessness, negligence, negligent

9    hiring and supervision, unjust enrichment and unfair business practices under California's

10   Business & Professions Code §§ 17200, *et. seq.*

11

12       6.      Plaintiffs bring this action on behalf of themselves and all others similarly situated

13   against the following Corporate Defendants: Bridgestone Corporation; Bridgestone Americas

14   Holding, Inc.; Bridgestone Firestone North American Tire, LLC; BFS Diversified Products,

15   LLC; Firestone Polymers, LLC; Firestone Natural Rubber Company; the Firestone Plantation

16   Co., (referred to collectively as the Bridgestone Firestone Group or Defendants) for the forced

17   labor Plaintiffs have endured as a result of the wrongful conduct either caused by and/or aided

18   and abetted by these corporate entities. Plaintiffs also bring this action on behalf of themselves

19

20   and all others similarly situated against individual Defendants Daniel J. Adomitis, the President

21   of the Firestone Natural Rubber Company, LLC as well as a Senior Counsel in the Legal

22   Department of Bridgestone Americas Holding Inc., and Charles Stuart, the President and

23   Managing Director of the Firestone Plantations Company, as well as the on-site manager and

24   ultimate authority at the Firestone Plantation. Individual Defendants Adomitis and Stuart have

25   personally ordered and directed policies that keep the Plaintiffs enslaved, and they have

26   personally witnessed and profited from the horrific conditions on the Firestone Plantation.

27

28

- 3 -

7.     The Plaintiffs bring their ATS actions in the United States because the judicial

system in Liberia is, according to the U.S. State Department, largely dysfunctional and still

suffering from the effects of the devastation brought by Liberia's recently suspended civil war.

*See Bureau of African Affairs, U.S. State Department, Background Note: Liberia* (Sept. 2005).

In the most recent State Department report on human rights practices in Liberia, the judiciary is

described as corrupt given judges' frequent practice of accepting bribes and illegal gifts. *See U.S.*

*State Department, Country Report on Human Rights Practices: Liberia* (Feb. 28 2005).  Further,

the Court of Appeals for the Second Circuit specifically found that Liberia is not an adequate

forum for a commercial dispute based largely on evidence of a dysfunctional judiciary. *See*

*Bridgeway Corp. v. Citibank*, 201 F. 3d 134 (2d Cir. 2000). In this case, there is the additional,

significant factor that because this case involves the Firestone Plantation, by far the largest

private employer in Liberia, which has current business relations with prominent candidates for

the Presidency in the recent election, there is little chance that the powerless and penniless

Plaintiffs will get a fair hearing. Finally, the ongoing lack of security in Liberia raises a concrete

prospect that both the Plaintiffs and counsel for Plaintiffs will face violent retaliation if they

bring this case in Liberia. Accordingly, Plaintiffs bring their claims in the United States, where

Congress has provided a forum for such human rights lawsuits with the passage of the ATS.

8.     All of the Plaintiffs bring this action using pseudonyms due to fear of retaliation

against themselves and their families by persons who are employees and/or agents of the

Defendants. There will be significant pressure on local Firestone employees and managers to

identify and silence the Plaintiffs for daring to speak out about the generations of suffering that

have gone on at the Firestone Plantation.  In addition to the prospect of violent retaliation

described in the preceding paragraph, the Plaintiffs, if identified by name, would face

- 4 -

termination, and they would be kicked out of their Firestone-provided shack, leaving them homeless and destitute. They would have no legal recourse in Liberia for this retaliation.

## II. JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over this dispute pursuant to the ATS, 28 U.S.C. § 1350, for the alleged violations of international human rights law. The ATS provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

10.     This Court has Supplemental Jurisdiction over Plaintiffs pendant state law claims based on 28 U.S.C. § 1332.

11.     Venue and Personal Jurisdiction over each Defendant is proper in this judicial district, and in the United States as a whole, for the foreign Defendants, because, as more fully detailed below, Defendants either own, lease, export to, or otherwise conduct business activities, including the sale of rubber and latex and rubber- and latex-derived products, to tire and other retailers in virtually every part of the United States and/or in California such that they maintain a general course of business activity within the United States, including California, either directly through their own activities, or by virtue of their parent entities acting as their alter ego and/or agent.

## III. PARTIES

**A. Plaintiffs**

12.     Plaintiff John Roe I is approximately 55 years-old. He has been working as a paid tapper on the Firestone Plantation for over 25 years. When he was a child, he was required to

- 5 -

1   assist his Uncle, a tapper on the Firestone Plantation. The only existence he has known since

2   being a child is working long hours for little or no pay on the Firestone Plantation. Of his living

3   minor children, two of them, James Roe I (age 11) and James Roe II (age 6), currently are

4   working with him to meet the family quota set by the overseers at the Firestone Plantation. If his

5   children didn't work to meet the family quota, Plaintiff John Roe I would not be paid and his

6   family would starve. His immediate overseers and supervisors at the Firestone Plantation are

7   aware of this, encourage the children to work, and, by setting the daily family quota well above

8   what a single adult could possibly manage, require that one or more of his children work with

9   him to meet the quota. Plaintiff John Roe I brings this action on behalf of himself, and he is the

10  legal representative herein for his minor children, James Roe I and James Roe II. He also brings

11  this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

13. Plaintiff John Roe II is approximately 42 years-old. He has been working as a paid

14  tapper on the Firestone Plantation for many years. When he was a child, he was required to assist

15  his father, a tapper on the Firestone Plantation. The only existence he has known since being a

16  child is working long hours for little or no pay on the Firestone Plantation. Of his living minor

17  children, two of them, James Roe III (age 16) and Jane Roe I (age 7), currently are working with

18  him to meet the family quota set by the overseers at the Firestone Plantation. His son, James Roe

19  III, has been working on the Firestone Plantation for at least 6 years. If his children didn't work

20  to meet the family quota, Plaintiff John Roe II would not be paid and his family would starve.

21  His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage

22  the children to work, and, by setting the daily family quota well above what a single adult could

23  possibly manage, require that one or more of his children work with him to meet the quota.

24  Plaintiff John Roe II brings this action on behalf of himself, and he is the legal representative

- 6 -

herein for his minor children, James Roe III and Jane Roe I. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

14.   Plaintiff John Roe III is approximately 36 years-old. He has been working as a paid tapper on the Firestone Plantation for over 15 years. When he was a child, he was required to assist his father, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. Of his living minor children, two of them, Jane Roe II (age 15) and Jane Roe III (age 16), currently are working with him to meet the family quota set by the overseers at the Firestone Plantation. His daughters have been working with him on the Firestone Plantation for at least five years. If his children didn't work to meet the family quota, Plaintiff John Roe III would not be paid and his family would starve. His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage the children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe III brings this action on behalf of himself, and he is the legal representative herein for his minor children, Janes Roe II and Jane Roe III. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

15.   Plaintiff John Roe IV is approximately 25 years-old. He has been working as a paid tapper on the Firestone Plantation for just over a year. When he was a child, he was required to assist his father, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. Of his living minor children, one of them, James Roe IV (age 11), currently is working with him to meet the family quota set by the overseers at the Firestone Plantation. If his son didn't work to meet the family quota, Plaintiff John Roe IV would not be paid and his family would starve. His

immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage the children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe IV brings this action on behalf of himself, and he is the legal representative herein for his minor child, James Roe IV. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

16. Plaintiff John Roe V is approximately 25 years-old. He has been working as a paid tapper on the Firestone Plantation for just over a year. When he was a child, he was required to assist his father, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. Of his living minor children, one of them, Jane Roe IV (age 12), currently is working with him to meet the family quota set by the overseers at the Firestone Plantation. If his daughter didn't work to meet the family quota, Plaintiff John Roe V would not be paid and his family would starve. His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe V brings this action on behalf of himself, and he is the legal representative herein for his minor child, Jane Roe IV. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

17. Plaintiff John Roe VI is approximately 41 years-old. He has been working as a paid tapper on the Firestone Plantation for over 15 years. When he was a child, he was required to assist his father, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. Of his living

- 8 -

minor children, three of them, James Roe V (age 14), Jane Roe V (age 16), and Jane Roe VI (age 10), currently are working with him to meet the family quota set by the overseers at the Firestone Plantation. His two older children have been working on the Firestone Plantation for at least 4-6 years. If his children didn't work to meet the family quota, Plaintiff John Roe VI would not be paid and his family would starve. His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage the children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe VI brings this action on behalf of himself, and he is the legal representative herein for his minor children, James Roe V, Jane Roe V, and Jane Roe VI. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

18. Plaintiff John Roe VII is approximately 50 years-old. He has been working as a paid tapper on the Firestone Plantation for over 25 years. When he was a child, he was required to assist his father, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. Of his living minor children, three of them, Jane Roe VII (age 16), James Roe VI (age 14), and James Roe VII (age 10), currently are working with him to meet the family quota set by the overseers at the Firestone Plantation. His two older children have been working on the Firestone Plantation for at least 4-6 years. If his children didn't work to meet the family quota, Plaintiff John Roe VII would not be paid and his family would starve. His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage the children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe VII brings this action on behalf

- 9 -

of himself, and he is the legal representative herein for his minor children, Jane Roe VII, James

Roe VI, and James Roe VII. He also brings this action on behalf of all similarly situated

Plantation Workers and Child Plantation Laborers.

19.     Plaintiff John Roe VIII is approximately 48 years-old. He has been working as a

paid tapper on the Firestone Plantation for over 18 years. Of his living minor children, two of

them, James Roe VIII (age 10) and James Roe IX (age 9), currently are working with him to meet

the family quota set by the overseers at the Firestone Plantation. If his children didn't work to

meet the family quota, Plaintiff John Roe VIII would not be paid and his family would starve.

His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage

the children to work, and, by setting the daily family quota well above what a single adult could

possibly manage, require that one or more of his children work with him to meet the quota.

Plaintiff John Roe VIII brings this action on behalf of himself, and he is the legal representative

herein for his minor children, James Roe VIII and  James Roe IX. He also brings this action on

behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

20.     Plaintiff John Roe IX is approximately 40 years-old. He has been working as a

paid tapper on the Firestone Plantation for over 15 years. When he was a child, he was required

to assist his father, a tapper on the Firestone Plantation. The only existence he has known since

being a child is working long hours for little or no pay on the Firestone Plantation. Of his living

minor children, three of them, Jane Roe VIII (age 16), James Roe X (age 12), and James Roe XI

(age 10), currently are working with him to meet the family quota set by the overseers at the

Firestone Plantation. His two older children have been working on the Firestone Plantation for at

least 4-6 years. If his children didn't work to meet the family quota,  Plaintiff John Roe IX would

not be paid and his family would starve. His immediate overseers and supervisors at the

Firestone Plantation are aware of this, encourage the children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe IX brings this action on behalf of himself, and he is the legal representative herein for his minor children, Jane Roe VIII, James Roe X, and James Roe XI. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

21.     Plaintiff John Roe X is approximately 30 years-old. He has been working as a paid tapper on the Firestone Plantation for over a year. When he was a child, starting at age 7, he was required to assist his father, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. His younger brother, James Roe XII (age 9), is working with him to meet the family quota set by the overseers at the Firestone Plantation. If his brother didn't work to meet the family quota, Plaintiff John Roe X would not be paid and his family would starve. His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that he use one or more children to work with him to meet the quota. Plaintiff John Roe X brings this action on behalf of himself, and he is the legal representative herein for his minor child brother, James Roe XII. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

22.     Plaintiff John Roe XI is approximately 48 years-old. He has been working as a paid tapper on the Firestone Plantation for over 20 years. When he was a child, he was required to assist his father, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. Of his living

- 11 -

minor children, two of them, James Roe XIII (age 16) and James Roe XIV (age 14), currently are working with him to meet the family quota set by the overseers at the Firestone Plantation. His children have been working on the Firestone Plantation for at least the past 7 years. If his children didn't work to meet the family quota, Plaintiff John Roe XI would not be paid and his family would starve. His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage the children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe XI brings this action on behalf of himself, and he is the legal representative herein for his minor children, James Roe XIII and James Roe XIV. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

23.     Plaintiff John Roe XII is approximately 35 years-old. He has been working as a paid tapper on the Firestone Plantation for just over four years. When he was a child, he was required to assist his father's friend, a tapper on the Firestone Plantation. The only existence he has known since being a child is working long hours for little or no pay on the Firestone Plantation. Of his living minor children, one of them, James Roe XV (age 16), currently is working with him to meet the family quota set by the overseers at the Firestone Plantation. James Roe XV has been working on the Firestone Plantation since he was 13 years old. If his son didn't work to meet the family quota, Plaintiff John Roe XII would not be paid and his family would starve. His immediate overseers and supervisors at the Firestone Plantation are aware of this, encourage the children to work, and, by setting the daily family quota well above what a single adult could possibly manage, require that one or more of his children work with him to meet the quota. Plaintiff John Roe XII brings this action on behalf of himself, and he is the legal

- 12 -

representative herein for his minor child, James Roe XV. He also brings this action on behalf of all similarly situated Plantation Workers and Child Plantation Laborers.

**B. Bridgestone Firestone Group Defendants**

24. Defendant Bridgestone Corporation leads the Bridgestone Firestone Group, the world's largest manufacturer of tires and other rubber products. Headquartered in Tokyo, the Group operates 46 plants on six continents and markets its tires and other products in more than 150 nations. As of 2004, the Bridgestone Corporation possesses some 435 subsidiaries and reports having 113,699 employees. In 2004, worldwide net sales were in excess of $23 billion dollars, with over $9.8 billion dollars worth of those sales taking place in the Americas. The Bridgestone Corporation stock is traded in the United States in the form of American Depositary Receipts (ADR), which is a negotiable security representing ownership of publicly traded shares in a non-US corporation. Bridgestone ADRs are held through JPMorgan Chase Bank, a major U.S. banking institution based in New York. The ADR receipts together with the sales and marketing of Bridgestone products constitute significant contacts with both the United States as a whole and the forum itself. In its 2004 annual report, defendant Bridgestone Corporation emphasized that it has the in-house capabilities for producing raw materials such as natural rubber from its plantations in Liberia and Indonesia. Pledging to preserve profitability despite the fact that natural rubber prices are near historic highs, Bridgestone's plan includes "increased planting on rubber estates and working to offset the higher costs . . . by raising productivity".

25. Defendant Bridgestone Americas Holding, Inc. is wholly-owned by the Bridgestone Corporation and is its largest subsidiary. Net sales from the Bridgestone Americas Holding subsidiaries account for more than 40% of all of the Bridgestone Group net sales

- 13 -

1 worldwide. The Nashville, Tennessee-based company was formed in 1990 when Bridgestone

2 U.S.A. merged with The Firestone Tire & Rubber Company.

3      26.      Defendant Bridgestone Firestone North American Tire, LLC (BFNAT) is a

4 subsidiary of Bridgestone Americas Holding, Inc., and is wholly owned by the Bridgestone

5

6 Corporation. Headquartered in Tennessee, BFNAT has fifty offices throughout the U.S.,

7 including in California, and conducts sales and advertising in conjunction with Bridgestone at

8 almost 2,300 company-owned stores in North America, including in California, making it the

9 world's largest tire and automotive service network.

10      27.  Defendant BFS Diversified Products, LLC is a subsidiary of Bridgestone Americas

11 Holding, Inc., and is wholly owned by the Bridgestone Corporation. Headquartered in Indiana,

12

13 BFS Diversified Products controls major non-tire businesses throughout the United States

14 including business and industrial products, synthetic and natural rubber, as well as fibers and

15 textiles.

16      28. Defendant Firestone Polymers, LLC is a subsidiary of BFS Diversified Products, LLC

17 and is wholly owned by the Bridgestone Corporation. Headquartered in Ohio, the company is a

18 global supplier of rubber, plastics, adhesives, and asphalt good. The latex goods developed and

19

20 marketed by Firestone Polymers, LLC include a product line called "Hartex," named after the

21 location of the Firestone Plantation in Harbel, Liberia. All latex used in the Hartex line is

22 harvested by the Plantation Workers and Plantation Child Laborers at the Firestone Plantation in

23 Liberia.

24      29.      Defendant Firestone Natural Rubber Co. LLC, a Delaware Corporation, is a

25 division of BFS Diversified Products, LLC. The Firestone Natural Rubber Co. LLC owns,

26

27 controls and oversees the production, importation and distribution of natural rubber and latex

28

- 14 -

from the Firestone Plantation in Harbel, Liberia. The Firestone Natural Rubber Company, LLC, along with co-defendant Firestone Plantations Company, reinforced their longstanding control of huge tracts of land in Liberia through the recent signing of an agreement with the Government of Liberia which extends the land concession granted to the Firestone Plantation.

30.     According to the Bridgestone Firestone Defendants, the rubber plantation at Harbel rubber is the world's largest. Founded in 1926 and originally stretching over 1 million acres, the Firestone Plantation today spans some 240 square miles with a reported, official workforce of approximately 6,000. There are at least that many forced child laborers engaged in the heavy manual labor of retrieving rubber and latex through tapping trees on the plantation. According to statements made by Firestone Natural Rubber Company President Daniel J. Adomitis, 100% of the rubber and latex from the Firestone Plantation is sold to and/or further processed by U.S. owned and controlled members of the Bridgestone Firestone Group. Adomitis, who is also an in-house lawyer for Bridgestone Americas Holding, Inc., reports that 60% of the rubber harvested on the Plantation is tire grade rubber sold exclusively to Bridgestone Firestone group affiliates. The remaining 40% of rubber harvested from the Firestone Plantation is rubber latex that is sold primarily in the United States. *See* Mike McNulty, "BFS ensures long-term supply of Liberian NR," Global Tire News (2005).

31.     The Firestone Natural Rubber Company, the Firestone Plantation Co. and/or other Bridgestone Group affiliates own and operate shipping vessels such as the Harbel Tapper and Harbel Cutlass which regularly dock in the United States with cargo of latex and dry rubber harvested using the unlawful methods detailed herein. The Firestone Natural Rubber Company, the Firestone Plantation Co. and/or other Bridgestone Firestone Group affiliates also maintain their own U.S.-based shipping terminals in Savanah, Georgia and Norfolk, Virginia.

- 15 -

32.    Defendant Firestone Plantations Co., a Liberian company, is a wholly owned subsidiary of the Firestone Natural Rubber Company, LLC, and is member of the Bridgestone Firestone Group headed by the Bridgestone Corporation. The purpose of Firestone Plantations Co. is to provide the on-the-ground management for the Harbel plantation on behalf of and under control of the Firestone Natural Rubber Company, LLC,  and to oversee the export of latex and rubber to other Bridgestone Group subsidiaries in the United States. Firestone Plantations Co. exports rubber and latex to the United States directly (or indirectly) through other Bridgestone Group affiliates. As outlined above, Bridgestone Firestone officials state that nearly all latex and rubber harvested on the Harbel Plantation is sold to and/or further processed by Bridgestone Firestone Group defendants within the United States.

33.    Plaintiffs are currently unaware of the true names and capacities of Defendants sued herein as Bridgestone Firestone Corporate DOES 1-10, and therefore sue these Defendants by using fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged,  and the injuries to Plaintiffs herein alleged were proximately caused by the conduct of the named Defendants, as well as the Corporate Does 1-10.

34.    Defendant Daniel J. Adomitis, is the President of the Firestone Natural Rubber Company, LLC, as well as a Senior Counsel in the Legal Department of Bridgestone Americas Holding, Inc. Although based in Tennessee, Adomitis is involved in the day-to-day operations of the plantation itself, as well as the shipping and distribution network which brings the rubber and latex into the United States. Defendant Adomitis is the signatory for the Firestone Natural Rubber Company, LLC in the recent concession agreement of dubious legality between the Bridgestone Firestone Group and the transitional government currently governing with limited

- 16 -

authority and under UN-imposed constraints in Liberia. Through his role in the setting of inhumanly high tapping quotas for Plantation Workers to be accompanied by barely subsistence wages, defendant Adomitis engaged in intentional conduct resulting in the Plaintiffs' injuries alleged herein. Adomitis is therefore personally responsible for the maintenance of a modern day slavery system on the Firestone Plantation.

35. Defendant Charles Stuart is the President and Managing Director of the Firestone Plantation Company, and is accordingly the on-site manager and ultimate authority at the Firestone Plantation in Harbel. Defendant Stuart is the signatory for the Firestone Plantation Company in the aforementioned concession agreement between the Bridgestone Firestone Group and the transitional governing authority in Liberia. Through his role in the setting of inhumanly high tapping quotas for Plantation Workers to be accompanied by barely subsistence wages, defendant Stuart engaged in intentional conduct resulting in the Plaintiffs' injuries alleged herein. As he is involved in the on-site management of the Firestone Plantation, Defendant Stuart regularly sees the inhumane conditions his policies have wrought, and he is therefore personally responsible for the maintenance of a modern day slavery system.

36. Plaintiffs are currently unaware of the true names and capacities of Defendants sued herein as the Individual Bridgestone Firestone DOES 11-20 and therefore sue these Defendants by using fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Each fictitiously named Individual Defendant engaged in intentional conduct that led to Plaintiffs' injuries alleged herein. For the most part, these Individual Defendants were past and present senior managers working on the site of the Firestone Plantation from 1995 to the present, and were therefore personally responsible for maintaining a modern day slavery system, complete with the plantation, overseers, and manor house.

- 17 -

1

2

## IV. FACTS RELATING TO PLAINTIFFS' INJURIES

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37.    The Firestone Plantation had its genesis in exploitation and corruption. At the time of its founding in 1926, Liberia was not in a position, even if its leaders were proceeding in good faith, to negotiate an equitable arrangement with Firestone Company, the predecessor-in-interest to Defendant Bridgestone Corporation. During the mid-1920s, Liberia was racked with foreign debt, and faced increasingly serious boundary disputes as neighboring French colonies attempted to encroach on Liberian sovereign land. Attempting to shore up its financial and political situation, Liberia went to its long-time ally, the United States, with which it had close ties since its founding by the American Colonization Society, to ask for a loan. While a substantial loan was supported by President Coolidge, and approved by the House, it languished in the Senate. It is at this point that the Firestone Tire and Rubber Company stepped in. With worldwide rubber prices reaching historic highs due to the British rubber monopoly, industrialist and aspiring colonizer Harvey Firestone declared that "America must grow its own rubber." The only hitch was that America couldn't grow rubber on her own shores. So instead, acting with the overt support and guidance of the U.S. State and Commerce Departments, in 1926 Firestone and its wholly-owned Finance Corporation of America refinanced the entire Liberian state, extending a $5 million dollar loan, repayable at an interest rate of 7%. A 1935 *Time Magazine* article recounts the series of events: "In 1925, when rubber was $1 per lb. the State Department had encouraged Mr. Firestone to start a huge rubber plantation in Liberia and lend the African Republic money to pay off its European and other debts." *Time*, "Wound Unsalted," June 24, 1935.

26

27

38.    In return for the loan, Firestone was granted a 99-year concession for one million

28

- 18 -

acres of land at a yearly rate of only six cents per acre. Former Liberian President William V. S. Tubman insisted that one reason why the loan was political, rather than economic, was that border incidents and boundary disputes promptly ceased once Firestone had control of the Liberian land.

39.     By 1929, Firestone was reported to "employ" some 350,000 Liberians on its plantation. *Time*, "Deals," Oct. 29, 1929. Although press coverage of the time represents Firestone as paying their "native" workers 25 cents per day in cash, charges of exploitation and forced labor have rightly dogged Firestone since the creation of the Plantation, which coincided with the zenith of colonial exploitation in Africa. As one story covering the opening of the Firestone Plantation put it, "to the 20th Century industrialist, eagerly scanning the world's wealth, Africa means first RAW MATERIALS, then CHEAP LABOR." *Time*, "Lever, Ford, Firestone," Aug. 6, 1928. The history of the rubber extraction industry in West Africa is particularly brutal. In *King Leopold's Ghost*, author Adam Hothschild describes how the Belgian-controlled Congo became an efficient production center for rubber by relying upon forced labor and brutal treatment to enforce the daily quota for rubber gatherers. The parallel history of Liberia, under control of American colonial powers, awaits its own comprehensive historical exposure, but there is no question that overall methodology was similar.

40.     In Liberia, indigenous people were forced off their land to make room for Firestone's "largest rubber plantation in the world." At the outset, local residents were then conscripted for forced labor in planting and cultivation of the rubber trees, and then the harvesting of rubber and latex from the adult trees.

41.     Even near-official histories that Firestone itself has helped to document make little effort to hide Firestone's original crimes. A 1956 report matter-of-factly states that "[i]n a

- 19 -

country like Liberia where the bulk of the population still lives in a largely self-sufficient tribal society, the recruitment of labor cannot be left to the automatic operation of market forces." Wayne Chatfield Taylor, *United States Business Performance Abroad, The Case Study of the Firestone Operations in Liberia*, p. 66 (1956).

42.     Liberians initially were forcibly conscripted at gunpoint the outset of the Plantation's operations. For decades afterwards, Firestone maintained at a de facto system for buying able-bodied men from tribal chiefs. Benevolent in name if not in purpose, Firestone developed the "Paramount Chiefs Assistance Plan," through which tribal chiefs were given quotas of laborers to deliver up to the Plantation in return for a payment per man. In 1955 alone, Firestone reported paying over $90,000 to various tribal officials in return for this kind of conscripted labor. *Id.* at 69.

43.     Many, if not most, of the present tappers on the Firestone Plantation, including Plaintiffs herein, are descendants of the original, forcibly conscripted laborers recruited at gunpoint to work on the Firestone Plantation. Many of the current tappers are the 3rd or 4th generation of laborers on the Firestone Plantation, and have rarely, if ever, set foot off the Firestone-controlled property.

44.     Many of the current families working the Firestone Plantation are from the Kissi tribe. In Liberia, the Kissi are generally regarded as being friendly and passive people, and many in the country today assert that the Kissi were initially targeted to be the labor force for Firestone for this reason. Most of the Kissi are Christians, which distinguishes them from the rest of the country as well.

45.     The Firestone Plantation has avoided the social and economic progress of the last century. In fact, from the perspective of the workers, the economic situation has deteriorated.

- 20 -

Today, the tappers, including Plaintiffs herein, labor much like their ancestors did in the late 1920's and 1930's. The tappers begin each day at 4:30 a.m. by rising to clean the tapper cups that must be mounted on each tree that is tapped. A primitive machete-like tool is used to cut the tree to let the sap, latex, seep into the cup. The tapper collects the latex from the cups and dumps in into large buckets, that, when filled, weigh 75 pounds each. When 2 buckets are full, the tapper finds a tree branch, and with a bucket at each end, walks for up to an hour to dump his 150-pound load into collection barrels. The tappers apply fertilizers and pesticides by hand, without any warnings or safety equipment. The tappers do not have any safety equipment of any kind and most do not even have shoes.

46.     Just as in 1926, the tappers live a hand-to-mouth subsistence existence. Except, according to the older tappers, things were better in the old days. The daily quotas are so high now that to get the minimum daily pay, tappers work 12-14 hours per day, and they are obligated to bring their family members, including children, to meet the daily "family quota" that will allow the family to earn enough to at least buy food from the company store.

47.     A tapper today on the Firestone Plantation is assigned three "tasks." A "task" is a section of rubber trees that numbers approximately 750 trees. To get the daily wage of $3.19 (before deductions), a tapper must tap a complete task, 750 trees, and ½ of a second task, 375 trees, for a total of at least 1,125 trees. If the tapper completes 750 trees, but not the additional 375, he loses 50% of his daily pay, so he would get only $1.59. And that is the heart of the system of forced labor and child labor. The difference between $3.19 and $1.59 is the difference between barely surviving and starving. In addition to facing the impossible task of tapping 1,125 trees, each tapper is responsible for cleaning and placing the tapping cups on each of the trees in his tasks, as well as applying pesticides and fertilizers. He must also trim and otherwise keep his

- 21 -

trees healthy. And then there is the most dreaded burden: the tapper must load himself like a mule and walk barefoot for up to an hour carrying 150 pounds of latex, balancing two heavy buckets on a stick. Many of the tappers bear extreme scars and bone and muscle deformities on their shoulders from performing this onerous task three times a day. The 1,125 trees correspond to the more important number from Firestone's perspective – each tapper must deliver six 75-pound buckets of latex per day to meet their quota. And at the beginning and end of each day the tappers and their accompanying family members must walk up to an hour to and from the shacks provided to them as residences to the trees assigned to them.

48.     There is no tapper working at the Firestone Plantation who could possibly tap 1,125 trees in a day, and also clean the cups, treat the trees, and make the three deliveries a day carrying 150 pounds of latex each trip. Indeed, in an interview on CNN International's Inside Africa on November 12, 2005, Defendant Adomitis, President of the Firestone Natural Rubber Company, claimed that the tappers only need to do 650 trees a day (which is not true), and that it takes two to three minutes to tap a tree. CNN did the math, taking the lower figure of two minutes a tree, and it came to 21 hours! Taking Plaintiffs' number of 1,125 trees per day, the figure is 37.5 hours per day. Either way, even based on Firestone's admission, it is clear that no single worker could complete the daily quota in a day, and must use family members, including children, to avoid starvation. While the basic implements used for these tasks– chiefly the heavy buckets and rusted machetes– have not changed in the least since Firestone came to Liberia in 1926, the daily quota for workers has risen relentlessly. According to a 1956 study of the Plantation, Firestone reported that tappers were responsible for tapping 250 - 300 trees per day. *See* Wayne Chatfield Taylor, United States Business Performance Abroad: *The Case Study of Firestone Operations in Liberia* (1956). By 1979, Firestone officials reported in a Washington

- 22 -

Post story that the daily quota consisted of a task of 400-500 trees. *See* Dan Morgan,

Washington Post, "Firestone Efficiency Shadows Liberian Problems," (Mar. 7th 1979). With no

technological increases and yet a quota two to four times higher than previous reports, the system

today requires that each tapper, to meet his daily quota, find one or more unpaid "helpers." Of

course the only helper available under those terms are the tappers' own children. The overseers

and supervisors at the Firestone Plantation not only know this, they encourage and require it.

Tappers, including Plaintiffs herein, are told that if they can't meet their quota, they should put

their children to work. They are reminded that they too worked as helpers when they were

children. They are told that their children will starve if they don't get out and work. Tappers who

fall short of the daily 1,125 tree requirement, and are then docked 50% of their daily pay no

matter how close they come to the quota, are told to get some help from their children.

49.     Tappers today, including Plaintiffs herein, unlike their ancestors, do not get any

days off for worship, family or any other reason. They do not get any paid holidays, any paid sick

days or any other relief from working every single day that they want to earn their $3.19. While

at the present time there is not even the prospect of enforcement on the Firestone Plantation,

these basic benefits are requirements of the law of Liberia, and Firestone systematically violates

these requirements. Because of the relentless production requirements at the Firestone

Plantation, even workers who are willing to forgo a day's pay to get a day off are not able to and

are told they will be dismissed if they do so. The extremely high unemployment rate in Liberia,

in the rural areas above 80%, allows Firestone to say with confidence that anyone who wants to

leave can do so and join the ranks of the starving unemployed. Accounts of 19th century slavery

in the United States report that the slaves were allowed to enjoy Sunday as a day of worship and

family. *See* John Cimprich, Self-Purchase, in *Dictionary of Afro-American Slavery* (Randall M.

- 23 -

Miller & John David Smith eds., 1988).

50. Defendants claim to the public that tappers and their families are provided with "free" medical care at company clinics on the Firestone Plantation. In fact, the clinic is open on Mondays, Wednesdays and Fridays, and the workers joke in their resigned-to-life way that they need to make sure they get sick or injured on one of those days to keep Firestone happy. Workers are particularly incensed about the way they are treated in matters of life and death. Babies are seldom born on schedule, and if they are born off the plantation, they are not eligible for the limited benefits available to Plantation residents, including medical care.

51. Defendants proclaim to the public that they provide free education to Plantation residents. In reality the workers, including Plaintiffs herein, are charged for various school fees, either directly, or through an " income tax" deducted from their pay. Most workers have no idea exactly how much they are charged per child to enroll a child in the Firestone Plantation school, but they know it is not "free." As with all other issues relating to their pay, workers simply receive each month what the company unilaterally informs them they have earned, minus company-calculated deductions, which often involve company profit-making schemes. Also, in a perverse disincentive system, if a child is not born on the plantation, which requires that the child comply with the Monday, Wednesday or Friday schedule, then Firestone considers them automatically ineligible for whatever the limited education benefit is. To enforce this policy, Firestone requires production of a birth certificate from the company doctor to prove birth on the plantation, but the exorbitant fees charged for copies of the birth certificates, as well as the significant time off needed for a worker to deal with the bureaucratic system, prevent many families from ever obtaining the piece of paper that would allow their child to attend the company school, even if it is not free. Many workers, including Plaintiffs herein, believe that the

- 24 -

Firestone Plantation puts up these formidable hurdles to education to ensure that the plantation continues to have a steady stream of uneducated, desperate workers willing to endure the horrific conditions of the Firestone Plantation in order to earn enough to eat.

52.     The tappers are paid each month, and each month the tappers, many of whom are illiterate, receive their computer-printed pay stubs with a myriad of deductions imposed and calculated by the Firestone Plantation. Amounts are deducted for rice from the company store, the sole source of food on the remote plantation, "income tax," which none of the Plaintiffs herein were able to define, with most of them speculating that it was to pay for the company school, "reconstruction tax," which again none of the Plaintiffs herein could explain, although they speculated it was to pay for their "free" one-room shacks they were given to share with their entire families, and "union dues," which they are required to pay for a "union" the company set up without the knowledge or consent of the workers. At the end of the month, the workers are left with virtually nothing, enough to buy enough food to continue their cycle of subsistence poverty.

53.     When a tapper dies, his family is supposed to receive insurance and death benefits that have been deducted from the tapper's pay during his entire life. The Firestone Plantation uses red tape and the illiteracy of the tappers to avoid payments or to cheat the families out of their rightful payments.

54.     The one-room shacks provided to the tappers are situated in shanty towns. Open sewers run along the central dirt road, and an open latrine leaches human waste a few feet from the shanty-town's pit well. The Firestone Plantation made some recent renovations to some of the shacks, replacing some of the leaking roofs with new asbestos tiles. These shanty towns are in stark contrast to the large villas built on the higher grounds of the Firestone Plantation for the

- 25 -

Firestone Plantation managers from the United States and Japan. These homes have verandas, swimming pools, and all the comforts of home. A private golf course is maintained on the Firestone Plantation for the expatriate managers to enjoy in their leisure time. Within each of the large homes occupied by the foreign overseers, former plantation workers serve as domestic staff, promoted up from life in the fields, and are able to enjoy a few scraps of the good life.

55. The managers and overseers on the Firestone Plantation have specific knowledge of the starvation conditions imposed upon the Plantation Workers, including Plaintiffs herein, as well as the pervasive use of child labor. They have specific knowledge that without the Plantation Child Laborers, no family could meet the family quota. All of the Plaintiffs herein have had interactions with supervisors, overseers, and/or managers of the Firestone Plantation in which these representatives of the Firestone Plantation were able to see the Plantation Child Laborers performing various tasks necessary to meet the family quota, including cleaning tapper cups, tapping trees, helping with the collection of latex, applying fertilizers or pesticides to the trees by hand,  or carrying the latex buckets to collection points. Several of the Plaintiffs herein were directly told by management representatives of the Firestone Plantation that they should use more of their children if they were having trouble meeting the family quota. For example, John Roe III was specifically told by a manager after he had complained that he can't meet his quota alone, "With the help of your children, you can produce it."

56. Perhaps in anticipation of this lawsuit, in early September 2005, the Firestone Plantation issued a directive that child labor will no longer be permitted on the Plantation. Wholly apart from the obvious fact that by all accounts child labor apparently was officially permitted on the Firestone Plantation up to September 2005, the directive was issued purely as a public relations device, made with knowledge that it was false and misleading to the public.

- 26 -

There was no change in the daily quota, no increase in pay for the tappers that might allow them to hire paid helpers, and accordingly there was no change in the use of child labor on the Firestone Plantation. The day after the directive was issued, and every day since then, the Plantation Child Laborers began their days at 4:30 a.m. washing the hundreds of tapping cups needed for their families to meet their daily quotas. Firestone's cynical announcement of a change in policy has made no change in the systematic use of child labor on the Plantation.

57.     The rubber trees on the Firestone Plantation are susceptible to a number of diseases. The most common is "black tread," which is a fungus that can kill the tree. The tappers are required to apply a chemical called molcorit. This is one of the jobs the Plantation Child Laborers frequently do. The chemical is applied by hand as no protective equipment is supplied by the Firestone Plantation. This chemical causes skin irritation, and its effect is visible on many of the Plantation Workers and Plantation Child Laborers.

58.     The raw latex that is tapped from the rubber trees is itself extremely dangerous if it gets in the eyes. The latex can burn the eyes and cause severe damage, including blindness. There are numerous cases among the tappers of people who have suffered permanent eye damage from tapping without proper protective eye gear.

59.     The Plantation Workers are not given any formal letter of employment by the Firestone Plantation. This allows the company to treat them as casual labor which can be fired for any reason. This is another mechanism, in violation of the law of Liberia, that the Firestone Plantation uses to keep the workers in line.

60.     The Firestone Plantation does not just exploit the Plantation Workers and profit from the Plantation Child Laborers; it had its genesis in exploitation and forced labor. An article in Time Magazine from 1928, *Lever, Ford, Firestone* (Aug. 6, 1928) reports:

- 27 -

1   Last week, the Mandates Commission of the League of Nations was called upon to
    read a curious document. It was a report, made by onetime Harvard professor
2   Raymond Buell, submitted to the League by Henri A. Junod, President of the
    International Society for the Protection of Natives. Declared Professor Buell,
3   in effect: "Firestone forced its way into Liberia. The U. S. State Department
    and Herbert Hoover brought pressure to bear to make the Liberian government
4   accept the refinancing operations and admit Firestone rubber. Eventually, the
5   lands of the natives will be confiscated. Through the terms of the loan,
    through U. S. financial advisers, a closed door has been established. It will
6   end in peonage." Shocked, the State Department issued vigorous and sweeping
    denials. The Firestones have used but 20,000 of its 1,000,000 acres. The U. S.
7   will not countenance closed doors, forced labor.

8

9   61.    Regrettably, nothing was done to correct Firestone's initial criminal act, and it

10  continues unabated today. Firestone managed to operate its plantation as a private fiefdom, using

11  the forefathers of the Plantation Workers as their serfs or slaves, and operating under an initial

12  99-year lease signed in 1926 with the government of Liberia that was imposed with the backing

13  of high-level officials in the Coolidge Administration such as then-Secretary of Commerce

14

15  Herbert Hoover.

16  62.    There was one event that Firestone could not control that caused a brief cessation

17  of operations – the raging civil war in Liberia beginning in 1989. Firestone officials, however,

18  did their best to see that the violence spilling over throughout the country would effect the Harbel

19  Plantation as minimally as possible. In 1990, Firestone officials had no qualms with the fact that

20
    war criminal and President to-be Charles Taylor's brutal rebel forces were stationed on
21

22  Bridgestone Firestone's land, near their production factory and office. For a time at least,

23  production could continue, and a U.S.-based Bridgestone Firestone spokesman blithely referred

24  to Taylor and his butchers as "freedom fighters." Kenneth B. Noble, "Rebels in Liberia Seize

25  Plantation," *NY Times,* A7 (June 6, 1990). Firestone continued its friendly relations with war

26  criminal Taylor after his victory and even appointed one of Taylor's key generals, Adolphus

27

28
    - 28 -

Dolo, as the Chief of Security for the Firestone Plantation in 1994. Other key positions on the

Plantation were filled by other Taylor operatives. During Taylor's reign of terror, Firestone aided

and abetted his regime in a number of ways, all to keep the plantation operating and the profits

flowing, regardless of consequences. In addition to putting Taylor's associates on the payroll,

Firestone used its shipping facilities to import arms and ammunition for the Taylor regime.

Allegations that the Firestone Plantation stored arms for Charles Taylor's brutal rebel forces were

widespread and were reported in the U.S. media at the time. *See* Associated Press, "38 Die in

Attach on U.S.-owned Rubber Plantation in Liberia," *NY Times*, A11 (Nov. 4, 1992).

63.     Although the original 99-year lease was not set to expire until 2025, Firestone

again acted to exploit the people of Liberia by negotiating with the transitional government, in

advance of the long-scheduled October 11, 2005 election that would select a President and a

Congress, a significant extension of the lease agreement. Allegations abound in Liberia that

Firestone was able to reach very favorable terms with transitional leaders who had little long-

term interests other than their own financial condition.

64.     As the Firestone Plantation was initially created to allow, the Plantation Workers

and the Plantation Child Laborers suffer daily injuries from the extremely exploitative practices

on the Plantation. The Plantation Workers are modern day slaves, forced to work by the coercion

of poverty, with the prospect of starvation just one complaint about conditions away. They are

isolated on the Plantation by design, and are completely dependent upon the Firestone Plantation

for access to food and for the only homes they have ever known, the one-room shacks in filthy

shanty towns provided by the company. The paltry net wage the workers receive ensures that they

also do not have the resources for transportation to escape the Plantation. The Plantation Workers

are simply fulfilling the destiny planned for them by the founders of the Firestone Plantation in

1926. The original workforce was captured and forced to work for Firestone. Succeeding generations were kept on the Plantation by poverty, fear, and ignorance of the outside world, living in a cycle of poverty and raising their children to be the next generation of Firestone Plantation Workers.

65. The Plantation Child Laborers are forced to work to avoid the starvation of their families. These young children have not reached the legal age of consent by any definition, and therefore could not possibly agree to become laborers for the Firestone Plantation. They suffer daily the deprivations of living a slave-like existence, including malnutrition, disease, physical ailments from exposure to chemicals, and the lack of decent educational opportunities.

66. All of the Plantation Workers seek the simple justice of the freedom of choose whether to work, the opportunity to work free of coercion, the security of a proper employment relationship, the benefit of wages that do not leave them in malnourished poverty, and the meager benefits provided under the law of Liberia, including rest days and holidays. Most of all, they seek the cessation of conditions that formed the premise of the Firestone Plantation, and that have left them in the same situation as their own fathers, watching their own children join them as tappers with no future other than the misery they have experienced their entire lives.

## V. AGENCY

67. The Firestone Plantation Co. is and was, at all relevant times, the agent of its parent companies, including but not limited to, the Bridgestone Corporation, Bridgestone Americas Holding Inc., BFS Diversified Products, LLC, Firestone Polymers, LLC and the Firestone Natural Rubber Company. Specifically, these parent entities control the subsidiary's operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution,

- 30 -

and/or retailing of rubber, latex and rubber- and latex-derived products from the Firestone Plantation in Liberia. The parent corporations also set production quotas for the Plantation, and also control its economic operations, including the price at which natural rubber and latex is sold, as well as the amount of compensation received by workers. The Firestone Plantation Co. operates the largest rubber plantation in the world, and is certainly a major producer for the Bridgestone Firestone empire. The Firestone Plantation Co. is ultimately the agent of each of the other named parent Defendants.

68. Each of the parent Defendants control and/or have the ability to control their subsidiaries' actions with respect to labor practices on the Firestone Plantation.

69. At all material times the Firestone Plantation Co. was the agent of or was otherwise working in concert with the parent entities. As just one example, the Delaware-incorporated Firestone Natural Rubber Company is a co-signatory with the Liberian-incorporated Firestone Plantation Co. in the 2005 land concession agreement made with the transitional Liberian government. Furthermore, the signatory for the Firestone Natural Rubber Company, Daniel J. Adomitis, is a general counsel for Bridgestone Americas Holding, Inc., the parent company controlling all of Bridgestone Firestone's U.S. operations. At all material times the Firestone Plantation Co. was acting within the course and scope of such agency or was engaged in concerted activity. To the extent that said conduct was perpetrated by the Firestone Plantation Co., the parent Defendant corporations confirmed and ratified the same.

70. The Bridgestone Firestone Group's wholly-owned subsidiary, Firestone Natural Rubber Company, is and was at all relevant times, the agent of the parent companies, including but not limited to, the Bridgestone Corporation, Bridgestone Americas Holding Inc., BFS Diversified Products, LLC, and Firestone Polymers, LLC. Specifically, these parent entities

- 31 -

control the subsidiary's operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, and/or retailing of rubber, latex and rubber- and latex-derived products from the Firestone Plantation in Liberia.

71. Each of the parent defendants control and/or have the ability to control the Firestone Natural Rubber Company's actions with respect to labor practices on the Firestone Plantation.

72. At all material times the Firestone Natural Rubber Company was the agent of or was otherwise working in concert with the parent entities. As just one example, the Delaware-incorporated Firestone Natural Rubber Company is a co-signatory with the Liberian-incorporated Firestone Plantation Co. in the 2005 land concession agreement made with the transitional Liberian government. Furthermore, the signatory for the Firestone Natural Rubber Company, Daniel J. Adomitis, is a general counsel for Bridgestone Americas Holding, Inc., the parent company controlling all of Bridgestone Firestone's U.S. operations. At all material times the Firestone Natural Rubber Company was acting within the course and scope of such agency or was engaged in concerted activity. To the extent that said conduct was perpetrated by the Firestone Natural Rubber Company, the parent Defendant corporations confirmed and ratified the same.

## VI. ALTER EGO

73. The Firestone Plantation Co. is and was, at all relevant times, the alter-ego of the parent entities identified herein. Specifically, the parent entities control every aspect of the Firestone Plantation Co.'s operations, particularly with respect to the sourcing, purchasing, manufacturing, distribution, pricing and/or retailing of rubber, latex, and rubber- and latex-

- 32 -

derived products from the Harbel Plantation. These named parent entities also control every aspect of Firestone Plantation Co.'s Liberian ground operations, including overall production quotas and compensation, which in turn drives the daily quota of trees that each family must tap. As just one example, the Delaware-incorporated Firestone Natural Rubber Company is a co-equal signatory with the Liberian-incorporated Firestone Plantation Co. in the 2005 land concession agreement made with the transitional Liberian government. Furthermore, the signatory for the Firestone Natural Rubber Company, Daniel J. Adomitis, is a general counsel for Bridgestone Americas Holding, Inc., the parent company controlling all of Bridgestone Firestone's U.S. operations. Bridgestone Firestone Group parent entities have used the Firestone Plantation Co. merely as a conduit for the receipt or transfer of funds and/or products related to rubber and latex cultivated on the Firestone Plantation in Liberia.

74.     The subsidiary and parent corporations named herein have common ownership, interlocking boards of directors, and have failed to observe corporate formalities with respect to their operations. Further, the subsidiary companies Firestone Plantation Co. and Firestone Natural Rubber Company are inadequately capitalized for the risks they face in conducting their business operations and they rely upon infusions of capital from the parent companies to operate. The inherent and pervasive failure to maintain separate identities constitutes improper conduct and disrespects the privilege of using the corporate form to conduct business.

## VII. AIDING AND ABETTING

75.     Defendants are directly liable for any actions alleged herein that they aided and abetted by knowingly providing financial support, supplies, training, regular arrangements to purchase or receive the raw material outputs, and/or other substantial assistance that contributed

- 33 -

1  to the ability of their agents, subsidiaries, employees and/or partners to use and/or facilitate the

2  use of forced labor and/or forced child labor from the Firestone Plantation to obtain rubber and

3  latex.

4

5

6

7  ## VIII.  VICARIOUS LIABILITY

8      76.     To the extent that any of the Defendants can be said to have acted indirectly, these

9  Defendants are vicariously liable for the actions of their agents, employees, co-venturers and/or

10 partners for any and all acts that served to require, encourage, or ratify the system at the Firestone

11

12 Plantation that utilizes forced labor and forced child labor to produce latex and/or rubber and

13 provide it to the Defendants for their material benefit.

14     77.     To the extent that any such agent, employee, co-venturers and/or partner used

15 and/or facilitated the use of forced child labor and/or made material misrepresentations and

16 omissions, such entity was acting within the course and scope of such agency, enterprise, or

17

18 venture and Defendants confirmed and ratified such conduct.

19     78.     The Defendants also acted as joint employers and/or joint tortfeasors with any

20 direct actors in maintaining a joint scheme to rely upon a steady supply of latex and rubber that

21 originated in a plantation system that all concerned knew depended on forced labor and forced

22 child labor.

23

24

25 ## IX. CLASS ALLEGATIONS

26     79.     The Plantation Worker Plaintiffs bring this action individually, and pursuant to

27 Fed. R. Civ. P. 23(a),  23(b)(2), and 23(b)(3), on behalf of the following class:

28
- 34 -

1    All individuals during the period November 17, 1995 through the present who worked as

2    a tapper on the Firestone Plantation in Liberia under the conditions described herein in

3    paragraphs 1 to 78.

4    80.    The Plantation Child Labors, with their fathers acting as their legal

5    representatives, bring this action individually, and pursuant to Fed. R. Civ. P. 23(a), 23(b)(2),

6

7    and 23(b)(3), on behalf of the following class:

8    All individuals during the period November 17, 1995, through the present who were

9    forced as children to work on the Firestone Plantation so that their families could meet

10   their quota and be paid enough to allow the family to avoid starvation.

11   81.    Both classes are so numerous that joinder of all members is impractical. The class

12   of Plantation Workers is between 3,000 and 4,000 members. The class of Plantation Child

13   Laborers is between 8,000 and 10,000 members.

14

15   82.    There are questions of law and fact common to the class. Key common questions

16   include, but are not limited to, the following:

17       a. Whether the Plantation Worker Plaintiffs and the Proposed Class Members

18       were subjected to forced labor in violation of "the law of nations" provision of the

19       ATS;

20

21       b. Whether the Plantation Child Laborers were forced to work against their will

22       also in violation of the international prohibitions on using child labor, both of

23       which would be in violation of "the law of nations" provision of the ATS;

24       c. Whether Defendant parent corporations knowingly caused and/or aided and

25       abetted the forced labor and child labor imposed on Plaintiffs by either providing

26       logistical support to the Firestone Plantation and/or failing to take adequate action

27

28

- 35 -

to prevent and stop such forced and child labor;

83.     The claims of both the Plantation Workers and the Plantation Child Laborers are typical of the claims of the classes they seek to represent. They seek redress for the same conduct that has affected all class members and press legal claims which are the same for all class members.

84.     The  Plantation Workers and the Plantation Child Laborers named herein will fairly and adequately represent the class.  These Plaintiffs do not have conflicts of interest with members of the class and have retained counsel who are experienced in complex litigation, including class actions and international litigation, who will vigorously prosecute this action.

85.     A class action is the superior method for adjudication of this controversy.  In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions.  Moreover, if a class is not certified, many meritorious claims will go un-redressed as the individual class members are not able to prosecute complex litigation against large defendant corporations. Finally, given the lack of an adequate forum for these claims in Liberia, it would be logistically and financially impossible for the thousands of class members to each bring an individual action in the courts of the U.S.

## X. DEFENDANTS' VIOLATIONS OF LAW

86.     The causes of action maintained herein arise under and violate the following laws, agreements, conventions, resolutions and treaties:

a. Alien Tort Statute (ATS), 28 U.S.C § 1350;

b. Protocol Amending the Slavery Convention, done Dec. 7, 1953, 7 U.S.T. 479

c. International Labour Organisation Convention No. 29 Concerning Forced or

compulsory Labor (1930), 39 U.N.T.S. 55 (<u>entered into force</u> May 1, 1932);

d. International Labour Organisation Convention No. 105 Concerning the Abolition of

Forced Labour Convention;

e. International Labour Organisation (ILO) Convention 138 on Minimum Age for

Employment (1973) 1015 U.N.T.S. 297 (<u>entered into force</u> June 19, 1976);

f. ILO Convention 182 on the Worst Forms of Child Labour (1999) 38 I.L.M. 1207

(<u>entered into force</u> November 19, 2000);

g. United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

h. Universal Decl. of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

i. International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21

U.N.Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

j. Customary international law;

k. Federal Common and Statutory Law, including the United States Constitution;

l. California state law, including the Code of Business & Professional Conduct,  17200,

*et. seq;*

m. the labor laws of Liberia.


## XII.  CLAIMS FOR RELIEF

### COUNT I

**FORCED LABOR BY ALL PLANTATION WORKERS AGAINST ALL DEFENDANTS
THE ALIEN TORT STATUTE, 28 U.S.C. § 1350**

87.     The Plantation Worker Plaintiffs incorporate by reference paragraphs 1 to 86 of

this Complaint as if fully set forth herein.

88.     The Plantation Worker Plaintiffs were placed in fear for their lives, were

1  deprived of their freedom, and were forced to suffer severe physical and/or mental abuse

2  designed to coerce them into working on the Firestone Plantation despite the horrible conditions

3  they faced.

4      89.    Defendants' use of forced labor under these conditions violates the law of nations,

5  customary international law, and worldwide industry standards and practices, including, but not

6

7  limited to, those identified in paragraph 86.

8      90.    To the extent necessary, Defendants' actions occurred under color of law and/or in

9  conspiracy or on behalf of those acting under color of official authority, such that the injuries

10  inflicted on these Plaintiffs as a result of the forced labor were inflicted deliberately and

11  intentionally through the acts and/or omission of responsible state officials and/or their agents.

12
       91.    The Government of Liberia has a partial stake in the Harbel plantation, making it
13
    a co-venturer, and through its knowledge of conditions it daily ratifies the acts alleged herein.
14
15  Moreover, the plantation is protected by government officials either through the provision of

16  security services or through payments made to such officials that allows the plantation to

17  continue the use of forced labor of the Plaintiffs.

18      92.    Defendants' conduct in violation of customary international law has caused the

19  Plantation Worker Plaintiffs significant injury, and these Plaintiffs will continue to experience

20
    pain and suffering, and extreme and severe mental anguish and emotional distress.
21

22      93.    The conduct of Defendants was malicious, fraudulent and/or oppressive, and was

23  done with a willful and conscious disregard for the Plantation Worker Plaintiffs' rights. The

24  Plantation Worker Plaintiffs are thereby entitled to compensatory and punitive damages in

25  amounts to be proven at trial.

26

27

28
                                          - 38 -

**COUNT II**

**FORCED LABOR BY ALL CHILD PLANTATION LABORERS AGAINST ALL DEFENDANTS**
**THE ALIEN TORT STATUTE, 28 U.S.C. § 1350**

94.     The Plantation Child Laborer Plaintiffs incorporate by reference paragraphs 1 to 93 of this Complaint as if fully set forth herein.

95.     The Plantation Child Laborer Plaintiffs were placed in fear for their lives, were deprived of their freedom, and forced to suffer severe physical and/or mental abuse.

96.     Defendants' use of forced labor under these conditions violates the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, those identified in paragraph 86. As children, the plaintiffs could not consent to this work. Moreover, even if they could consent, they were in all relevant instances coerced to labor by concrete threats of starvation and displacement.

97.     To the extent necessary, Defendants' actions occurred under color of law and/or in conspiracy or on behalf of those acting under color of official authority, such that the injuries inflicted on these Plaintiffs as a result of the forced labor were inflicted deliberately and intentionally through the acts and/or omissions of responsible state officials and/or their agents. The Government of Liberia has a partial stake in the Harbel plantation, making it a co-venturer, and through its knowledge of conditions it daily ratifies the acts alleged herein. Moreover, the plantation is protected by government officials, either through the provision of security services or through payments made to such officials, that allows the plantation to continue the use of forced child labor.

98.     Defendants' conduct in violation of customary international law has caused the Plantation Child Laborer Plaintiffs significant injury, and these Plaintiffs will continue to

- 39 -

1 experience pain and suffering, and extreme and severe mental anguish and emotional distress.

2     99.    The conduct of Defendants was malicious, fraudulent and/or oppressive, and was

3 done with a willful and conscious disregard for the Plantation Child Laborer Plaintiffs' rights.

4 These Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be

5 proven at trial.

6

7 **COUNT III**

8

## CRUEL, INHUMAN, OR DEGRADING TREATMENT
9 ## BY ALL PLANTATION WORKER PLANTIFFS
## AGAINST ALL DEFENDANTS
10 ## THE ALIEN TORT STATUTE, 28 U.S.C. § 1350

11     100.    The Plantation Worker Plaintiffs incorporate by reference paragraphs 1 to 99 of

12 this Complaint as if fully set forth herein.

13

14     101.    The acts described herein had the intent and the effect of grossly humiliating and

15 debasing the Plantation Worker Plaintiffs, forcing them to act against their will and conscience,

16 inciting fear and anguish, and breaking their physical and/or moral resistance.

17     102.    Defendants' actions forced the Plantation Worker Plaintiffs against their will and

18 under fear of harm, to labor for Defendants' economic benefit, and in doing so, the Plantation

19 Worker Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and

20 psychological abuse and agony.

21

22     103.    In acting through the implicit sanction of the state, Defendants acted under color

23 of law and/or in conspiracy or on behalf of those acting under color of official authority, and the

24 injuries inflicted on the Plantation Worker Plaintiffs as a result of the cruel, inhuman and

25 degrading treatment were inflicted deliberately and intentionally through the acts or omissions of

26 responsible state officials and/or their agents. The Government of Liberia has a partial stake in

27

28

-40-

1  the Harbel plantation, making it a co-venturer, and through its knowledge of conditions it daily

2  ratifies the acts alleged herein.  Moreover, the plantation is protected by government officials,

3  either through the provision of security services or through payments made to such officials, and

4  this allows the Plantation to continue the use of forced labor.

5        104.    The acts described herein constitute cruel, inhuman or degrading treatment in

6

7  violation of the law of nations under the ATS. The Plantation Worker Plaintiffs are thereby

8  entitled to compensatory and punitive damages in amounts to be proven at trial.

9

10

11

12

13  **COUNT IV**

14
15
16  **CRUEL, INHUMAN, OR DEGRADING TREATMENT**
**BY ALL PLANTATION CHILD LABORER PLANTIFFS**
**AGAINST ALL DEFENDANTS**
**THE ALIEN TORT STATUTE, 28 U.S.C. § 1350**

17        105.    The Plantation Child Laborer Plaintiffs incorporate by reference paragraphs 1 to

18  104 of this Complaint as if fully set forth herein.

19        106.    The acts described herein had the intent and the effect of grossly humiliating and

20  debasing the Plantation Child Laborer Plaintiffs, forcing them to act against their will and

21

22  conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

23        107.    Defendants' actions forced the Plantation Child Laborer Plaintiffs against their

24  will and under fear of harm, to labor for Defendants' economic benefit, and in doing so, the

25  Plantation Child Laborer Plaintiffs were placed in great fear for their lives, and were forced to

26

27  - 41 -

28

1  suffer severe physical and psychological abuse and agony.

2  108.  In acting through the implicit sanction of the state, Defendants acted under color

3  of law, and/or in conspiracy, or on behalf of those acting under color of official authority.

4  Accordingly, the injuries inflicted on the Plantation Child Laborer Plaintiffs as a result of the

5  cruel, inhuman and degrading treatment were inflicted deliberately and intentionally through the

6

7  acts or omissions of responsible state officials and/or their agents. The Government of Liberia

8  has a partial stake in the Harbel plantation, making it a co-venturer, and through its knowledge of

9  conditions it daily ratifies the acts alleged herein. Moreover, the Plantation is protected by

10  government officials either through the provision of security services or through payments made

11  to such officials, and this allows the Plantation to continue the use of forced child labor.

12  109.  The acts described herein constitute cruel, inhuman or degrading treatment in

13  violation of the law of nations under the ATS. The Plantation Child Laborer Plaintiffs are thereby

14

15  entitled to compensatory and punitive damages in amounts to be proven at trial.

16

17  **COUNT V**

18  **FORCED LABOR BY ALL PLANTATION WORKER PLAINTIFFS**
**AGAINST ALL DEFENDANTS**

19  **UNITED STATES CONSTITUTION AMENDMENT XIII**

20

21  110.  The Plantation Worker Plaintiffs incorporate by reference paragraphs 1 to 109 of

22  this Complaint as if fully set forth herein.

23  111.  The Plantation Worker Plaintiffs were knowingly recruited, harbored, transported,

24  provided, or obtained by Defendants, or those acting in concert with them, for the purpose of

25  forcing them to work on the Bridgestone Group Harbel, Liberia rubber plantation.

26

27  - 42 -

28

112. The labor of the Plantation Worker Plaintiffs was knowingly provided or obtained by Defendants, or those acting in concert with them, by means of severe physical and/or mental abuse and restraint against them and other persons, or by schemes, plans, patterns, and duress intended to induce fear of severe physical and/or mental abuse and restraint against them and other persons.

113. The conduct of Defendants was malicious, fraudulent and/or oppressive and done with a willful and conscious disregard for the Plantation Worker Plaintiffs' rights.

114. Through such actions, Defendants and those working in concert with them violated the Thirteenth Amendment to the United States Constitution. The Plantation Worker Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial, and reasonable attorneys fees.

## COUNT VI

### FORCED LABOR BY ALL PLANTATION CHILD LABORER PLAINTIFFS AGAINST ALL DEFENDANTS
### UNITED STATES CONSTITUTION AMENDMENT XIII

115. The Plantation Child Laborer Plaintiffs incorporate by reference paragraphs 1 to 114 of this Complaint as if fully set forth herein.

116. The Plantation Child Laborer Plaintiffs were knowingly recruited, harbored, transported, provided, or obtained by Defendants, or those acting in concert with them, for the purpose of forcing them to work on the Bridgestone Group Harbel, Liberia rubber plantation.

117. The labor of the Plantation Child Laborer Plaintiffs was knowingly provided or obtained by Defendants, or those acting in concert with them, by means of severe physical and/or

- 43 -

mental abuse and restraint against them and other persons, or by schemes, plans, patterns, and duress intended to induce fear of severe physical and/or mental abuse and restraint against them and other persons.

118.   The conduct of Defendants was malicious, fraudulent and/or oppressive, and was done with a willful and conscious disregard for the Plantation Child Laborer Plaintiffs' rights.

119.   Through such actions, Defendants and those working in concert with them, violated the Thirteenth Amendment to the United States Constitution. The Plantation Child Laborer Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial, and reasonable attorneys fees.

## COUNT VII

## FORCED LABOR BY ALL PLANTATION WORKER PLAINTIFFS AGAINST ALL DEFENDANTS
## 18 U.S.C. §§1589, 1590, 1595

120.   The Plantation Worker Plaintiffs incorporate by reference paragraphs 1 to 119 of this Complaint as if fully set forth herein.

121.   The Plantation Worker Plaintiffs were knowingly recruited, harbored, transported, provided, or obtained by Defendants, or those acting in concert with them, for the purpose of forcing them to work on the Bridgestone Firestone Group's  Harbel, Liberia rubber plantation.

122.   The labor of the Plantation Worker Plaintiffs was knowingly obtained by Defendants, or those acting in concert with them, by means of severe physical and/or mental

- 44 -

abuse and restraint against them and other persons, or by schemes, plans, patterns, and duress intended to induce fear of severe physical and/or mental abuse and restraint against them and other persons.

123.    The conduct of Defendants was malicious, fraudulent and/or oppressive, and was done with a willful and conscious disregard for the Plantation Worker Plaintiffs' rights.

124.    Through such actions, Defendants, and those working in concert with them, violated 18 U.S.C. §§ 1589, 1590, and 1595. The Plantation Worker Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial, and reasonable attorneys fees.

## COUNT VIII

### FORCED LABOR BY ALL PLANTATION CHILD LABORERS PLAINTIFFS AGAINST ALL DEFENDANTS
### 18 U.S.C. §§ 1589, 1590, 1595

125.    The Plantation Child Laborer Plaintiffs incorporate by reference paragraphs 1 to 124 of this Complaint as if fully set forth herein.

126.    The Plantation Child Laborer Plaintiffs were knowingly recruited, harbored, transported, provided, or obtained by Defendants, or those acting in concert with them, for the purpose of forcing them to work on the Bridgestone Firestone Group's Harbel, Liberia rubber plantation.

127.    The labor of the Plantation Child Laborer Plaintiffs was knowingly obtained by

- 45 -

Defendants, or those acting in concert with them, by means of severe physical and/or mental abuse and restraint against them and other persons, or by schemes, plans, patterns, and duress intended to induce fear of severe physical and/or mental abuse and restraint against them and other persons.

128. The conduct of Defendants was malicious, fraudulent and/or oppressive, and was done with a willful and conscious disregard for the Plantation Child Laborer Plaintiffs' rights.

129. Through such actions, Defendants, and those working in concert with them, violated 18 U.S.C. §§ 1589, 1590, and 1595. The Plantation Child Laborer Plaintiffs are thereby entitled to compensatory and punitive damages in amounts to be proven at trial, and reasonable attorneys fees.

## COUNT IX

## NEGLIGENCE AND RECKLESSNESS
## BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

130. Plaintiffs incorporate by reference paragraphs 1 to 129 of this Complaint as if fully set forth herein.

131. Defendants owed a duty to the Plaintiffs to exercise due care in conducting its international ventures. Defendants breached their duty of care by engaging in business activities which failed to adequately monitor and prevent the use of forced labor and forced child labor on the Firestone Plantation from which they obtain rubber and latex.

132. Defendants knew, or should have known, through due diligence, that the use of

- 46 -

1  forced labor and forced child labor was prevalent in the West Africa region and was likely to be
2  used on the Firestone Plantation in Liberia. Defendants were surely aware of their own history
3  concerning the genesis of the Firestone Plantation and the use of forced labor at the outset of the
4  Plantation operation. Further, Defendants have had on-site mangers in place on their Plantation
5  since the outset, including Defendant Stuart who is the current manager, and have specific
6
7  knowledge of the abysmal conditions on the Plantation. In addition, more recent documented
8  reports of forced child labor in the region were publicly available as early 1994. Accordingly,
9  Defendants knew, or should have known, that specific and concrete actions would be necessary
10  to ensure compliance with local law and with international human rights conventions that
11  prohibit the use of forced labor.
12
13  133.    As a direct and proximate result of Defendants' breaches of duties, Plaintiffs have
14  suffered injuries to their persons as described herein. Such Plaintiffs are thereby entitled to
15  compensatory and punitive damages in amounts to be ascertained at trial.

16  ## COUNT X

17  ### UNJUST ENRICHMENT
18  ### BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

19  134.    Plaintiffs incorporate by reference paragraphs 1 to 133 of this Complaint as if set
20  forth herein.

21  135.    As a result of the forced labor practices utilized by Defendants on the Firestone
22  Plantation from which Defendants obtain rubber and latex, Defendants received benefits by being
23  able to obtain rubber and latex at a significantly lower cost as the Plantation's labor costs were
24  greatly diminished by reliance on the systematic use of forced labor and forced child labor, which
25  is unlawful under international law, the law of Liberia and the law of California.
26
27  - 47 -
28

1      136.   Defendants' conduct thereby constitutes unjust enrichment, and Defendants are

2   under a duty of restitution to the Plaintiffs for the benefits unlawfully received from Defendants'

3   wrongful conduct.

4

5

6                                          **COUNT XI**

7   **VIOLATION OF CALIFORNIA CODE OF BUSINESS & PROFESSIONAL CONDUCT**
    **PRACTICE LAW §17200, *et. seq;***
8   **BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

9      137.   Plaintiffs incorporate by reference paragraphs 1 to 136 of this Complaint as if set

10  forth herein.

11     138.   The conduct of the Defendants has and continues to be detrimental to the general

12  public, and Plaintiffs are seeking to enforce important rights affecting the public interest within

13  the meaning of the California Code of Civil Procedure § 1021.5.

14

15     139.   The fraudulent and deceptive practices of Defendants alleged herein constitute

16  ongoing and continuous unfair business practices within the meaning Business and Professional

17  Conduct Practice Law §17200. Such practices include, but are not limited to, the knowing use of

18  forced child labor in the cultivating and harvesting of rubber and latex on the Firestone

19  Plantation, and the making of material misrepresentations and omissions denying these unlawful

20  acts, whether directly or indirectly, to the public.

21

22     140.   These material misrepresentations and omissions include, but are not limited to:

23  the September 2005 directive, knowingly false when issued, and done only as a public relations

24  ploy, that pretends to prohibit the use of child labor, other statements made to either deny the use

25  of forced child labor and/or to create the false impression that the problem of forced child labor

26

27                                          - 48 -

28

1 | was being adequately addressed by Defendants.

2 | 141. The conduct as alleged herein constitutes a violation of California laws relating to

3 | labor practices, criminal statutes, as well as obligations under customary international law. The

4 | use of such unfair, illegal, and forced labor and forced child labor creates an unfair business

5 | advantage over competitors within California and the United States, and members of the public

6 |
7 | have been in the past and will likely be in the future damaged by these practices, as such persons

8 | were falsely made to believe that the rubber- and latex-derived products produced by Defendants

9 | were either not made with child labor and/or that the use of child labor was being adequately

10 | addressed.

11 | 142. Plaintiffs therefore collectively seek injunctive relief, disgorgement of all profits

12 | resulting from these unfair business practices, restitution and other appropriate relief on behalf of

13 |
14 | themselves and members of the general public as provided in Business and Professions Code

15 | §17203.

16 | **COUNT XII**

17 | **NEGLIGENT HIRING AND SUPERVISION**
**BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**
18 |

19 | 143. Plaintiffs incorporate by reference paragraphs 1 to 142 of this Complaint as if

20 | fully set forth herein.

21 | 144. As a regular part of its international supply chain for natural rubber and latex, the

22 | Bridgestone Firestone Defendants selected, hired, retained and contracted with Plantation

23 | Overseers to run the day-to-day operations of the Harbel Plantation in Liberia in order to produce

24 |
25 | rubber and latex for goods sold nearly entirely in the U.S., including in California.

26 |

27 | - 49 -

28 |

145. Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting with the Plantation Overseers. At the time that Defendants selected, hired, retained and contracted with these Overseers, and at all other relevant times, Defendants knew, or reasonably should have known, that these Overseers would violate Plaintiffs' rights and that, as a direct and proximate result of those violations, Plaintiffs would suffer injuries as alleged herein.

146. Bridgestone Firestone Defendants knew or reasonably should have known that its Plantation Overseers would violate Plaintiffs' rights, and that, as a direct and proximate result of those violations, the Plaintiffs would suffer injuries as alleged herein.

147. As a direct and proximate result of the Defendants' negligent selection, hiring, retention and contracting with the Plantation Overseers identified herein, as well as the subsequent failure to supervise them, Plaintiffs have suffered, and continue to suffer, injuries entitling them to damages in amounts to be proven at trial.

## XIII.   DEMAND FOR JURY TRIAL

148. Plaintiffs demand a trial by jury on all issues so triable.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to:

    (a)   enter judgment in favor of the Plaintiffs on all counts of the Complaint;

    (b)   award the Plaintiffs compensatory and punitive damages;

    (c)   grant the Plaintiffs equitable relief including, but not limited to, an

- 50 -

1               injunction prohibiting further damage to their persons, and their

2               rights under the laws of California and customary international

3               law;

4        (d)   award all Plaintiffs injunctive relief, disgorgement of all profits

5               resulting from these unfair business practices alleged herein such

6

7               that restitution is made to the general public;

8        (e)    award Plaintiffs the costs of suit including reasonable attorneys

9               fees; and

10       (f)    award Plaintiffs such other and further relief as the Court deems

11              just and equitable under the circumstances.

12

13

14     Respectfully submitted on this 17th day of November, 2005 by:

15

16

17

18

19                      Terry Collingsworth, *Esq.* (DC Bar # 471830)
                        INTERNATIONAL LABOR RIGHTS FUND

20

21

22

23

24                      Paul Hoffman, *Esq.* (S.B. # 71244)

25                      SCHONBRUN, DeSIMONE, SEPLOW, HARRIS
                      & HOFFMAN LLP

26

27                             - 51 -

28