UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN ROE I, *et al.*,                )
                                     )
            Plaintiffs,              )
                                     )
      v.                             )   CASE NO. 1:06-cv-0627-DFH-JMS
                                     )
BRIDGESTONE CORPORATION, *et al.*,   )
                                     )
            Defendants.              )

ENTRY ON DEFENDANTS' MOTION TO DISMISS

Plaintiffs are adults and children who work on a rubber plantation in the
West African nation of Liberia.  Based on allegations of forced labor, forced child
labor, poor working conditions, and low wages, plaintiffs seek damages from the
Japanese, American, and Liberian companies and two individuals that own and
control the plantation.  Plaintiffs seek relief in the federal courts of the United
States.  Their twelve-count Complaint asserts claims under international law
pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, the Thirteenth Amendment
to the United States Constitution, a federal statute authorizing civil actions for
criminal forced labor violations, 18 U.S.C. § 1595, and California law.


The plaintiffs originally filed this action in the Central District of California.
That court granted the plaintiffs' motion to proceed using pseudonyms.
Defendants filed a motion to transfer venue to the Southern District of Indiana

and a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The Central District of California granted the motion to transfer venue under 28 U.S.C. § 1404(a) based on the case's lack of connection to California and the fact that two defendants are headquartered or reside in the Southern District of Indiana. The California court did not address the motion to dismiss.

For the reasons explained in detail below, the defendants' motion to dismiss all claims for lack of subject matter jurisdiction is denied. The motion to dismiss for failure to state a claim is granted with respect to Count One and Counts Three through Twelve and denied with respect to Count Two, the child labor claim under international law.

The adult plaintiffs' principal claim for forced labor in violation of international law is undermined by plaintiffs' own allegations that they are afraid of *losing* the same jobs they claim they are being forced to perform. Forced labor cannot be equated with only low wages and difficult working conditions, which are all too common throughout the world. Some forms of truly forced labor violate specific, universal and obligatory norms of international law, but the circumstances alleged by the adult plaintiffs in this case do not. See generally *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732-33 (2004) (explaining that the Alien Tort Statute is available to enforce a narrow class of specific, universal, and obligatory norms of international law). The Count Two claims of at least some of

the child plaintiffs under international law survive the motion to dismiss. Plaintiffs allege that the defendants are actively encouraging parents to require children as young as six, seven, and ten years old to work full-time at heavy and dangerous jobs on defendants' plantation tapping raw latex from rubber trees. As applied to the alleged working conditions for these young children, international law is sufficiently specific, universal, and obligatory to permit relief under the Alien Tort Statute. See International Labour Organisation ["ILO"], Worst Forms of Child Labour Convention (No. 182), June 17, 1999, 38 I.L.M. 1207, *available at* http://www.ilo.org/ilolex/english/convdisp1/htm (last visited June 25, 2007), Docket No. 2-85, Exhibit D (hereinafter "ILO Convention 182").

I.    *The Parties*

The Firestone Rubber Plantation ("the Plantation") near Harbel, Liberia is the world's largest rubber plantation. The Plantation was founded in 1926 under an agreement between the Firestone Tire and Rubber Company and the Liberian government, with what might be called strong encouragement from the United States government. All of the raw latex produced at the Plantation is sold to or otherwise controlled by other Bridgestone Firestone companies.

Plaintiffs John Roe I through John Roe XII are adults who work as latex "tappers" on the Plantation. They cut into the rubber trees and collect the raw latex for eventual processing into tires and other rubber products. Plaintiffs James Roe I through James Roe XV and Jane Roe I through Jane Roe VIII are

children who have assisted their parents or other family members in work at the Plantation. The child plaintiffs range in age from six to sixteen years old. Plaintiffs seek to represent two plaintiff classes. The first proposed class is all adults who worked as tappers on the Plantation at any time between November 17, 1995 and the present under the conditions described in the Complaint. Compl. ¶ 79. (Claims under the Alien Tort Statute, 28 U.S.C. § 1350, have been held subject to a ten-year statute of limitations. *E.g., Jean v. Dorelien*, 431 F.3d 776, 778-79 (11th Cir. 2005).) The second proposed class is all persons who, during the period November 17, 1995 through the present, "were forced as children to work on the Firestone Plantation so that their families could meet their quota and be paid enough to allow the family to avoid starvation." Compl. ¶ 80.[1]

The named defendants are Bridgestone Corporation; Bridgestone Americas Holding, Inc.; Bridgestone Firestone North American Tire, LLC; BFS Diversified

---

[1]The plaintiffs' definitions of the proposed classes incorporate elements of the merits of their claims and thus have an improper "fail-safe" character. See *Bledsoe v. Combs*, 2000 WL 681094, *4 (S.D. Ind. March 14, 2000) (denying class certification where determination of a person's membership would require determination of merits of claim); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1169 (S.D. Ind. 1997) (denying class certification where determining class membership would require individualized determination on the merits of the claim); *Indiana State Employees Ass'n v. Indiana State Highway Comm'n*, 78 F.R.D. 724, 725 (S.D. Ind. 1978) (denying class certification where "it would be impossible for the Court to ascertain whether or not a given person is a member of the class until a determination of ultimate liability as to that person is made"); *Dafforn v. Rousseau Associates, Inc.*, 1976-2 Trade Cas. (CCH) ¶ 61,219 (N.D. Ind. 1976) (denying certification of proposed "fail-safe" class defined as all persons who paid illegally fixed brokerage fees). These matters of class definition may be addressed later, as needed.

Products, LLC; Firestone Polymers, LLC; Firestone Natural Rubber Company, LLC; the Firestone Plantation Company; Daniel J. Adomitis; and Charles Stuart.[2]

Bridgestone Corporation is headquartered in Japan and is the world's largest manufacturer of tires and other rubber products.  Defendant Bridgestone Americas Holding, Inc. is a wholly-owned subsidiary of Bridgestone Corporation and has its headquarters in Nashville, Tennessee.  Defendant Bridgestone Firestone North American Tire, LLC, is a subsidiary of Bridgestone Americas Holding, Inc. and also has headquarters in Nashville.

BFS Diversified Products, LLC is another subsidiary of Bridgestone Americas Holding, Inc. and has its headquarters in the Southern District of Indiana.  Defendant Firestone Polymers, LLC is in turn a subsidiary of BFS Diversified Products, LLC and has its headquarters in Ohio.

Firestone Natural Rubber Company, LLC is a Delaware company described in the Complaint as a "division" of BFS Diversified Products, LLC.[3]  Firestone Plantation Company is a Liberian subsidiary of Firestone Natural Rubber Company, LLC, and also has control of the Plantation.  The concession agreement

---

[2]The only defendants who have been served with process are Bridgestone Americas Holdings, Inc., Bridgestone Firestone North American Tire, LLC, BFS Diversified Products, LLC, and Firestone Natural Rubber Company, LLC.  See Def. Mem. at 1 n.1.

[3]These descriptions of defendants and the relationships among them are taken from the Complaint and are not as precise as they might become at a later stage of the case.

governing the Plantation is an agreement among the government of Liberia, Firestone Natural Rubber Company, LLC, and Firestone Plantation Company. See Adomitis Aff., Ex. A. (Docket No. 2-26.)

Defendant Daniel J. Adomitis is the president of Firestone Natural Rubber Company, LLC and senior counsel in the legal department of Bridgestone Americas Holding, Inc. He signed the 2005 concession agreement with Liberia. Plaintiffs allege that Adomitis is involved in the day-to-day operation of the Plantation and the shipping and distribution network that brings the latex to the United States. Defendant Charles Stuart is the president and managing director of Firestone Plantation Company, the Liberian subsidiary. He also signed the concession agreement with Liberia. Plaintiffs allege that he is the on-site manager of the Plantation.

II.     *The Claims*

As detailed below, the Complaint describes working conditions at the Plantation. Based on those allegations, plaintiffs have asserted twelve counts against all the defendants, claiming that each defendant is responsible for all of the alleged wrongs.

Count One seeks relief under the Alien Tort Statute, 28 U.S.C. § 1350, on behalf of the adult plaintiffs on the theory that defendants violated the law of nations by forcing the plaintiffs to work at the Plantation. Plaintiffs rely on the

ILO Forced Labour Convention (No. 29), June 28, 1930, 39 U.N.T.S. 55, *available at* http://www.ilo.org/ilolex/english/convdisp1.htm (last visited June 25, 2007), Docket No. 2-78, Exhibit A (hereinafter "ILO Convention 29"); ILO Abolition of Forced Labour Convention (No. 105), June 26, 1957, 320 U.N.T.S. 291, *available at* http://www.ilo.org/ilolex/english/convdisp1.htm (last visited June 25, 2007), Docket No. 2-79 (hereinafter "ILO Convention 105"); the United Nations Charter; the Universal Declaration of Human Rights, G.A. Res. 217A, U.N. GAOR, ed Sess., 1st plen. mtg., U.N. Doc A/810 (Dec. 10, 1948), *available at* http://www.unhchr.ch/udhr/lang/eng.htm (last visited June 25, 2007); the International Covenant on Civil and Political Rights, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* March 23, 1976, *available at* http://www.ohchr.org/english/law/ccpr.htm, (last visited June 25, 2007); and customary international law.  Plaintiffs also refer to the labor laws of Liberia and of California, where they originally filed the action.  Count Two is a parallel claim by the child plaintiffs for forced labor, which also relies on ILO Convention 182 on the Worst Forms of Child Labour and ILO Minimum Age Convention (No. 138), (June 17, 1973), *available at* http://www.ilo.org/ilolex/english/convdisp1.htm (last visited June 25, 2007), Docket No. 2-39, Baxter Decl. Ex. D (hereinafter "ILO Convention 138").

Count Three seeks relief under the Alien Tort Statute on behalf of the adult plaintiffs for cruel, inhuman, or degrading treatment in violation of the customary law of nations.  Count Four is a parallel claim by the child plaintiffs.

Count Five alleges a claim by the adult plaintiffs for forced labor directly under the Thirteenth Amendment to the United States Constitution.  Count Six is a parallel claim by the child plaintiffs.

Count Seven seeks relief for the adult plaintiffs under 18 U.S.C. § 1595, which authorizes a civil remedy for criminal violations of United States forced labor laws, 18 U.S.C. §§ 1589 & 1590.  Count Eight is a parallel claim by the child plaintiffs.

Count Nine asserts claims for negligence and recklessness on behalf of all plaintiffs against all defendants, apparently under California law, based on the foregoing allegations of violations of international law and United States law, as well as some Liberian laws.  Count Ten alleges a claim for unjust enrichment by all plaintiffs against all defendants, also under California law.  Count Eleven alleges a claim by all plaintiffs against all defendants for violating the California Code of Business & Professional Conduct Practice Law, § 17200 *et seq.*  Count Twelve alleges a claim by all plaintiffs against all defendants under California law for negligent hiring and supervision for the foregoing alleged violations of international law, United States law, and Liberian law.

III.    *The Factual Allegations*

The Complaint alleges that after the Liberian government leased the Plantation to Firestone Tire and Rubber Company in 1926, indigenous people were forced from their land and were then conscripted to provide forced labor, first planting and cultivating rubber trees and then harvesting latex from the mature trees.  ¶ 40.  The Complaint alleges that Firestone agreed to pay local chiefs to deliver able-bodied workers to the Plantation, and that the local chiefs conscripted workers at gunpoint.  ¶ 42.  According to the Complaint, plaintiffs and most other current workers on the Plantation are third or fourth generation descendants of those original workers, and these plaintiffs have rarely if ever left the Plantation.

The adult plaintiffs work as tappers on the Plantation.  The tappers use a machete to cut a rubber tree to allow the raw latex to drip into a cup mounted on the tree.  The tapper collects the latex from the cups and dumps them into a large bucket that weighs 75 pounds when full.  When two buckets are full, the tapper hangs one bucket on each end of a branch and carries the 150 pounds of latex to a collection location.  ¶ 45.  The tappers also apply fertilizers and pesticides to the trees.  They do so by hand, without warnings or safety equipment.  *Id.*

The Complaint alleges that payment for the tappers is based on a "task," which is a section of approximately 750 rubber trees.  To earn a daily wage equivalent to $3.19 (U.S.), the tapper must tap one complete task of 750 trees and half of a second task, or another 375 trees.  If the tapper completes 750 trees but

not the additional 375 trees, he is paid only half of the daily wage, or $1.59. Plaintiffs allege that the difference between $3.19 and $1.59 per day is the difference between subsistence and starvation, and they say that earning $3.19 is physically impossible for one adult without unpaid help from children. ¶¶ 47-48. Plaintiffs allege that the Plantation managers and overseers know that the quotas effectively require child labor and have encouraged plaintiffs who complain about the quotas to use their children to help meet the quotas. ¶ 55.

Plaintiffs allege that tappers do not have any days off for worship, family, or other reasons. They receive no paid holidays or sick days. "Because of the relentless production requirements at the Firestone Plantation, even workers who are willing to forgo a day's pay to get a day off are not able to and are told they will be dismissed if they do so. The extremely high unemployment rate in Liberia, in the rural areas above 80%, allows Firestone to say with confidence that anyone who wants to leave can do so and join the ranks of the starving unemployed." ¶ 49.

Plaintiffs also allege that Firestone does not give them any formal letter of employment, so that they can be treated as "casual labor" who can be fired for any reason. ¶ 59. Plaintiffs allege that this is a violation of Liberian law that Firestone uses to keep the workers in line. (The allegation is consistent with the doctrine of employment at will that dominates private employment in Indiana and many other states. See *Meyers v. Meyers*, 861 N.E.2d 704, 706 (Ind. 2007) ("Indiana

generally follows the employment at will doctrine, which permits both the employer and the employee to terminate the employment at any time for a 'good reason, bad reason, or no reason at all.'").)

According to the Complaint, Firestone provides medical care in clinics and schools for children on the Plantation. Plaintiffs complain that the clinics are open only three days a week and that the schools charge fees that are deducted from the workers' wages. ¶¶ 50-51. Company stores sell food and other goods on the Plantation. The plaintiffs complain that after deductions for food and other charges, they are left with virtually nothing at the end of a month. Firestone also provides housing for workers that plaintiffs describe as shacks in shanty-towns, without plumbing or electricity. ¶¶ 52, 55.

In the oral argument on the motion to dismiss, plaintiffs' counsel emphasized the physical isolation of the Plantation, which makes it difficult and dangerous for any Plantation worker to try to leave if he wanted to do so. Liberia does not have much by way of public transportation even if a worker were able to buy a ticket. A worker who wishes to leave the Plantation faces a long and dangerous walk. Plaintiffs argue that defendants have exploited this isolation by refusing to improve wages and working conditions, since workers do not have a practical alternative to continued work at the Plantation.

Liberia experienced a generation of coups d'état, civil war, and turmoil from approximately 1980 to 2003. Firestone managed to keep the Plantation open and productive through most of that time, but production stopped for several years. The Plantation was certainly affected by the fighting. The Complaint alleges that in 1994, Firestone appointed as the chief of security for the Plantation General Adolphus Dolo, who had been loyal to President Charles Taylor. ¶ 62. (Taylor is currently on trial in The Hague, Netherlands, for alleged war crimes in Sierra Leone.) The Complaint alleges that Firestone hired other associates of Taylor and used its shipping facilities to import arms and ammunition for the Taylor regime. *Id.*

The Complaint summarizes the case as follows:

64.     As the Firestone Plantation was initially created to allow, the Plantation Workers and the Plantation Child Laborers suffer daily injuries from the extremely exploitative practices on the Plantation. The Plantation Workers are modern day slaves, forced to work by the coercion of poverty, with the prospect of starvation just one complaint about conditions away. They are isolated on the Plantation by design, and are completely dependent upon the Firestone Plantation for access to food and for the only homes they have ever known, the one-room shacks in filthy shanty towns provided by the company. The paltry net wage the workers receive ensures that they also do not have the resources for transportation to escape the Plantation. The Plantation Workers are simply fulfilling the destiny planned for them by the founders of the Firestone Plantation in 1926. The original workforce was captured and forced to work for Firestone. Succeeding generations were kept on the Plantation by poverty, fear, and ignorance of the outside world, living in a cycle of poverty and raising their children to be the next generation of Firestone Plantation Workers.

65.     The Plantation Child Laborers are forced to work to avoid the starvation of their families. These young children have not reached the legal age of consent by any definition, and therefore could not possibly agree to become laborers for the Firestone Plantation. They suffer daily the

deprivations of living a slave-like existence, including malnutrition, disease, physical ailments from exposure to chemicals, and the lack of decent educational opportunities.

66.    All of the Plantation Workers seek the simple justice of the freedom to choose whether to work, the opportunity to work free of coercion, the security of a proper employment relationship, the benefit of wages that do not leave them in malnourished poverty, and the meager benefits provided under the law of Liberia, including rest days and holidays.  Most of all, they seek the cessation of conditions that formed the premise of the Firestone Plantation, and that have left them in the same situation as their own fathers, watching their own children join them as tappers with no future other than the misery they have experienced their entire lives.

The overarching questions in this case are whether the wages and working conditions described in the Complaint violate international law, as well as what role, if any, United States courts might have in addressing such wages and working conditions for employees of foreign subsidiaries of global businesses.  The more specific questions in the case are whether the court has jurisdiction over the subject matter and whether plaintiffs have stated claims upon which relief can be granted.  The court addresses in turn the plaintiffs' claims under the Thirteenth Amendment, their claims under 18 U.S.C. § 1595, their claims under the Alien Tort Statute, 28 U.S.C. § 1350, and finally their claims under state law.

IV.    *Rule 12(b)(6) Standard*

Apart from jurisdictional issues discussed below, the defendants' motion must be treated as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.  In deciding the motion, the court must assume as true all well-pleaded facts set

forth in the complaint, construing the allegations liberally and drawing all inferences in favor of the plaintiffs. *E.g.*, *Brown v. Budz*, 398 F.3d 904, 908-09 (7th Cir. 2005). While a complaint need not contain detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, it is not enough merely that there might be some conceivable set of facts which entitle the plaintiffs to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. —, —, 127 S. Ct. 1955, 1968-69 (2007), abrogating in part *Conley v. Gibson*, 355 U.S. 41 (1957). Instead, a plaintiff has an obligation under Rule 8(a)(2) to provide the grounds of his or her entitlement to relief. This obligation requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice. 550 U.S. at —, 127 S. Ct. at 1965. Factual allegations must be enough to raise a right to relief above the speculative level, treating the factual allegations as true. *Id.*

A count may be dismissed under Rule 12(b)(6), however, if it includes particulars that show the plaintiffs cannot possibly be entitled to the relief they seek. *Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994). The court is not obliged to ignore any facts set forth in the complaint that undermine the plaintiffs' claims, nor must the court give any weight to unsupported conclusions of law. *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998), quoting *R.J.R. Services, Inc. v. Aetna Casualty & Surety Co.*, 895 F.2d 279, 281 (7th Cir. 1989). In effect, a plaintiff may plead himself out of court by including factual allegations that defeat his claim for relief. *E.g.*, *Jackson v. Marion County*, 66 F.3d 151, 153-54 (7th Cir. 1995).

-14-

V.      *Thirteenth Amendment Claims*

Section One of the Thirteenth Amendment of the United States Constitution provides:  "Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  In Counts Five and Six of the Complaint, plaintiffs allege that defendants have violated the Thirteenth Amendment by knowingly recruiting, harboring, transporting, providing, or obtaining adult and child plaintiffs for the purpose of forcing them to work on the Plantation by means of severe physical and/or mental abuse and restraint, or by schemes and duress intended to induce fear of severe physical and/or mental abuse and restraint, and that defendants acted with a willful and conscious disregard for the plaintiffs' rights.  Compl. ¶¶ 110-19.

The court has subject matter jurisdiction over these claims based on general federal question jurisdiction, 28 U.S.C. § 1331, regardless of whether plaintiffs have alleged viable claims on the merits.  "[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case."  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998); accord, *Bell v. Hood*, 327 U.S. 678, 682 (1946) (jurisdiction not defeated by possibility that allegations "might fail to state a cause of action on which petitioners could actually recover").

Defendants argue that the Thirteenth Amendment claims must be dismissed for two reasons: first, the Thirteenth Amendment does not itself provide a private right of action for damages; second, the Thirteenth Amendment itself does not reach conduct outside the United States. The court agrees with defendants on both points without reaching defendants' additional arguments on whether the alleged conditions on the Plantation in Liberia would violate the Thirteenth Amendment if it were located in the United States.

A.     *No Implied Right of Action for Damages*

Although the question does not arise frequently, federal district courts have consistently held that the Thirteenth Amendment itself does not provide a private right of action for damages. See, *e.g.*, *Bhagwanani v. Howard Univ.*, 355 F. Supp. 2d 294, 301 & n.5 (D.D.C. 2005); *Jane Doe I v. Reddy*, No. C-02-05570, 2003 WL 23893010, at *10 (N.D. Cal. Aug. 4, 2003) (granting motion to dismiss); *Doe I v. The Gap, Inc.*, No. CV-01-0031, 2001 WL 1842389, at *16-18 (D. N. Mar. I. Nov. 26, 2001) (granting motion to dismiss); *Del Elmer v. Metzger*, 967 F. Supp. 398, 402 (S.D. Cal. 1997) (granting motion to dismiss); *Holland v. Board of Trustees of Univ. of District of Columbia*, 794 F. Supp. 420, 424 (D.D.C. 1992) (granting motion to dismiss); *Sanders v. A.J. Canfield Co.*, 635 F. Supp. 85, 87 (N.D. Ill. 1986) (granting motion to dismiss and awarding sanctions under Rule 11); *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1480 n.12 (S.D. Fla. 1987) (granting motion to dismiss), *aff'd*, 865 F.2d 1272 (11th Cir. 1988); *Westray v. Porthole, Inc.*, 586 F. Supp. 834, 838-39 (D. Md. 1984) (granting motion to

dismiss); *Turner v. Unification Church*, 473 F. Supp. 367, 373-74 (D.R.I. 1978) (granting motion to dismiss), *aff'd*, 602 F.2d 458 (1st Cir. 1979).

Plaintiffs have not cited any decisions contrary to the many cases holding that there is no direct cause of action for damages under the Thirteenth Amendment. Instead, plaintiffs rely on the Supreme Court's 1883 statement that the Thirteenth Amendment

> is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances. By its own unaided force and effect it abolished slavery, and established universal freedom. Still, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character; for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.

*The Civil Rights Cases*, 109 U.S. 3, 20 (1883). *The Civil Rights Cases* did not hold or suggest that there is a private right of damages directly under the Thirteenth Amendment, nor is such a private right of damages needed for the Thirteenth Amendment to be effective. Once the Thirteenth Amendment abolished legal recognition of slavery, the wrongs committed by masters against slaves became actionable under conventional tort remedies, such as those for false imprisonment or intentional infliction of emotional distress, and contract provisions that might purport to justify slavery or involuntary servitude became void and unenforceable. See *Jane Doe I v. Reddy*, 2003 WL 23893010, at *10; see generally *Pollock v. Williams*, 322 U.S. 4 (1944) (reviewing history of anti-peonage decisions). And of

course, Section Two of the Thirteenth Amendment gave Congress the power to implement the Amendment through legislation, some of which is discussed below.

Plaintiffs also cite *City of Memphis v. Greene*, 451 U.S. 100 (1981), but it does not help their case. The Supreme Court held in *City of Memphis* that a city's decision to close a particular street did not violate the Thirteenth Amendment. The Court's opinion acknowledged the earlier statements that the Thirteenth Amendment was self-executing as to slavery. The Court left open the question whether the Amendment did anything more by its own terms. *Id.* at 125-26.

B.     *No Extraterritorial Effect*

Even if the Thirteenth Amendment authorized a direct cause of action for damages against a private entity, the Thirteenth Amendment bars slavery and involuntary servitude only "within the United States, or any place subject to their jurisdiction." By its terms, that language does not appear to reach activity in other countries.

Plaintiffs have not come forward with any authority applying the Thirteenth Amendment to activity in foreign nations. They rely on the federal Trafficking Victims Protection Act, 22 U.S.C. § 7101, stating that Congress relied on the Thirteenth Amendment to give some international reach to the statute. The court does not see such reliance in the statute. The House committee report for the 2003 re-authorization of the legislation relied upon the interstate and foreign

commerce clause of the Constitution. See H.R. Rep. No. 108-264(I), reprinted in 2004 U.S. Code, Cong. & Ad. News 2408, 2413.[4]

Because the Thirteenth Amendment does not create a private right of action for damages and does not directly reach slavery or involuntary servitude outside the territorial jurisdiction of the United States, plaintiffs could not be entitled to relief on Counts Five and Six. Defendants' motion to dismiss is granted with respect to Counts Five and Six.

VI.    *Federal Statutory Claims – Extraterritorial Application*

In Counts Seven and Eight of the Complaint, plaintiffs allege that defendants have violated United States criminal statutes, 18 U.S.C. §§ 1589 and 1590, and plaintiffs seek a civil remedy under 18 U.S.C. § 1595. Plaintiffs allege that the same conduct alleged under the Thirteenth Amendment also violates

---

[4]Professor Wolff has argued that the Thirteenth Amendment should be interpreted to apply to labor practices of U.S. businesses in foreign nations. Tobias B. Wolff, *Thirteenth Amendment and Slavery in the Global Economy*, 102 Colum. L. Rev. 973 (2002). The article provides an informative history of the Thirteenth Amendment, its interpretation, and some of the odious labor practices that are part of the global economy today. The article also offers powerful reasons why the United States might want to extend its existing law to reach such activities when there is a sufficient United States contact. The article does not persuade this court, however, that the existing language of the Thirteenth Amendment itself can reasonably be stretched to reach slavery that exists in places other than "within the United States, or any place subject to their jurisdiction." The argument that slavery is a prohibited relationship that "exists" wherever the master might be found is clever but not persuasive. Specific legislation and international treaties and conventions are better suited to reach international dimensions of slavery, forced labor, and related practices.

those statutes.  The court has subject matter jurisdiction of these claims under

the general federal question jurisdiction, 28 U.S.C. § 1331, regardless of whether

the claims are sufficient to withstand a motion to dismiss.  In the briefing on the

motion to dismiss, plaintiffs have not relied on section 1590, which does not fit

this situation, so the court focuses on section 1589.


Section 1589 is entitled "Forced Labor" and provides:

> Whoever knowingly provides or obtains the labor or services of a person–
>> (1)    by threats of serious harm to, or physical restraint against, that person or another person;
>> (2)    by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>> (3)    by means of the abuse or threatened abuse of law or the legal process,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.  If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

Section 1595 provides a civil damages remedy for violations of several statutes,

including section 1589.


Defendants argue that even if the alleged conditions on the Firestone

Plantation in Liberia amount to forced labor, section 1589 does not apply to labor

conditions outside the United States.  Neither side has cited prior case law

determining the extent to which section 1589 applies to conduct outside the

United States.  The court concludes that section 1595 does not provide a remedy for alleged violations of section 1589's standards that occur outside the United States.

"Generally speaking, Congress has the authority to apply its laws, including criminal statutes, beyond the territorial boundaries of the United States, to the extent that extraterritorial application is consistent with the principles of international law."  *United States v. Dawn*, 129 F.3d 878, 882 (7th Cir. 1997), citing *E.E.O.C. v. Arabian American Oil Co.* ("*Aramco*"), 499 U.S. 244, 248 (1991), and *United States v. Bowman*, 260 U.S. 94, 97-98 (1922); see also *Foley Brothers,Inc. v. Filardo*, 336 U.S. 281, 284 (1949).  Whether Congress has attempted to legislate beyond those territorial boundaries is a question of statutory interpretation.

In answering the question, the court must be guided by the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Aramco*, 499 U.S. at 248, quoting *Foley Brothers*, 336 U.S. at 285.  This canon of statutory construction "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord."  *Aramco*, 499 U.S. at 248, citing *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20-22 (1963); accord, *Small v. United States*, 544 U.S. 385, (2005) ("we find help in the 'commonsense notion that Congress

generally legislates with domestic concerns in mind,'" which has led to "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application"), quoting *Smith v. United States*, 507 U.S. 197, 204 n.10 (1993), and citing *Foley Brothers*, 336 U.S. at 285.

Where Congress has not stated clearly that a statute should apply extraterritorially, it may still be possible to show that Congress intended such application based on the nature of the activity and other relevant indications of Congressional intent. One such rare example is *United States v. Bowman*, 260 U.S. 94 (1922), in which the Supreme Court reversed dismissal of an indictment alleging that three United States citizens had conspired to defraud a corporation in which the United States government owned stock. The alleged conspiracy was hatched on the high seas and was carried out in Brazil by falsifying documents for a purchase of fuel oil for a ship owned by the government-owned corporation. In interpreting the statute, the Court explained:

> Crimes against private individuals or their property . . . must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

260 U.S. at 98. Nevertheless, *Bowman* upheld the extraterritorial application of a criminal statute that was silent as to its territorial scope. The Court concluded that the nature of the crime – false claims against the United States and corporations in which the government owned stock – could easily be committed

on the high seas and in ports and military bases all over the world. The crime was not against private individuals or their property. The role of the United States government as victim played a key role in persuading the Court to allow extraterritorial application: "Clearly it is no offense to the dignity or right of sovereignty of Brazil to hold [three United States citizens] for this crime against the government to which they owe allegiance." *Id.* at 102.

The *Bowman* approach remains the rare exception for a narrow set of unusual cases. The general presumption remains that a statute will not apply extraterritorially unless Congress has clearly indicated its intent to reach beyond United States boundaries. The Supreme Court has often applied this presumption to United States laws governing employment relationships, including wages and working conditions, where the United States connection to the employment relationships was much stronger than is alleged in this case. Two clear examples are *Aramco* and *Foley Brothers*.

In *Aramco*, the Supreme Court held that Title VII of the Civil Rights Act of 1964 did not apply to alleged discrimination by a *United States* employer against a United States citizen employed in a foreign country. 499 U.S. at 259. To apply Title VII to *foreign* employers of United States citizens in foreign countries, even stronger and clearer statements of Congressional intent would be needed. *Id.* at 255. In words that could apply to this case, the Court wrote:

> Without clearer evidence of congressional intent to do so than is contained in the alien-exemption clause, we are unwilling to ascribe to that body a policy which would raise difficult issues of international law by imposing this country's employment-discrimination regime upon foreign corporations operating in foreign commerce.

*Id.*[5]

In *Foley Brothers*, the Court held that the federal "Eight Hour Law" requiring United States government contractors to pay overtime wages to their employees did not apply to a United States contractor that employed a United States citizen in a foreign country. 336 U.S. at 285. Even where the employer was a United States company, the Court viewed the employment relationship in a foreign country as supporting a strong presumption against extraterritorial application, especially where labor conditions (in Iran) were "wholly dissimilar to those in the United States and wholly beyond the control of this nation. An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose." 336 U.S. at 286. This reasoning applies with extra force to the circumstances alleged in this case, where Liberian residents work in Liberia for a Liberian company, which is part of a larger multinational group of corporations.

---

[5]In the wake of *Aramco*, Congress specifically overruled its holding in section 109 of the Civil Rights Reform Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1077, which expressly applied the Civil Rights Act of 1964 to foreign employment of United States citizens by United States employers, unless compliance would cause a violation of foreign law.

To avoid the effect of the general presumption against extraterritorial effect, plaintiffs make two arguments. First, they contend that the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, of which 18 U.S.C. § 1589 was a part, also includes "an array of measures to counteract forced labor and trafficking of persons, including provisions for activities overseas." Pl. Mem. at 20. The findings show that Congress understood that forced labor and trafficking are problems with an international dimension. See Pub. L. 106-386, § 102; 22 U.S.C. § 7101. The Act also included several provisions with explicit international dimensions.[6]

The international dimensions of the problems of trafficking and forced labor do not support a departure from the usual presumption against extraterritorial application for section 1589. The other closely related statutes addressing slavery and related practices in Chapter 77 of Title 18 show that Congress has been acquainted with the question of international reach in this context for more than

---

[6]Section 104 of the Act required countries receiving U.S. foreign assistance to report on steps taken to combat forced labor trafficking within their borders. 22 U.S.C. §§ 2151 & 2304. Section 105 established a high-level Interagency Task Force to monitor and investigate human trafficking at home and abroad. 22 U.S.C. § 7103. Section 106 authorized the President to establish international initiatives to promote public awareness of trafficking and economic opportunity for women. 22 U.S.C. § 7104. Section 107 directed the Department of State and USAID to develop reintegration programs for trafficking victims in other countries and defined specific forms of assistance to be provided to victims in the United States. 22 U.S.C. § 7105. Sections 108-110 provided for assistance to foreign countries to meet minimum standards for the elimination of trafficking, and penalties for countries which fail to meet those standards. 22 U.S.C. §§ 7106, 2152d, and 7107. Section 111 authorized the President to exercise national emergency powers against foreign persons involved in human trafficking. 22 U.S.C. § 7108.

200 years.  Congress knows how to legislate with extraterritorial effect in this field. It has done so expressly when it has intended to do so.[7]

For example, in Chapter 77, section 1581 addresses peonage and contains no territorial language.  Sections 1582 to 1588 apply to various aspects of slave trading and include specific language about territorial and extraterritorial application.  Section 1586, the first federal anti-slavery statute (passed by Congress in 1800, 2 Stat. 70), includes clear language with extraterritorial effect. It prohibits United States citizens and residents from serving on a slave ship anywhere in the world:  "Whoever, being a citizen or resident of the United States, voluntarily serves on board of any vessel employed or made use of in the transportation of slaves from any foreign country or place to another, shall be fined under this title or imprisoned not more than two years, or both."  See also *United States v. Morris*, 39 U.S. 464, 477 (1840) (holding that United States citizen violated federal law by serving on a slave ship traveling between Cuba and St. Thomas).  Section 1589, upon which plaintiffs rely in this case, contains no language indicating any intent to have extraterritorial effect.  That silence, in the context of these other statutes with explicit extraterritorial language, weighs against giving extraterritorial effect to section 1589.

---

[7]As another recent example of Congressional drafting to reach beyond the United States, see 18 U.S.C. § 2333 (authorizing civil remedy in United States courts for an "act of international terrorism"), and 18 U.S.C. § 2331(1) (defining "act of international terrorism" to reach conduct anywhere in the world).

Plaintiffs' second argument is based on a comparison of the language of section 1589 and section 1591, which addresses sex trafficking of children by any means and of adults by means of force, fraud or coercion.[8]  The comparison actually weighs in favor of defendants on the issue of extraterritorial effect.

---

[8]Section 1591 provides in its entirety:

(a) Whoever knowingly –
    (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, or obtains by any means a person; or
    (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
knowing that force, fraud, or coercion described in subsection (c)(2) will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).
(b) The punishment for an offense under subsection (a) is–
    (1) if the offense was effected by force, fraud, or coercion or if the person recruited, enticed, harbored, transported, provided, or obtained had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or
    (2) if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, or obtained had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.
(c) In this section:
    (1) The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.
    (2) The term "coercion" means–
    (A) threats of serious harm to or physical restraint against any person;
    (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
    (C) the abuse or threatened abuse of law or the legal process.
    (3) The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

Plaintiffs focus on the phrase "in or affecting interstate or foreign commerce." As first enacted in 2001, section 1591(a)(1) referred only to interstate commerce. Congress amended the provision in 2003 to apply it to activity "in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States." Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 5(a)(2), 117 Stat. 2875, 2879.

From these statutory differences, plaintiffs infer that the language of section 1591(a)(1) limits its application more narrowly than section 1589. The court does not agree. In amending section 1591 to expand its reach, Congress relied upon its power over both interstate and foreign commerce, see H.R. Rep. 108-264(I), reprinted in 2004 U.S Code, Cong. & Ad. News 2408, 2413, and its sovereign power over the special maritime and territorial jurisdiction of the United States. Section 1589, by contrast, is obviously an exercise of Congressional power under Section Two of the Thirteenth Amendment. See *United States v. Garcia*, No. 02-CR-1105-01, 2003 U.S. Dist. Lexis 22088 at 4-5 (W.D.N.Y. 2003) (holding that Congressional authority to enact § 1589 stems from the Thirteenth Amendment, not the Commerce Clause).

Perhaps most illuminating is the provision in section 1591(a)(2) applying to a person who "benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)." In this case, plaintiffs attempt to impose a similar form of liability

on the American affiliates who benefit from exploitive conditions at the Firestone Plantation in Liberia. The problem is that section 1589 does not contain such provisions. If Congress wants to impose such liability, it knows how to do so, just as it knew in 1800 how to prohibit United States citizens and residents from participating in slave trade anywhere in the world. Congress has not taken such steps to impose extraterritorial restrictions on forced labor under section 1589.

Because 18 U.S.C. § 1589 does not apply extraterritorially to conditions on the Plantation in Liberia, plaintiffs could not recover under Counts Seven and Eight of the Complaint. Defendants' motion to dismiss those claims under Rule 12(b)(6) is granted.

VII.    *International Law Claims for Forced Labor Under the Alien Tort Statute*

A.    *Subject Matter Jurisdiction*

Counts One and Two assert claims under the law of nations and invoke the court's subject matter jurisdiction under the federal Alien Tort Statute ("ATS"), which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.[9] The defendants have moved to

---

[9]The statute is also called the "Alien Tort Claims Act" or "ATCA" by some courts and commentators. The Supreme Court used the title "Alien Tort Statute" in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 697 (2004).

dismiss the ATS claims for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

Defendants argue that they have done nothing wrong and that they offer relatively good jobs in a poor, dangerous, and war-torn country. Defendants have submitted evidence to support these arguments, such as an indication that the President of Liberia recently moved to *increase* civil servants' pay to one dollar a day, which is still less than Firestone pays a rubber tapper who meets only a partial daily quota. Such arguments on the merits that require supporting evidence are out of place, however, on a motion to dismiss under Rule 12(b)(6).

On the motion to dismiss the ATS claims, defendants' central argument is that the Complaint does not actually allege violations of international law standards that are sufficiently specific, universal, and obligatory to support relief under the ATS. See *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) ("federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted"); *Sarei v. Rio Tinto, PLC*, — F.3d —, —, 2007 WL 1079901, at *5 (9th Cir. April 12, 2007) (noting that *Sosa* accepted the requirement of a "specific, universal and obligatory norm of international law" for an ATS claim).

As noted above with respect to plaintiffs' federal claims, a complaint ordinarily must set forth only a colorable or arguable claim arising under federal law to establish federal question subject matter jurisdiction. See *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998); *Bell v. Hood*, 327 U.S. 678, 681-85 (1946). The doubtful validity or even invalidity of such a claim does not undermine the court's subject matter jurisdiction. Although there is conflicting authority on the question, the court finds that the same standard applies to international law claims asserted under the Alien Tort Statute. Because plaintiffs have alleged claims arising under international law that are at least colorable and arguable, the court has subject matter jurisdiction over Counts One and Two under the ATS, 28 U.S.C. § 1350.

Defendants argue that a higher standard applies to attempts to invoke jurisdiction under the ATS. They propose a standard that blurs the line between subject matter jurisdiction and the sufficiency of a claim on the merits. The distinction can be subtle and is sometimes ignored. See *Arbaugh v. Y & H Corp.*, 546 U.S. 500, —, 126 S. Ct. 1235, 1242 (2006) ("On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous."). Yet the distinction can be important for at least four reasons. First, matters of subject matter jurisdiction cannot be waived by litigants; federal courts have an obligation to raise such an issue themselves. *Steel Co.*, 523 U.S. at 94. Second, a court considering an issue of subject matter jurisdiction is not limited to the pleadings. The court may consider affidavits and

may even hold evidentiary hearings to decide facts that control jurisdictional issues. *E.g.*, *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996) (affirming dismissal for lack of jurisdictional standing based on factual findings). A court considering a motion to dismiss for failure to state a claim for relief may consider only the plaintiff's allegations. Third, dismissal for lack of subject matter jurisdiction bars exercise of supplemental jurisdiction under 28 U.S.C. § 1367, rather than leaving such exercise to the district court's judgment under § 1367(c). *Arbaugh*, 546 U.S. at —, 126 S. Ct. at 1244-45. Fourth, a dismissal for lack of subject matter jurisdiction ordinarily is not a dismissal on the merits, so that there is at least some possibility that the claim might be pursued later in another forum, such as the state courts. *E.g.*, *T.W. v. Brophy*, 124 F.3d 893, 898 (7th Cir. 1997).

Defendants rely on a line of ATS cases stating, for example, that "it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations. There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)." *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995), citing *Filartiga v. Pena-Irala*, 630 F.2d 876, 887-88 (2d Cir. 1980). The point was *obiter dicta* in both *Kadic* and *Filartiga*, in which the Second Circuit held that the plaintiffs had adequately pled violations of the law of nations. The Second Circuit transformed the point into a holding in *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 447-49 (2d Cir. 2000), where the court affirmed dismissal for lack of subject matter

jurisdiction under the ATS. The court found that plaintiffs had failed to allege adequately that the defendant private corporation bore responsibility for the Egyptian government's seizure of private property.

Other courts have rejected this blending of standards for subject matter jurisdiction and sufficient pleading of claims on the merits. See *Sarei v. Rio Tinto, PLC*, — F.3d at —, 2007 WL 1079901, at *4-5 (9th Cir. April 12, 2007) (applying *Bell v. Hood* standard under ATS and holding that jurisdiction was proper under ATS as long as plaintiffs alleged a non-frivolous claim for violating law of nations); *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 165-68 (5th Cir. 1999) (affirming dismissal of ATS claims on the merits under Rule 12(b)(6) where plaintiff failed to allege actual violation of law of nations). The Seventh Circuit has offered conflicting indications in *dicta* on this question. Compare *Enahoro v. Abubakar*, 408 F.3d 877, 884 (7th Cir. 2005) (quoting with approval the "more searching review" standard from *Kadic*), with *Jogi v. Voges*, 425 F.3d 367, 373 (7th Cir. 2005) (describing *Sosa* as having rejected the plaintiff's claims on the merits rather than for lack of jurisdiction), *vacated in relevant part on rehearing*, 480 F.3d 822, 825-26 (7th Cir. 2007) (resting jurisdiction solely on 28 U.S.C. § 1331 and saving questions under ATS for another day).

The higher jurisdictional standard for ATS claims articulated by the Second Circuit in *Filartiga* and *Kadic*, and argued here by defendants, does not seem consistent with the Supreme Court's 2004 decision in *Sosa v. Alvarez-Machain*.

In *Sosa*, the Supreme Court determined that the plaintiff did not have an actionable claim for a violation of the law of nations.  542 U.S. at 738.  After the Supreme Court remanded the case, the district court entered judgment for defendant Sosa on both the international and state law claims, rather than dismiss the claims for lack of subject matter jurisdiction.  *Alvarez-Machain v. United States*, 2004 U.S Dist. LEXIS 28528 (C.D. Cal. Oct. 26, 2004).  As the Seventh Circuit observed in the vacated portion of the original opinion in *Jogi*, 425 F.3d at 473, the Supreme Court never indicated that it was deciding *Sosa* based on a lack of subject matter jurisdiction.

Treating the sufficiency of a claim under the ATS as a jurisdictional requirement would conflict with the most basic original goal of the ATS identified by the Supreme Court in *Sosa*:  to allow the federal courts to hear cases that could affect the young nation's foreign relations, rather than sending such cases to state courts.  That was the problem the Continental Congress had faced in the Marbois incident, involving an assault and battery against a French diplomat in Philadelphia several years before ratification of the Constitution.  See *Sosa*, 542 U.S. at 716-17 & n.11; *Republica v. De Longchamps*, 1 U.S. (1 Dallas) 111 (O.T. Phila. 1784).  The French government had complained about the treatment of the French minister in the state courts.  The Congress instructed the national Secretary of Foreign Affairs to apologize, to explain "the nature of a federal union," and to explain that the "young Nation" needed "many allowances."  By enacting the ATS after ratification of the new Constitution, the First Congress acted to

ensure that the federal government could address such sensitive cases in its own courts.  See  William R. Casto, *The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations*, 18 Conn. L. Rev. 467, 515-22 (1986) (detailing the Framers' concern to establish federal jurisdiction over cases with potential implications for foreign affairs).  Yet if the sufficiency of a claim affects subject matter jurisdiction under the ATS, then the more marginal and creative cases might be pursued, at least for a time, in state courts after dismissal in the federal courts for lack of jurisdiction, a result directly at odds with the original and central purpose of the ATS.

To establish subject matter jurisdiction under the ATS, it should be sufficient that plaintiffs allege an arguable violation of the law of nations.  If the court finds that the plaintiffs do not *adequately* plead a violation of the law of nations, a Rule 12(b)(6) motion should be granted.  However, "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to hear the case." *Steel Co.*, 523 U.S. at 94.  As discussed below, plaintiffs in this case have alleged at least colorable claims for violations of the law of nations, so the court has subject matter jurisdiction over Counts One and Two under the ATS.

B.      *The Record on the Rule 12(b)(6) Motion*

When deciding a motion to dismiss under Rule 12(b)(6), the issue is not whether plaintiffs have submitted "competent proof" or even are likely to prevail

upon the evidence. The focus is on the sufficiency of the pleading in the Complaint. See Part IV, *supra*, at 13-14.

In support of their motion to dismiss, defendants have submitted several affidavits and documents, including the current concession agreement between Firestone and the Liberian government, the Plantation employees' collective bargaining agreement, Liberian labor laws, and media accounts of a recent labor strike on the Plantation. The affidavits provide information about conditions on the Plantation, including defendants' views on the available medical care and education, as well as the effects of the civil war.

Plaintiffs argue that such submissions have no place in supporting a motion to dismiss under Rule 12(b)(6). Plaintiffs urge the court either to disregard the defendants' evidence or to convert the Rule 12(b)(6) motion to a Rule 56 motion for summary judgment, as permitted by Rule 12(b), so that plaintiffs may launch formal discovery efforts. The court is not converting the pending motion to a Rule 56 motion for summary judgment.

Defendants argue that they are permitted to submit the additional materials because they are relevant to the jurisdictional issues. See, *e.g.*, *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001) (when jurisdiction depends on contested facts, even those closely linked to merits, district court may hold a hearing and resolve factual disputes). Under the *Filartiga-Kadic* approach

to subject matter jurisdiction under the ATS, it would be permissible for a district court to hear evidence on the merits to decide subject matter jurisdiction, but the court has declined to follow that approach for the reasons explained above.

A party seeking dismissal under Rule 12(b)(6) may still submit certain documents outside the pleadings. For example, if the document is referred to in the complaint and is central to a claim, a moving defendant may submit the document. *E.g.*, *Wright v. Associated Insurance Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994). In deciding a Rule 12(b)(6) motion, the court may also consider public and historical documents and reports of administrative bodies that are proper subjects for judicial notice. *Papasan v. Allain,* 478 U.S. 265, 268 n.1 (1986); *Menominee Indian Tribe of Wisconsin v. Thompson,* 161 F.3d 449, 456 (7th Cir. 1998); *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997).

Under this standard, the court may consider the 2005 concession agreement between Liberia and Firestone (see Compl. ¶ 69) and the collective bargaining agreement (referenced at least by implication for compensation levels). The court may also consider the laws of Liberia submitted by defendants, as well as copies of various international treaties and conventions as sources of foreign law. See Fed. R. Civ. P. 44.1. The court is not considering the various current news media reports submitted by defendants.

The court is also considering a number of additional documents that plaintiffs have submitted, including the United States Department of State Overview to Country Reports on Human Rights Practices for 1997. See Baxter Decl. Ex. E (Docket No. 2-86). A party opposing a motion under Rule 12(b)(6) has much more latitude than the moving party, for example, to illustrate for the court the facts the party hopes to prove to support the allegations in the complaint. See *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704 (7th Cir. 2004). Such documents are not evidence, but they provide a way for a plaintiff to show a court that there is likely to be some evidentiary weight behind the pleadings the court must evaluate.

C.    *The Alien Tort Statute*

The ATS was enacted in 1789 by the First Congress, but it was used only rarely before 1980. That is when the Second Circuit held in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), that citizens of Paraguay could use the ATS to sue another citizen of Paraguay in a United States district court for the torture and death of their son in Paraguay as a violation of international law. Since *Filartiga* held that the ATS could reach wrongs committed in other nations, many plaintiffs have used the ATS to pursue a wide variety of international human rights cases in United States federal courts. See Harold Hongju Koh, *Transnational Public Law Litigation*, 100 Yale L. J. 2347, 2366 (1991); Curtis A. Bradley, *The Alien Tort Statute and Article III*, 42 Va. J. Int'l L. 587, 588 (2002); Fuks, *Sosa v. Alvarez-Machain and the Future of ATCA Litigation: Examining Bonded Labor Claims and*

*Corporate Liability*, 106 Colum. L. Rev. 112 (2006).  In recent years, the ATS has been used to assert many claims against private corporations.  See Eugene Kontorovich, *Implementing Sosa v. Alvarez-Machain:  What Piracy Reveals About the Limits of the Alien Tort Statute*, 80 Notre Dame L. Rev. 111, 117 (2004); Fuks, 106 Colum. L. Rev. at 116-19.

In 2004, the Supreme Court gave its first detailed consideration to the scope of the ATS in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  That decision effectively supersedes many of the earlier circuit and district court opinions on several key issues.   *Sosa* requires close attention, beginning with its facts. Plaintiff Alvarez-Machain was a physician and a citizen of Mexico.  United States Drug Enforcement Administration officials received information that led them to believe that Dr. Alvarez had been involved in the torture and murder of an American DEA agent in Mexico in 1985.  A United States grand jury indicted Dr. Alvarez, and a United States warrant was issued for his arrest.  After unsuccessful efforts to use the usual channels for arresting and transporting a suspect from another country, the DEA approved a plan to hire Mexican nationals to seize Dr. Alvarez and bring him to the United States.  He was abducted from his house, held overnight in a motel, and then brought to the United States by private plane, where he was arrested on the United States charges.  He was eventually acquitted of the criminal charges in the United States.  542 U.S. at 697-99.

Dr. Alvarez then sued in a United States federal court under the ATS, among other claims, on the theory that his arrest and detention amounted to torts in violation of international law. The district court and Ninth Circuit eventually ruled in favor of Dr. Alvarez under the ATS. The Supreme Court reversed and ordered dismissal.

The Supreme Court unanimously concluded that the ATS "enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law," but that "the limited, implicit sanction to entertain the handful of international law *cum* common law claims understood in 1789" should not be taken as authority to recognize the right of action asserted by Dr. Alvarez. 542 U.S. at 712. After a detailed review of the history of the ATS, the unanimous portion of the Court's opinion concluded: "The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Id.* at 724. The First Congress probably had in mind only three such wrongs identified by Blackstone in his Commentaries: violations of safe conducts, violations of the rights of ambassadors, and piracy. *Id.*

The *Sosa* Court divided on whether federal courts may recognize additional torts beyond those three. The dissenters said no. The majority decided to leave the judicial door "ajar subject to vigilant doorkeeping, and thus open to a narrow

class of international norms today." *Id.* at 729. What did the Court mean by vigilant doorkeeping? The Court posted many warning signs against judicial innovation under the ATS, and then held that the extra-judicial arrest and abduction of Dr. Alvarez did not pass the test. The Court wrote:

> Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350, we are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted. * * * And the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.

542 U.S. at 732-33 (citations and footnotes omitted). The Court wrote that its standard was generally consistent with the Ninth Circuit's earlier formulation that plaintiffs must show a violation of an international norm that is "specific, universal, and obligatory." *Id.* at 732, quoting *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994).

Before reaching that conclusion, the Court identified five reasons for "judicial caution" when considering additional claims that might be recognized under the ATS. The first is the change in the concept of the common law since 1789, recognizing that judges do not find or discover the common law, but make it, which calls for discretionary judgment. 542 U.S. at 725-26. The second is the change in the role of federal courts in making common law after *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). The third is the recent shift in favor of

deferring more to legislative judgment in deciding whether to recognize any private right of action under federal law, particularly in light of "the possible collateral consequences of making international rules privately actionable." 542 U.S. at 727. The fourth is the potential implications for the nation's foreign relations, especially in claiming the power to impose limits on the powers of foreign governments over their own citizens and to hold them accountable in the courts of the United States. *Id.* at 727. The fifth is the absence of any express congressional mandate "to seek out and define new and debatable violations of the law of nations," along with indications that Congress does not want to encourage "greater judicial creativity" in this area. *Id.* at 728.

After posting all these caution signs and requiring that any innovation under the ATS would need to be based on norms of international law as specific, universal, and obligatory as Blackstone's three, the Court then turned to Dr. Alvarez's claim. The Court reviewed available sources of international law and determined that there was not an international norm against arbitrary arrest that was as specific and binding as the eighteenth century common law norms against violations of safe conducts, violations of ambassadors' rights, and piracy. *Id.* at 734-37. The Court's analysis provides a framework for lower courts approaching such issues.

First, while the Court recognized the "moral authority" of the Universal Declaration of Human Rights, it found that the document had no legally binding

force.  542 U.S. at 734-35.  Second, although the United States had ratified the International Covenant on Civil and Political Rights, it did so with the express understanding that the Covenant was not self-executing.  Notwithstanding its moral authority, the Covenant therefore did not create obligations enforceable in federal courts.  *Id.* at 735.

On the plaintiff's claim that his arrest and detention violated customary international law, the *Sosa* Court was troubled by the broad scope of his theory, that an arrest or detention anywhere in the world that was unauthorized by local law would also violate international law and support a federal case under the ATS. *Id.* at 736-37.  Of particular interest for present purposes, the Court noted that Section 702 of the Restatement (Third) of Foreign Relations Law of the United States (1986), said that a "state violates international law if, as a matter of state policy, it practices, encourages, or condones . . . prolonged arbitrary detention." The Court then commented:

> Although the Restatement does not explain its requirements of a "state policy" and of "prolonged" detention, the implication is clear.  Any credible invocation of a principle against arbitrary detention that the civilized world accepts as binding customary international law requires a factual basis beyond relatively brief detention in excess of positive authority.  Even the Restatement's limits are only the beginning of the enquiry, because *although it is easy to say that some policies of prolonged arbitrary detentions are so bad that those who enforce them become enemies of the human race, it may be harder to say which policies cross that line with the certainty afforded by Blackstone's three common law offenses.*  In any event, the label would never fit the reckless policeman who botches his warrant, even though that same officer might pay damages under municipal law.

542 U.S. at 737 (emphasis added).

The emphasized passage is especially relevant here.  As shown below, there is a broad international consensus that at least some extreme practices called "forced labor" violate universal and binding international norms.  But the adult plaintiffs in this case allege labor practices that lie somewhere on a continuum that ranges from those clear violations of international law (slavery or labor forced at the point of soldiers' bayonets) to more ambiguous situations involving poor working conditions and meager or exploitative wages.  The *Sosa* Court ultimately concluded that the plaintiff's claim based on arrest and detention depended on an aspiration in "the present, imperfect world" that exceeded any binding customary rule that was sufficiently specific to reach his case, and so ordered dismissal.  *Id.* at 738; accord, *Doe v. Qi*, 349 F. Supp. 2d 1258, 1278 (N.D. Cal. 2004) ("The question of whether a claim under the ATCA lies thus turns on whether the specific facts (not the general characterization of the claim) violate[ ] international norms that are 'specific, universal and obligatory.'").

D. *Case Law Dealing with Forced Labor*

Plaintiffs cite several pre-*Sosa* federal cases holding or stating that "forced labor" violates the law of nations.  Those cases show that some forms of forced labor violate the law of nations, but the facts in those cases are so different from the plaintiffs' allegations in this case as to show that the label "forced labor" adds little to the needed analysis.

In *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999), the plaintiff alleged that during World War II, she was literally sold from her home in Russia and transported by Nazi troops to Germany to work for the German subsidiary of Ford under inhuman conditions and without compensation.  67 F. Supp. 2d at 433-34, 440-41.  Then 17 years old, the plaintiff was forced to live with 65 other deportees in a wooden hut without heat, running water, or sewage facilities, and they were locked in at night.  *Id.* at 433-34.  She was required to perform heavy labor drilling holes in engine blocks.  Company officials, she alleged, used rubber truncheons to beat workers who failed to meet their quotas.  *Id.* at 434.  In the course of dismissing all of her claims on other grounds, the court stated that "the case law and statements of the Nuremberg Tribunals unequivocally establish that forced labor violates customary international law."  *Id.* at 441.

In *In re World War II Era Japanese Forced Labor Litigation*, 164 F. Supp. 2d 1160, 1179 (N.D. Cal. 2001), the court also dismissed all claims as time-barred but stated it was inclined to agree with the *Iwanowa* conclusion that forced labor violates the law of nations.  The district court opinion did not dwell on the historical details, but the Ninth Circuit opinion affirming the dismissal described the treatment of the civilians subjected to forced labor by the Japanese military: "[T]hey were all subjected to serious mistreatment, including starvation, beatings, physical and mental torture, being transported in unventilated cargo holds of ships, and being forced to make long marches under a tropical sun without water.

Some survived, while others were ultimately executed, or died from disease or physical abuse." *Deutsch v. Turner Corp.*, 324 F.3d 692, 705 (9th Cir. 2003).

In *Jane Doe I v. Reddy*, 2003 WL 23893010, at *8-9 (N.D. Cal. Aug. 4, 2003), the court denied a motion to dismiss forced labor claims under the ATS. The plaintiffs were young women who alleged they were fraudulently induced to come to the United States with promises of education and employment, but were then forced to work long hours under arduous conditions at illegally low wages, and that they were sexually abused, physically beaten, and threatened. *Id.* at *1 and *9. The court found that the allegations stated claims for forced labor, debt bondage, and trafficking actionable under the ATS. In reaching that conclusion, the court relied on the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights. *Id.* at *8. (As noted above, the Supreme Court later held in *Sosa* that both documents were insufficient foundations for ATS claims. 542 U.S. at 734-35.)

Plaintiffs also rely on the Burmese forced labor case against Unocal, *Doe v. Unocal Corp.*, 110 F. Supp. 2d 1294 (C.D. Cal. 2000) (granting summary judgment for defendants), *aff'd in part, rev'd in part*, 395 F.3d 932, 945 (9th Cir. 2002) (stating that forced labor violates law of nations, also relying on Universal Declaration of Human Rights), *vacated on rehearing en banc*, 395 F.3d 978 (9th Cir. 2003), *appeal dismissed*, 403 F.3d 708 (9th Cir. 2005). The plaintiffs in the Burmese forced labor case testified that the Burmese military used both force and

threats of force to conscript them to work on Unocal's pipeline and supporting infrastructure.  110 F. Supp. 2d at 1298 & n.3.  The district court had no difficulty finding that such evidence showed forced labor in violation of the law of nations, *id.* at 1307-08, and the Ninth Circuit panel agreed, 395 F.3d at 945-47, before the appeal was eventually dismissed.

### E.    *International Norms for Forced Labor*

The Complaint in this case uses the same powerful label "forced labor." That conclusory label is not decisive.  The court need not take at face value the legal conclusions in a complaint.  *Bell Atlantic v. Twombly*, 550 U.S. at —, 127 S. Ct. at 1964-65, citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (when deciding a motion to dismiss, a court is not "bound to accept as true a legal conclusion couched as a factual allegation").  This case lies at a point on a continuum far from the forced labor of Nazi Germany, Japanese labor camps, or the workers rounded up more recently by the Burmese military.  Even if the adult plaintiffs' factual allegations are credited, as the court must, these plaintiffs have not alleged violations of a specific, universal, and obligatory norm of international law.

The adult plaintiffs in this case rely on several international agreements to show that their working conditions violate international law.  The first is ILO Forced Labour Convention (No. 29), June 28, 1930, 39 U.N.T.S. 55, *available at* http://www.ilo.org/ilolex/english/convdisp1.htm (last visited June 25, 2007), Docket No. 2-78, Exhibit A (hereinafter "ILO Convention 29").  ILO Convention 29

entered into force on May 1, 1932. Liberia and Japan have ratified ILO Convention 29, but the United States has not. Article 2 of ILO Convention 29 defines forced labor to mean "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."[10] In ILO Convention 29, the ratifying members of the ILO agreed to end some forms of forced labor and to impose certain minimum standards for working conditions and wages in cases in which forced labor was permitted. Prohibited forms of forced labor include forced labor "for the benefit of private individuals, companies or associations." Art. 4. This prohibition would apply to forced labor for the benefit of private corporations like the defendants in this case, at least if plaintiffs could allege and prove true forced labor and if ILO Convention 29 were deemed to apply in the United States.

Plaintiffs also rely on the ILO Abolition of Forced Labour Convention (No. 105), (June 26, 1957) 320 U.N.T.S. 291, *available at* http://www.ilo.org/ilolex/english/convdisp1.htm (last visited June 25, 2007), Docket No. 2-79 (hereinafter "ILO Convention 105"). Both Liberia and the United States have ratified ILO Convention 105; Japan has not. ILO Convention 105 also did not outlaw all forms of forced labor. Instead, in Article 1, each ratifying member of the ILO agreed to suppress any form of forced labor for certain

---

[10]Article 2 of ILO Convention 29 then excludes from the definition several categories of compulsory service, including military service, normal civil obligations, work as part of a criminal sentence under official supervision, and emergency services.

prohibited purposes, including political and ideological education, economic development, as a means of labor discipline, as punishment for participating in strikes, and as a means for racial, social, national, or religious discrimination.

The question here is what is "forced labor," keeping in mind that international norms are actionable under the ATS only if they are as specific, universal, and obligatory as Blackstone's three 18th century archetypes – piracy, wrongs against ambassadors, and violations of safe conducts.

Plaintiffs have submitted a 2005 report by the Director General of the ILO entitled "A global alliance against forced labour" that reports on the ILO Declaration on Fundamental Principles and Rights at Work.  Docket No. 2-80, Baxter Aff., Ex. C, *available at* http://www.ilo.org/dyn/declaris/DECLARATIONWEB.GLOBALREPORTDETAI LS?var_language=EN&var_PublicationsID=5232&var_ReportType=Report    (last visited June 25, 2007).  The report tackled the problem of definition in terms that help illuminate the parties' arguments in this case:

> Yet the very concept of forced labour, as set out in the ILO standards on the subject, is still not well understood.  In many quarters the term continues to be associated mainly with the forced labour practices of totalitarian regimes:  the flagrant abuses of Hitler's Germany, Stalin's Soviet Union or Pol Pot's Cambodia.  At the other end of the spectrum, such terms as "modern slavery", "slavery-like practices" and "forced labour" can be used rather loosely to refer to poor or insalubrious working conditions, including very low wages.  Indeed, some national legislation has identified the late payment of wages, or remuneration below the legal minimum wage, as at least one element of a forced labour situation.

Ex. C. at 5.  The 2005 ILO report relied on the definition from ILO Convention 29, "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."  The report then explained:

> Forced labour cannot be equated simply with low wages or poor working conditions.  Nor does it cover situations of pure economic necessity, as when a worker feels unable to leave a job because of the real or perceived absence of employment alternatives.  Forced labour represents a severe violation of human rights and restriction of human freedom, as defined in the ILO Conventions on the subject and in other related international instruments on slavery, practices similar to slavery, debt bondage or serfdom.

*Id.,* ¶ 13.

The ILO report includes a list of factors for "identifying forced labour in practice."  *Id.* at 6.  For identifying the lack of consent prong of the definition from ILO Convention 29, the ILO report lists the following indicators:

- Birth/descent into "slave" or bonded status
- Physical abduction or kidnapping
- Sale of person into the ownership of another
- Physical confinement in the work location – in prison or private detention
- Psychological compulsion, i.e. an order to work, backed up by a credible threat of a penalty for non-compliance
- Induced indebtedness (by falsification of accounts, inflated prices, reduced value of goods or services produced, excessive interest charges, etc.)
- Deception or false promises about types and terms of work
- Withholding and non-payment of wages
- Retention of identity documents  or  other valuable personal possessions

Plaintiffs in this case do not allege that any of these indicators of involuntary work apply to the current generation of adult Plantation workers. The plaintiffs allege that their grandparents and great-grandparents were abducted, kidnapped, and/or physically threatened when the Plantation was established in the 1920s, but plaintiffs are not in a position to assert claims for money damages today based on the mistreatment of their ancestors. Plaintiffs allege that they have nothing left after they spend their wages at company stores and other company facilities (such as schools), but they do not allege induced indebtedness. Plaintiffs allege that they are physically isolated at the Plantation, but they do not allege that Firestone keeps them physically *confined* there. To the extent plaintiffs allege psychological compulsion, they are clearly alleging what the ILO report calls "pure economic necessity, as when a worker feels unable to leave a job because of the real or perceived absence of employment alternatives," which is not forced labor under international law.

As factors indicating the "menace of any penalty" prong of the forced labor definition from ILO Convention 29, the ILO report lists:

Actual presence or credible threat of:

– Physical violence against worker or family or close associates
– Sexual violence
– (Threat of) supernatural retaliation
– Imprisonment or other physical confinement
– Financial penalties
– Denunciation to authorities (police, immigration, etc.) and deportation
– Dismissal from current employment
– Exclusion from future employment

– Exclusion from community and social life
– Removal of rights or privileges
– Deprivation of food, shelter or other necessities
– Shift to even worse working conditions
– Loss of social status

*Id.* Plaintiffs allege that they have been threatened with dismissal from current employment. Neither the ILO report nor the plaintiffs explain how a threat of dismissal from current employment is a "menace of a penalty" that forces labor in the same job. It would seem that the expressed fear of losing one's current employment is a clear indicator that the current employment is not forced labor. Plaintiffs' allegations about being told they can leave and join the starving unemployed, see Compl. ¶ 49, describe the brutal economic consequences of losing the jobs they complain they are being forced to perform, in a poor and dangerous country with 80 to 85 percent unemployment. At least in terms of international law, those consequences are not comparable to the practices alleged in *Deutsch v. Turner Corp.*, where laborers confined by the Japanese military were starved if they refused to work. See 324 F.3d at 705.

In other words, the plaintiffs do not allege any of the listed indicators of forced labor – other than those indicating that the persons might lose the same jobs they say they are being forced to perform.

In a discussion of labor practices in Africa, the 2005 ILO report offered these observations, which are relevant here because of the Supreme Court's requirement in *Sosa* that international norms be specific:

A review of recent trends in Africa needs to take account of some particularities of this continent.  First, where extreme poverty is the norm, many workers receive little or no financial payment, but are remunerated mainly through substandard food and lodging, or other payment in kind; delayed payment and non-payment of wages are widespread; and wages rarely match any legally defined minimum.  *It can be difficult to determine when the generalized breach of labour contracts, together with poor terms and conditions of work, degenerates into actual forced labour.*

\*    \*    \*

[T]he results of recent studies commissioned by the ILO indicated that the national researchers, as well as their respondents, had great difficulty in understanding the concept [of forced labour], and in distinguishing forced labour situations from extremely exploitative, but nonetheless "freely chosen", work.

Ex. C at 42, ¶¶ 195 & 200 (emphasis added).  Even though there are some forms of forced labor (Nazi Germany, for example) that clearly violate international law, these comments signal that the circumstances alleged by the adult plaintiffs in this Complaint do not violate specific, universal, and obligatory norms of international law.

Plaintiffs acknowledge that the United States has not ratified ILO Convention 29 with its definition of forced labor:  "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."  Plaintiffs argue that the United States later bound itself to ILO Convention 29 through the ILO Declaration on Fundamental Principles and Rights at Work (June 1998), *available at* http://www.ilo.org/dyn/declaris/DeclarationWeb.IndexPage (last visited June 25, 2007), Docket No. 31, Collingsworth Aff., Ex. A.  In that document, ILO member

nations acknowledged that even if they had not ratified all of the specific ILO conventions, they had an obligation to respect, to promote, and to realize the principles concerning the fundamental rights that are the subjects of the conventions, including "the elimination of all forms of forced or compulsory labour" and "the effective abolition of child labour."  *Id.*

That Declaration, however, clearly did not impose any new binding legal obligations on the ILO member nations.  The Legal Advisor of the ILO advised the members that "the Declaration and its follow-up does not and cannot impose on any member State any obligation pursuant to any Convention which that State has not ratified through its own constitutional or other requisite legal procedure." Report of the Committee on the Declaration of Principles, International Labour Conference, 86th Sess., at ¶ 325 (1998), Docket No. 34, Ex. A.  The Legal Advisor added that the Declaration "is recognized by everyone as not being a binding instrument."  A number of member nations expressed similar views in the debate. *Id.*, ¶¶ 183, 186, 188, 193, 224, 226.  It would be odd indeed if a United States court were to treat as universal and binding in other nations an international convention that the United States government has declined to ratify itself.

F.    *Application of Forced Labor Standards to This Case*

The adult plaintiffs in this case allege that they are "kept on the Plantation by poverty, fear, and ignorance of the outside world, living in a cycle of poverty

and raising their children to be the next generation of Firestone Plantation

Workers." Compl. ¶ 64. The adult plaintiffs allege that they

> seek the simple justice of the freedom [to] choose whether to work, the
> opportunity to work free of coercion, the security of a proper employment
> relationship, the benefit of wages that do not leave them in malnourished
> poverty, and the meager benefits provided under the law of Liberia,
> including rest days and holidays. Most of all, they seek the cessation of
> conditions that formed the premise of the Firestone Plantation, and that
> have left them in the same situation as their own fathers, watching their
> own children join them as tappers with no future other than the misery they
> have experienced their entire lives.

Compl. ¶ 66. Anyone can appreciate these most basic human aspirations, even

from the comfortable distance between Liberia and Indiana. The relief plaintiffs

seek, however, and the changes that would resolve their complaints, show that the

conditions about which they complain are not "forced labor" as that term is used

in any specific, universal, and obligatory norm of international law.


During the hearing on the motion to dismiss, the court asked plaintiffs'

counsel what would need to change so that plaintiffs' labor would no longer be

forced, in plaintiffs' view. The principal answer was to reduce the daily quota for

latex production and thus to raise effective wages on the Firestone Plantation. Tr.

49-50. Plaintiffs' counsel also said that the remedy would include providing

information to workers about their rights, upgrading equipment, including safety

equipment, and changing the security force. Tr. 50-51. Apart from the comment

on the security force, discussed below, those are all clearly matters of wages and

working conditions that fall outside any specific, universal, and obligatory understanding of the prohibition against forced labor.

Plaintiffs have not alleged that Firestone fails to pay them. They do not allege that Firestone is using physical force to keep them on the job. They do not allege that Firestone is using legal constraints to keep them on the job. Plaintiffs do not allege that they could not freely quit their jobs if they felt they had better opportunities elsewhere in Liberia. Plaintiffs do not allege that they have been held against their will, tortured, jailed, or threatened with physical harm. Plaintiffs do not allege any form of ownership or trafficking in employees.

Plaintiffs allege instead that they are being kept on the job by the effects of "poverty, fear, and ignorance." As powerful as these forces may be, they are qualitatively different from armed troops keeping kidnapped and deported workers in labor camps. Higher wages, rest days and holidays, and the security of a proper employment relationship, better housing, education, and medical care are all understandable desires. But better wages and working conditions are not the remedy for the forced labor condemned by international law. The remedy for truly forced labor should be termination of the employment and the freedom to go elsewhere. *Pollock v. Williams*, 322 U.S. 4, 18 (1944); *Does v. The Gap, Inc.*, 2002 WL 1000068, at *15 (D.N. Mar. I. May 10, 2002) (dismissing claims for involuntary servitude). Yet the adult plaintiffs allege in their Complaint that they are afraid of losing the very jobs they say they are forced to perform. Compl. ¶ 64

(complaining of "the prospect of starvation just one complaint about conditions away"); ¶ 59 (alleging that Firestone improperly treats plaintiffs as "casual labor which can be fired for any reason"); ¶ 49 (alleging that workers are told they will be dismissed even if they wish to take a day off without pay, and that Liberia's extremely high unemployment rate "allows Firestone to say with confidence that anyone who wants to leave can do so and join the ranks of the starving unemployed").

The court does not mean to diminish the plaintiffs' desires or their fears of the future they face if they lose their jobs or leave the Plantation. But the fact that the plaintiffs face worse prospects elsewhere in Liberia cannot be equated with an employer's use of force or coercion to keep workers on the job. Nor can the allegations in the complaint be equated with the use of military power to force labor on behalf of the Nazi regime in Germany as in *Iwanowa*, or the Japanese Empire in World War II as in *Deutsch v. Turner Corp.*, or the Burmese military government in *Doe v. Unocal*.[11]

---

[11]After the hearing in this case, plaintiffs submitted an affidavit from Professor Virginia A. Leary, a scholar with expertise and first-hand experience in international labor law. See Docket No. 39, Ex. A. Professor Leary asserts that customary international law includes a prohibition on forced labor. ¶ 10. The court accepts that conclusion. The critical question is whether that norm is sufficiently specific, universal and binding as applied to the circumstances alleged in this particular case. On that question, Professor Leary asserts in Paragraph 25 of her affidavit that the ILO has clarified that "conditions similar to the allegations made by Plaintiffs in this case . . . constitute forced labor." She relies in particular on the 2005 ILO report passage stating that penalties showing forced labor can include financial penalties, "including economic penalties linked to debts, the non-payment of wages, or the loss of wages accompanied by threats of dismissal if

(continued...)

G.     *Force and Physical Coercion*

Plaintiffs' claims for relief allege that they "were placed in fear for their lives, were deprived of their freedom, and were forced to suffer severe physical and/or mental abuse designed to coerce them into working on the Firestone Plantation . . . ." Compl. ¶ 88; see also ¶¶ 95, 112, 117, 122, 127. In the absence of more specific factual allegations, these conclusory allegations add nothing to the complaint. See *Bell Atlantic v. Twombly*, 550 U.S. at ___, 127 S. Ct. at 1964-65.

The Complaint does not include any allegations by any of the plaintiffs stating that they or other Plantation workers have been threatened with physical force. Plaintiffs say they are afraid, but that does not mean that defendants are responsible for their fear. Plaintiffs live in a nation that has been torn apart by vicious civil war over the past generation. Between approximately 1980 and 2003, Liberia was one of the most dangerous places on earth.

In the hearing on the motion to dismiss, plaintiffs' counsel stated that plaintiffs had alleged, or could allege, physical coercion. Tr. 43. By that, plaintiffs mean that they live and work in what counsel calls a "climate of fear." Tr. 44.

---

[11](...continued)
workers refuse to do overtime beyond the scope of their contract or national law." *Id.*, quoting Baxter Decl., Ex. C, ¶ 14. The court does not find these allegations in the plaintiffs' Complaint. The alleged financial "penalties" are the consequences of losing jobs that are scarce in a poor and war-torn nation, not a refusal to pay earned wages. Under American employment at will doctrine, an employer may fire an employee who refuses to do overtime work, so long as the employer is willing to pay overtime wages required by law.

Many circumstances contributed to that climate. The focus here must be on circumstances for which defendants might be deemed legally responsible. The only one identified in the complaint is the allegation that in 1994, Firestone hired General Adolphus Dolo as chief of its security for the Plantation, and that General Dolo had been part of the forces led by Charles Taylor. Compl. ¶ 62. Plaintiffs also allege that Firestone filled other key positions at the Plantation with "Taylor operatives." *Id.*

It is not surprising that a multinational corporation needed to make security arrangements during a vicious civil war. Nor is it surprising that some of the persons willing and able to provide those services had some history with one side or the other in the civil war. Yet the Complaint does not allege a single incident of physical force, physical threat, or intimidation by those security forces directed against these plaintiffs or other Plantation workers. In the absence of such allegations or other indications of forced labor, the court cannot conclude that the presence of the current security force could transform the alleged circumstances at the Plantation into a violation of a specific, universal, and obligatory international norm against forced labor. Recall also that plaintiffs alleged repeatedly that they are afraid of losing the same jobs they say they are forced to work.

Plaintiffs also argue that they are so isolated on the Plantation that they have no realistic prospect of leaving if they want to do so. Plaintiffs argue that

there is no transportation available and that they would starve if they left their jobs. The principal problem with the argument is that those circumstances are not the creation of defendants. Defendants are operating a commercial enterprise in a war-torn nation that is one of the poorest and most dangerous on earth. The court is not aware of a basis in international law for stating that an employer must provide transportation or food or other necessities to a worker who wishes to leave his job.

The court assumes that the plaintiffs do not have better choices available to them as a practical matter. But the absence of those better choices is not the legal responsibility of these defendants. Under the standards of international law, Firestone is not responsible for Liberia's poverty, its history of civil war, or the dangers its people face. This basic distinction between harsh conditions for which an employer is or is not responsible is recognized in the ILO definition of forced labor dating back to ILO Convention 29 in 1930. Forced labor is "work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."

The phrase "menace of any penalty" does not refer to the harm a person would suffer if he leaves a job and is unable to earn a living elsewhere. The concept of a penalty is a punishment deliberately inflicted (whether justly or not) by some authority or other actor for some perceived wrongdoing, not the consequences of being homeless and penniless in one of the poorest and most

dangerous nations on earth.  Without that element of deliberately inflicted harm, the definition of forced labor would expand to reach many people who work at poor jobs to support themselves simply because they have no better alternative. The ILO Director General's 2005 report clearly cautions against such a broad definition:  forced labor does not cover "situations of pure economic necessity, as when a worker feels unable to leave a job because of the real or perceived absence of employment alternatives."  Baxter Decl., Ex. C, at 5, ¶ 13.

The issue here is not whether Firestone's management of the Plantation (as alleged in the Complaint) is enlightened or meets with approval of legal scholars or judges in the industrialized world.  The issue is whether the conditions violate a norm of international law that is as specific, universal, and obligatory as were the norms against piracy, violations of safe conducts, or violations of the rights of ambassadors in 1789.

In the absence of allegations of physical coercion, this case would reflect an unprecedented expansion of international law, contrary to all the cautionary warnings the Supreme Court posted in *Sosa*.  The Court instructed lower courts, when deciding whether a norm of international law is sufficiently definite to support a claim under the ATS, to consider the practical implications of recognizing additional types of claims under the ATS.  542 U.S. at 732-33.  Those considerations in this case are daunting – far more so than they were in *Sosa*. The merits of this case do not depend at all on the American presence in the chain

of corporate ownership.  If the working conditions for adults on the Firestone Plantation violate international law, then international law would extend without identifiable boundaries to exploitive working conditions and low wages all over the world.  Plaintiffs' basic reasoning – with conditions this bad, why would we stay if we could leave? – could apply all over the world to people who face no good alternatives for earning a living.

The court is confident that improvements in those wages and working conditions for many millions of people would make the world a better place.  Yet federal courts in the United States must also keep in mind the *Sosa* Court's caution against having American courts decide and enforce limits on the power of foreign governments over their own citizens.  542 U.S. at 727.  How much more intrusive would American law be if American courts took it upon themselves to determine the minimum requirements for wages and working conditions throughout the world?  And to enforce those requirements here against any international business with property that could be found in the United States?[12] Beyond situations presenting clear violations of specific, universal, and obligatory international law norms, these are matters left to diplomacy, legislation, publicity, and economic pressure from consumers, and not to the instincts of judges who would love to issue a writ to make the world a better place for some of the poorest

---

[12]Consider the reciprocal situation in which, for example, a court in France, India, or Peru exercised jurisdiction over claims that a United States employer's wages and working conditions were so poor as to violate norms of international law.

and least fortunate members of the human family. The adult plaintiffs have pleaded circumstances in their Complaint that show they have no claim in Count One under the ATS for forced labor in violation of specific, universal, and obligatory norms of international law. Defendants' motion to dismiss is granted with respect to Count One, the adult plaintiffs' claims of forced labor under the ATS.

H.    *International Norms for Child Labor*

Count Two also seeks relief under the ATS, asserting that work done by the child plaintiffs on the Plantation violates international law. The Complaint alleges that the Firestone supervisors on the Plantation encourage and even require the adult latex tappers to put their children to work to help meet the production quotas. ¶¶ 48, 55. Plaintiffs allege that children apply fertilizers and pesticides by hand, without protective equipment. ¶ 55. Plaintiffs also allege that children as young as six years old work at the Firestone Plantation. ¶¶ 12-23. The defendants deny these allegations, but the court must accept these factual allegations for purposes of the motion to dismiss under Rule 12(b)(6).

Plaintiffs have submitted for the court's consideration a United Nations report, U.N. Missions in Liberia, "*Human Rights in Liberia's Rubber Plantations: Tapping into the Future*" (May 2006), filed as Docket No. 14, Ex. A, *available at* http://unmil.org/documents/human_rights_liberiarubber.pdf (last visited June 25, 2007). United Nations human rights investigators reported that

management at the Firestone Plantation and other rubber plantation stated that child labor was prohibited. Yet the investigators spoke with a number of children working on the Firestone Plantation and other rubber plantations who were 10 to 14 years old. *Id.* at 45. The UN investigators also reported that Firestone management told them that management and the Liberian government did not effectively monitor compliance with policies against child labor. *Id.* This report is not admissible evidence at this point, but its filing as part of the opposition to a Rule 12(b)(6) motion enables plaintiffs to show the types of evidence they expect or hope to offer to support their allegations in the Complaint. See *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704 (7th Cir. 2004) (recognizing that plaintiffs opposing Rule 12(b)(6) motion may illustrate their allegations with additional submissions that are not yet fully admissible as evidence).

The question is whether Count Two alleges violations of sufficiently specific, universal, and obligatory norms of international law. Plaintiffs quote a report from the United States Department of State in 1997 stating that there is an international consensus that freedom from "child labor" is one of several "core labor standards." See Baxter Decl. Ex. E. at 131; accord, Leary Aff. ¶ 26 (Docket No. 39) (ILO recognizes elimination of child labor as fundamental or core right). Yet whatever one's initial reaction is to the broad phrase "child labor," reflection shows that national and international norms accommodate a host of different situations and balance competing values and policies. See ILO Report of the Committee on the Declaration of Principles (Geneva, June 1998), Docket No. 34,

Ex. A, at 224, 226.  What are the relevant age limits, for which types of work?

How does access to education affect the appropriate policies?  What does one say

to a parent who insists that a child work so that the family has enough to eat?

It is not always easy to state just which practices under the label "child labor" are

the subjects of an international consensus.

One can see this in the United States' own Fair Labor Standards Act.  The

FLSA prohibits not "child labor" but "oppressive child labor."  29 U.S.C. § 212(c).

The phrase is defined so that the law allows employment of minors aged 14 and

15 in occupations other than manufacturing and mining if the employment is

confined to periods that do not interfere with schooling and under conditions that

will not interfere with their health and well-being.  29 U.S.C. § 203(*l*).  Focusing

on agricultural work, such as that alleged here, in the United States minors who

are 16 and 17 years old may work in any farm job at any time.  Minors who are

14 or 15 years old may work a wide variety of agricultural jobs so long as the work

is done outside of school hours.  29 U.S.C. § 213(c)(1)(C).  Children who are 12 or

13 years old also may work on a farm with the consent of their parents, outside

school hours.  29 U.S.C. § 213(c)(1)(B).  The FLSA even allows the employment of

a child under the age of 12 by his parent on a farm owned by the parent, or

employment on another small farm, again outside school hours.   29 U.S.C.

§ 213(c)(1)(A).  In the United States, even children as young as 10 or 11 years old

may hand-harvest some crops with a special waiver from the Department of Labor.

29 U.S.C. § 213(c)(4).   Liberian law on this subject is not as detailed, but

defendants have come forward with evidence that Liberian law allows children under the age of 16 to be employed so long as their work does not interfere with their education.  Paegar Decl. ¶¶ 3-4 & Ex. A (Docket No. 2-31).

Returning to international standards, ILO Convention 138, the Minimum Age Convention of 1973, also shows the need to draw lines that accommodate a variety of policies.  ILO Convention 138 sets forth minimum ages for different types of work in different nations at different stages of economic development. Nevertheless, that convention notes that its age limits apply to certain forms of employment, including "plantations and other agricultural undertakings mainly producing for commercial purposes, but excluding family and small-scale holdings producing for local consumption and not regularly employing hired workers."  Art. 5(3).  In such settings, ILO Convention 138 prescribes a minimum age of 14 for employees.  Yet neither the United States nor Liberia has ratified ILO Convention 138, though Japan has ratified it.

The key source of international child labor standards for present purposes is ILO Convention 182, the 1999 Convention Concerning the Prohibition and Immediate Elimination of the Worst Forms of Child Labor, which the United States, Liberia, and Japan have all ratified.  The importance of the line-drawing is evident in that very title.  ILO Convention 182 does not seek to outlaw child labor as such, but only its "worst forms."  Those worst forms include slavery and forced or compulsory labor, prostitution and production of pornography, and drug

-66-

trafficking. The worst forms also include "work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children." Art. 3. ILO Convention 182 leaves to member nations the identification of the jobs likely to harm health, safety, or morals. Art. 4.

Giving plaintiffs the benefit of their factual allegations, the Complaint states that defendants are actively encouraging – even tacitly requiring – the employment of six, seven, and ten year old children. Giving plaintiffs the benefit of their factual allegations, the defendants are actively encouraging that these very young children perform back-breaking work that exposes them to dangerous chemicals and tools. The work, plaintiffs allege, also keeps those children out of the Firestone schools. The court understands that defendants deny the allegations, but defendants have chosen to file a motion that requires the court to accept those allegations as true, at least for now.

The circumstances alleged here include at least some practices that could therefore fall within the "worst forms of child labor" addressed in ILO Convention 182. The conditions of work alleged by plaintiffs (and reported by the UN investigators) are likely to harm the health and safety of at least the very youngest of the child plaintiffs in this case.

As noted above, and as Firestone has argued, national child labor laws and international conventions on child labor are often written to allow even very young

children to help out on family farms. Those special accommodations for family farms have no application here. Plaintiffs do not challenge labor practices on subsistence farms. They challenge the practices of a huge multinational corporate family that hires the children's parents and then (allegedly) encourages the parents to require their young children to do much of the work. Plaintiffs allege that defendants have set the daily production quotas so high that use of child labor is both necessary and inevitable, and that defendants take advantage of the parents in this situation. Compl. ¶ 55.

The court recognizes that international legal standards for child labor do not always establish bright lines, though there are some. That is also the case with forced labor, as discussed above. Just as some practices that might be described by some as "forced labor" might not violate international law, some practices that could be described as "child labor" also do not violate international law. One must look more closely at the particular circumstances, as shown by the pleadings and later by the evidence.

At least some of the practices alleged with regard to the labor of very young children at the Firestone Plantation in Liberia may violate specific, universal, and obligatory standards of international law, such that Count Two should not be dismissed on the pleadings. In light of ILO Convention 182, the court believes that the allegations of child labor in Count Two meet the *Sosa* standard for ATS claims. It would not require great "judicial creativity" to find that even paid labor

of very young children in these heavy and hazardous jobs would violate international norms. Those international norms are not inconsistent with Liberian law. Those norms also are stated in an international convention that both the United States and Liberia have ratified. On this record, there is no indication that this lawsuit threatens to cause friction with the foreign policy of the United States. See *Sosa*, 542 U.S. at 725-28 (identifying reasons for caution in recognizing new claims under the ATS). Plaintiffs may face other daunting challenges in pursuing their case, and the court will address those issues as they are raised. The court is also cautious about the practical consequences of recognizing child labor claims under the ATS and international law. See *id.* at 732-33. In a sufficiently extreme case, however, such as plaintiffs have alleged here, the court believes that *Sosa* leaves the ATS door open. The allegations that defendants are encouraging and even requiring parents to require their children as young as six, seven, or ten years old to do this heavy and hazardous work may state a claim for relief under the ATS. Defendants' motion to dismiss is denied as to Count Two.

VIII.  *ATS Claims Alleging "Cruel, Inhuman or Degrading Treatment"*

In Counts Three and Four, plaintiffs seek relief under the ATS alleging that defendants' actions violated customary international law norms against cruel, inhuman, and degrading treatment. Based on the reasoning set forth above on the ATS claims for forced labor, the court also has subject matter jurisdiction over these claims. On the merits, defendants argue that any international norm

against cruel, inhuman and degrading treatment fails the *Sosa* test of being specific, universal, and obligatory.

Plaintiffs rely on case law and Section 702 of the Restatement (Third) of Foreign Relations, which provides that a state violates international law if, as a matter of state policy, it practices, encourages, or condones "torture or other cruel, inhuman or degrading treatment or punishment," in addition to practices such as genocide, slavery, murder, prolonged arbitrary detention, and racial discrimination. To argue that Section 702 is binding, plaintiffs note that the Supreme Court in *Sosa* cited Section 702 with approval. In that passage, 542 U.S. at 737, the Court relied on the prohibition of "prolonged arbitrary detention" to conclude that the plaintiff's claim of relatively brief detention in the absence of positive authority fell short of an actionable international norm. That citation cannot reasonably be read as an endorsement of broad applications of other provisions of Section 702, especially in a context as new as this one.

The available case law does not support plaintiffs' claims in Counts Three and Four. In *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005), the plaintiffs were labor activists at a banana plantation in Guatemala. They alleged that the defendants had hired a security force that held two plaintiffs hostage, threatened to kill them, and shoved them with guns, and lured, abducted, or forced other labor activists into similar detention, ultimately forcing some plaintiffs at gunpoint to resign from their union leadership positions.

416 F.3d at 1245. The Eleventh Circuit upheld dismissal of ATS claims for cruel, inhuman and degrading treatment, though dismissal of other claims for torture was reversed. On the claims for cruel, inhuman and degrading treatment, the court noted that district courts permitting such claims under the ATS had relied on the International Covenant on Civil and Political Rights, which *Sosa* held definitively did not create obligations enforceable in federal courts. 416 F.3d at 1247, citing 542 U.S. at 734-35.

Plaintiffs rely on *Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004), in which members and supporters of the Falun Gong movement in China sued the mayor of Beijing and other Chinese officials for torture and prolonged detention. Applying the *Sosa* standard for specificity, the district court rejected a categorical approach and concluded that it needed to focus on the specific conduct at issue. 349 F. Supp. 2d at 1321-22, citing *Xuncax v. Gramajo*, 886 F. Supp. 162, 187 (D. Mass. 1995), and *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1093 (S.D. Fla. 1997 (issue is whether international community would agree that the specific conduct amounted to a violation of customary international law). The court in *Doe v. Qi* also relied on the International Covenant, however, which the Supreme Court had held in *Sosa* could not be used to support a claim under the ATS. *Id.* at 1322.

The court in *Doe v. Qi* reviewed case law to determine what types of conduct had been deemed violations of the norm against cruel, inhuman and degrading

treatment. *Id.* at 1322-24. The court found that short interrogations and beatings of three foreign citizens in China, see 349 F. Supp. 2d at 1267-68, paled in comparison to the acts found to amount to cruel, inhuman, or degrading treatment. *Id.* at 1324. The court found, however, that the treatment of a fourth citizen who alleged that she had also been sexually assaulted during her detention and interrogation stated a claim for cruel, inhuman and degrading treatment. *Id.* at 1324-25.

This court generally agrees with the approach of the court in *Doe v. Qi*, focusing on the particular conduct in question to decide whether the customary international norm against cruel, inhuman, and degrading treatment is sufficiently specific, universal and obligatory as applied to that conduct. Plaintiffs in this case have not directed the court's attention to any case law in any jurisdiction applying the general international norm against cruel, inhuman and degrading treatment to actions at all comparable to the exploitive labor practices that plaintiffs allege in this case.[13] Under these circumstances, the court cannot

---

[13]Plaintiffs rely on *Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996), in which the Eleventh Circuit affirmed a district court's award of damages under the ATS for arbitrary imprisonment and torture of the plaintiffs as teenage girls in Ethiopia, finding that the conduct amounted to torture and cruel, inhuman and degrading treatment. The torture is described at pages 845-46. Plaintiffs also rely on *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1183 (C.D. Cal. 2005), *Estate of Cabello v. Fernandez-Larios*, 157 F. Supp. 2d 1345 (S.D. Fla. 2001), and *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1347 (N.D. Ga. 2002). In *Mujica*, the Colombian military and associated groups dropped bombs on civilians, killing 17 civilians and wounding 25 others. 381 F. Supp. 2d at 1168. The court denied dismissal of many claims arising from the attack, but dismissed the ATS claims of cruel, inhuman, and degrading treatment as too similar to

(continued...)

find that the general international norm against cruel, inhuman and degrading treatment is sufficiently specific to apply to this case under the ATS as interpreted in *Sosa*. Defendants' motion to dismiss Counts Three and Four must be granted.

IX.    *State Law Claims*

The complaint filed in California included several claims arising under California law. The complaint alleged that defendants acted negligently and recklessly (Count Nine), that defendants have enjoyed unjust enrichment (Count Ten), that defendants violated a California statute on unfair business practices (Count Eleven), and that defendants negligently hired and supervised the supervisors and overseers on the Plantation (Count Twelve).

Plaintiffs have not yet articulated a viable basis for applying California law or Indiana law to the management of the Plantation in Liberia. Count Nine seems

---

[13](...continued)
claims under American law for intentional infliction of emotional distress. *Id.* at 1183. *Estate of Cabello* presented claims arising from the murder of a member of the Allende government during the coup d'état in Chile in 1973. The district court held that relief was available under the ATS based on claims of cruel, inhuman and degrading treatment, 157 F. Supp. 2d at 1361. In *Mehinovic*, the plaintiffs testified that the defendant had beaten and tortured them in the course of ethnic cleansing campaigns in Bosnia during the conflict there in the early 1990s. The district court found that the evidence supported a number of claims, including for cruel, inhumane and degrading treatment. (The Eleventh Circuit in *Aldana* later rejected the conclusions in both *Estate of Cabello* and *Mehinovic* on these particular claims, though it did not reject those district courts' findings that other claims based on the defendants' actions were viable. See 416 F.3d at 1247.) The facts in these cases simply are not comparable to the allegations in this case.

to assume that defendants' own policies have the force of law.  The state law claims are dismissed under Rule 12(b)(6).

*Conclusion*

For the reasons stated above, defendants' motion to dismiss the claims in the complaint is granted with respect to Counts One and Three through Twelve. The motion to dismiss is denied with respect to Count Two.  The court will set a status conference in the near future to discuss the next stages of this action.

So ordered.

Date: June 26, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Derek Joseph Baxter
INTERNATIONAL LABOR RIGHTS FUND
derek.baxter@ilrf.org

Terrence P. Collingsworth
INTERNATIONAL LABOR RIGHTS FUND
tc@ilrf.org

Paul L. Hoffman
SCHONBRUN DESIMONE SEPLOW HARRIS & HOFFMAN
723 Ocean Front Walk, Suite 100
Venice, CA 90291

Kimberly Denise Jeselskis
MACEY SWANSON AND ALLMAN
kjeselskis@maceylaw.com

Jeffrey J. Joyce
JONES DAY
jjjoyce@jonesday.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Mark J. R. Merkle
KRIEG DEVAULT
mmerkle@kdlegal.com

Terence M. Murphy
JONES DAY
tmmurphy@jonesday.com

Marc T. Quigley
KRIEG DEVAULT
mquigley@kdlegal.com

Michael L. Rice
JONES DAY
mlrice@jonesday.com

Natacha  Thys
INTERNATIONAL LABOR RIGHTS FUND
natacha.thys@ilrf.org