**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **John Roe I, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) Case No. 1.06-cv-0627-DFH-JMS |
| | ) |
| **vs.** | ) |
| | ) |
| **Bridgestone Americas Holding Inc., et al.** | ) |
| | ) |
| **Defendants.** | ) |

<u>**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**</u>

On April 15, 2008, Plaintiffs served Defendants with Plaintiff James Roe I's First Set of Interrogatories to Defendants and Plaintiffs' First Request to Defendants for Document Production (the "discovery requests"). After several meet and confers, Defendants still have provided insufficient and incomplete discovery responses and production of documents. Most significant, Defendants have disregarded the relevance standard for discovery and purport to limit their responses and document production to only those documents relating explicitly to the actual use of child labor on the Plantation, and thus fail to provide relevant information concerning security on the Plantation, the Liberian government's, including Charles Taylor's, involvement in the affairs, security, and governance of the Plantation, additional documents about safety and education, and work-related injuries for all tappers, among other categories of documents. Additionally, Defendants have unilaterally placed unreasonable time restrictions on Plaintiffs' requests, in most instances providing documents only for the period between 1999 and 2005, which does not even span the period of liability or the statute of limitations in this case. As the information sought in Plaintiffs' discovery requests is essential and relevant to Plaintiffs'

claims and also to the defenses and arguments Defendants have raised in their answer, motion to dismiss, and other filings before this Court, Plaintiffs respectfully request that the Court compel Defendants to respond to the discovery requests identified below pursuant to Fed. R. Civ. Pro. 37(a)(2)(B).

## INTRODUCTION

Plaintiffs James Roes I - XV and Jane Roes I - VIII are 23 current or former child laborers, ranging in age from 7 to 20, on Defendants' Firestone Plantations Company ("Firestone Plantation") in Harbel, Liberia.  All of the named child laborers worked on the Firestone Plantation generally between the ages of 6 and 18, and some began working as young as four or five. Complaint ("CT") ¶ 80.

Plaintiffs are children who are members of third or fourth generation families born into and trapped by a system of forced labor on the one-million acre Firestone Plantation.  Most of the class members have little conception of any world outside the million acres that Harvey Firestone seized at gunpoint from their enslaved ancestors.  These children work under unbearable conditions and many live in the same miserable hovels that were built for their ancestors in 1926, with the same open sewers, doing the same work using the same crude tools without the protection of safety equipment, and the same compulsion to meet the Firestone daily quota, or starve.  These quotas are unattainable by one person.[1]

On November 17, 2005, Plaintiffs filed suit against Defendants under the Alien Tort

---

[1]. Defendants take issue with Plaintiffs' use of the term "quota."  Regardless of the semantics used, Plaintiffs contend that on a daily basis the number of trees each worker is required to tap, the amount of cuplump (coagulated latex) each worker is required to collect and the combined duties associated with tapping and collecting raw latex are impossible to achieve for a single person without assistance from the tappers' unpaid children.  Firestone was not only aware of, but encouraged this family quota system.  *See* Argument and citations, *infra,* Section A, at p. 7.  Additionally, practices such as forced double tapping or recovery tapping increase the amount of work required of tappers on many days.  *See infra,*

Statute ("ATS"), 28 U.S.C. § 1350, for violations of international law norms prohibiting the use

of forced labor and forced child labor, and state laws. CT ¶ 5. The named children seek to

represent a class of Plaintiffs who currently work or worked on the Firestone Plantation as

children under the age of 18. *Id*. ¶ 80; Pls' Amended Motion for Class Certification, at p. 15.

On February 6, 2006, Defendants collectively filed their Motion to Dismiss.  *See* Dkt. No. 20.

As it related to Plaintiffs' claims of child labor Defendants predominantly argued that there is no

international, specifically defined norm governing the conditions under which children can work

on the Plantation, but that "if children are helping their parents, it is at the parents' behest, not

because Firestone forces the children to work." *Id.* at pp. 24-25.  On June 26, 2007, the Court

denied Defendants' Motion to Dismiss on Count II, the child labor claim, holding:

> It would not require great "judicial creativity" to find that even paid labor of very young
> children in these heavy and hazardous jobs would violate international norms. . . . In a
> sufficiently extreme case, however, such as plaintiffs have alleged here, the court
> believes that *Sosa* leaves the ATS door open.  The allegations that defendants are
> encouraging and even requiring parents to require their children as young as six, seven,
> or ten years old to do this heavy and hazardous work may state a claim for a relief under
> the ATS.

 Order, Docket No. 40, at pp. 68-69.

Based on Defendants' responses to Plaintiffs' discovery requests, it is clear that

Defendants take the position that the only *factual allegations* in Plaintiffs' complaint that

continue to have relevance after the Court's dismissal of the adults' forced labor claim are

simply that: (1) children have worked and do work on the Plantation; (2) children assist their

families in completing the duties associated with tapping; and (3) Firestone has passed policies

prohibiting child labor.  Defendants ignore that Plaintiffs have stated a claim of *forced* child

---

Section A, at p. 8; F, at p. 24.

labor and that certain categories of documents and information Plaintiffs request are related to both this claim and to defenses and arguments the Defendants have raised in their answer and motion to dismiss.

Based on Defendants' faulty premise, they have either refused to provide documents, or have limited the scope of documents produced as they relate to information in the following key categories: (1) security on the Plantation; (2) the Liberian government's, including the Charles Taylor regime's, involvement in the affairs, security, and governance of the Plantation; (3) safety equipment for the tappers; (4) education on the Plantation except for registration/attendance records for children enrolled and several general maps of schools; (4) the living conditions of tappers; (5) employment documents related to tappers, including termination reports or notifications; (6) work-related injuries for all tappers; and (7) miscellaneous documents, including those relating to punitive damages, costs of items sold in stores located on the Plantation, and other documents.

Defendants' misguided view that the above categories of documents are irrelevant to Plaintiffs' claim or are overly broad severely underestimates the charges Plaintiffs level against Defendants – Plaintiffs allege children work on the Plantation *because* Defendants propagate an exploitative system characterized by inhumanely high production quotas and devastatingly low wages.  Firestone perpetuates this system through fear and intimidation in an environment that keeps the next generation of tappers ignorant and geographically isolated.  In short, Plaintiffs' allegations necessarily attack the underlying oppressive system because as long as it remains in tact without alteration, children will continue to be forced to work on the Plantation.

After three lengthy telephonic meet and confers, Plaintiffs sent Defendants a detailed 24-

page Rule 37.1 letter in an attempt to define and narrow the remaining issues.  Defendants

responded with a detailed 16-page letter.  Although the parties have narrowed the issues,

important disputes concerning documents that are central to Plaintiffs' claim remain.  For these

reasons, Plaintiffs now move to compel production of these documents.

## ARGUMENT

### A.  Standard of Review and Overview of Relevance of the Discovery Plaintiffs Seek.

A court has broad discretion in overseeing the conduct of discovery, including granting a

motion to compel when, as here, Defendants have refused to provide relevant information.  *Gile*

*v. United Airlines, Inc.,* 95 F.3d 492, 495-96 (7th Cir.1996) ("The district court exercises

significant discretion in ruling on a motion to compel."); *Chavez v. Daimler Chrysler Corp.*, 206

F.R.D. 615, 619 (S.D. Ind. 2002) ("district courts have broad discretion in matters related to

discovery").  A party may "obtain discovery regarding any matter, not privileged, that is relevant

to the claim or defense of any party, including the existence, description, nature, custody,

condition and location of any books, documents, or other tangible things and the identity and

location of persons having knowledge of any discoverable matter." Fed. R. Civ. P. 26(b)(1).

"[A]ny matter that bears on, or that reasonably could lead to other matter[s] that could bear on,

any issue that is or may be in the case." *Chavez*, 206 F.R.D. at 619 (quoting *Oppenheimer Fund,*

*Inc. v.* Sanders, 437 U.S. 340, 351 (1978)). Even when information is not directly related to the

claims or defenses identified in the pleadings, the information still may be relevant to the broader

subject matter at hand and meet the Rule's good cause standard. *See Sanyo Laser Prods., Inc. v.*

*Arista Records, Inc.,* 214 F.R.D. 496, 502 (S.D. Ind. 2003).

Defendants predominantly argue that the particular discovery requests that are now in

dispute are overly broad and irrelevant to Plaintiffs' only remaining claim, which concerns child labor. Defendants' narrow and restrictive approach to discovery is not consistent with the nature of Plaintiffs' allegations or Defendants' discovery obligations. Plaintiffs alleged a *forced* child labor claim in Count II of their original complaint. *See* CT ¶¶ 94-99. Unlawful child labor constitutes forced labor in its own right, quite apart from whether it was included in a family's work. Under the Worst Forms of Child Labor Convention, 1999 (No. 182), forced or compulsory labor constitutes one of the "worst forms of child labour" to be accordingly prohibited. *See* Ex. 35, Art. 3(a). Additionally, forced child labor relates to "all work or service which is exacted from any person under [1] the menace of any penalty and [2] for which the said person has not offered himself voluntarily." Ex. 36, ILO Convention No. 29, Art. 2(1). Plaintiffs argue that no parent can legally consent to allow a third party to violate his or her child's rights.

Plaintiffs allege that forced child labor is perpetuated by an entire system of exploitation that is characterized by excessively high production quotas that make it necessary for children to work with their families to survive, geographic isolation, hazardous and grueling work that compromises children's ability to attend schools. *See* CT ¶¶ 94-99 (incorporating by reference ¶¶ 1-93). Firestone maintains its oppressive system in several key ways. First, Firestone employs a notorious security force created to maintain a climate of fear. *See* CT ¶ 62. *See also* Argument, *infra*, Section C. Thus, Defendants' use of child labor and their security forces on the Plantation are inextricably linked.

Second, Firestone sets production quotas so high that one adult cannot physically accomplish all daily duties associated with tapping without assistance from children. Based on

6

Defendants' admission, the daily quota would require laboring for 21 hours a day in order for a single worker to meet the quota.  CT ¶ 48. While that is itself unimaginable, Plaintiffs assert that tapping a task size of 750 trees, which is the approximate task size for many of Plaintiffs' guardians,  would require a single worker to toil for far more hours per day – 37.5.  *Id*. If the quota is not met, the worker's pay is cut in half. *Id.* Accordingly, the only feasible way for workers to make this quota is to have their children also work on the Plantation, which has been a recognized and consistent pattern and practice on the Firestone Plantation. *Id*. ¶¶ 4, 48, 55. Additionally, Firestone's managers not only know that the tappers must use their children to meet the quota, they actively encourage it.  *See* CT ¶¶ 4, 48; *see also infra*, p. 7.

Third, the existence of production practices such as forced double tapping or recovery tapping carry with them the threat of severe repercussions if tappers refuse, which further necessitates the use of children.  *See, e.g.,* Ex. 18 (E. F. Dep. 64:8-65:17); Ex. 21 (G. P. Dep. at 256:20-258:5); Ex. 14 (A. K. Sr. Dep. at 38:16-41:2); Ex. 20 (F. M. Dep. 56:22-57:16).  *See also* Ex. 32 (*Firestone:  The Mark of Modern Slavery*, 2005 Report, Save My Future Foundation, March 2005, at p. 11).  Additionally, Firestone supervisors not only encourage the use of child labor to achieve inhumanely high daily production quotas, CT ¶¶ 4, 48, they use various forms of coercion and intimidation ranging from threatened actions against tappers if the children do not perform more or *better*.  *See, e.g.,* Ex. 26 (James Roe I Dep. at 86:12-19); Ex. 17 (James Roe VI Dep. at  282:3-283:15); Ex. 24 (James Roe XIV Dep. at 14:3-17:11); Ex. 19 (James Roe XV Dep. at 134:16-135:1).

Defendants seek to deny that children perform grueling work, and try to change the subject to the newly-improved schools and housing on the Plantation, much of which came after

Plaintiffs filed this lawsuit.  Plaintiffs' allegations govern the scope of the case and they specifically assert that past education and living conditions have a direct correlation to the perpetuation of child labor on the Plantation.  Many children live or work too far away from schools to attend them, work such long hours that they miss school days and are forced to drop out of school, and that their parents cannot afford the uniforms and other supplies required to send all children in a given family to school.  Moreover, there is only one high school for the entire Plantation, which was only recently opened in 2006 after the filing of this lawsuit. Inadequate schooling has a direct impact on Defendants' ability to perpetuate an exploitative system of child labor.  Thus, Plaintiffs seek and are entitled to discovery related to Firestone's overall plantation system, including documents related to the policies, procedures, and practices that demonstrate a system that is built on and perpetuates child labor.

The "burden rests upon the objecting party to show why a particular discovery request is improper." *Kodish v. Oakbrook Terrace Fire Protection District,* 235 F.R.D. 447, 449-50 (N.D. Ill. 2006). To meet this burden, the objecting party must specifically detail the reasons why each request is improper. *Graham v. Casey's General Stores,* 206 F.R.D. 253, 254 (S.D. Ind. 2002); *Richmond v. UPS Service Parts Logistics*, 2002 U.S. Dist. LEXIS 7496, at *6 (S.D. Ind. 2002). Although in some instances Defendants have produced documents and information, in others they have failed to meet their burden, relying on the objection that discovery requests related to security, state action, and in some instances education, among other categories, are overly broad or irrelevant to Plaintiffs' child labor claim.  Plaintiffs' forced child labor claim encompasses far more than the act of children physically laboring on the Plantation.  *See* CT ¶¶ 94-99 (incorporating by reference ¶¶ 1-93).  As a result, Defendants' determination of relevance is

overly restrictive and does not suffice to meet their discovery burden.  *See Burkybile v. Mitsubishi Motors Corp.*, 2006 U.S. Dist. LEXIS 57892, 2006 WL 2325506, at *6 (N.D. Ill. 2006).

**B.  Defendants Have Unilaterally and Inappropriately Limited the Time Period for Virtually All of Plaintiffs' Discovery Requests to between 1999 and 2005.[2]**

Despite the fact that Plaintiffs have reasonably requested interrogatory responses and documents that encompass the liability period in this litigation – 1995 to 2005 or the present, Defendants have unilaterally limited their production to documents covering the period 1999 to the present.  *See* Ex. 4, at p. 2, ¶ 1 (Defs' Objections and Responses to Pls' First Requests for Document Production).  Defendants base this general temporal objection on a restrictive interpretation of this Court's June 26, 2007 order that is neither supported by the language of the order nor by international law.  Namely, Defendants state that Plaintiffs' "sole remaining claim is predicated on ILO Convention 182 ["C182"], which was not issued until June 1999."  *Id.* As a result, in nearly all instances Defendants will only produce non-privileged documents, to the extent they exist, for the period of June 1999 to the present.  *Id.*

The Court's June 26, 2007 order in no way restricted *discovery* to the period after the adoption of C182 in 1999.  Nor did the Court determine that C182 is the only applicable or persuasive international instrument of law relevant to Plaintiffs' claim.  In fact, other international instruments also apply to Plaintiffs' claim for forced child labor.  *See* Supplemental Decl. of Lee Swepston, ¶ 10.  For example, Liberia ratified the Convention on the Rights of the

---

[2] Defendants have placed this time restriction on virtually all of Plaintiffs' discovery requests with only limited exceptions, such as an earlier Collective Bargaining Agreement and the 1976 Concession Agreement.  Plaintiffs' discovery requests sought documents and responses covering 1995 to 2005 and in some instances to the present.  Thus, Plaintiffs seek an order compelling the production of all discovery for this period unless the parties previously agreed otherwise or this Court limits the temporal scope.

Child ("CRC") on June 4, 1993 – years before Liberia ratified C182 in June 1999.  Article 32 of

the CRC states:

> 1. States Parties recognize the right of the child to be **protected from economic exploitation and from performing any work that is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development**.
> 2. States Parties shall take legislative, administrative, social and educational measures to ensure the implementation of the present article. To this end, and **having regard to the relevant provisions of other international instruments**, States Parties shall in particular:
>> (a) Provide for a minimum age or minimum ages for admission to employment;
>> (b) Provide for appropriate regulation of the hours and **conditions of employment**;
>> (c) Provide for appropriate penalties or other sanctions to **ensure the effective enforcement of the present article**.

Ex. 37, CRC, Art. 32 (emphasis added).

Article 32 of the CRC, therefore, established the requirement that State Parties protect

children from exploitation and hazardous conditions, as well as implement effective

enforcement.  Article 32(2) of the CRC contains almost verbatim language from C138

concerning the prohibition against "work which by its nature or the circumstances in which it is

carried out is likely to jeopardize the health, safety, or morals of young persons."  C138.  *See*

*also* Supplemental Swepston Decl. ¶ 15.  C182, in turn, built upon the provisions of C138, which

were incorporated in the CRC, changing them only slightly, and mainly with regard to the

urgency with which States were required to implement them.  Supp. Swepston Decl. ¶¶ 18-19;

Ex. 35, art. 1 (C182); Ex. 34 (C138).  Thus, when Liberia ratified C182, it was already obligated

under the CRC to protect children from performing hazardous or harmful work. *See* Supp.

Swepston Decl. ¶¶ 18-19.

10

Even if Defendants' liability is tied to Liberia's ratification of C182, which Plaintiffs do not concede, the discovery period of Plaintiffs' child labor claim is not restricted to the years of liability.  In fact, discovery of information before and after the liability period is common, as long as the information requested is relevant or is reasonably calculated to lead to the discovery of admissible evidence.  *See, e.g., Johnson v. Kraft Foods North America, Inc.*, 238 F.R.D. 648, 652 (D. Kan. 2006).  Furthermore, the discovery period is often found to be reasonable when linked to the statute of limitations.  *See, e.g., Long v. Landvest Corp.* WL 897612, at *7-8 (D. Kan. Mar. 31, 2006).  Moreover, courts have approved a discovery period extending several or more years prior to the conduct at issue.  *See Beesley v. Int'l Paper Co.*, 2008 WL 207537, 1 (S.D. Ill. 2008) (holding that scope of discovery is defined by relevance, not statute of limitations); *Owens v. Spring/United Management Co.*, 221 F.R.D. 649, 655 (D. Kan. 2004).

In this case, the statute of limitations extends back ten years from the date of the filing of the complaint in 2005.  *See* 28 U.S.C. § 1350.  *See also Deutsch v. Turner Corp.*, 324 F.3d 692, 717 (9th Cir.2003) (adopting the statute of limitations under the TVPA and holding "[t]he statute of limitations under the ATCA is 10 years.").

Defendants have not argued that the burden is too great to produce documents from 1995 to the present.  Instead, they rely on a faulty premise that they could not be held liable for child labor on the Plantation until 1999.  Plaintiffs strongly disagree with this contention, but even if the Court agrees with Defendants, based on established discovery principles, Plaintiffs are entitled to documents beginning at least in 1995 and in some instances earlier.

**C.  Defendants Must Be Compelled to Produce Certain Documents and Information.**

As described above, despite Plaintiffs efforts to narrow and limit interrogatories and document requests, Defendants continue to maintain that Plaintiffs are not entitled to certain key categories of documents and information. Set forth below are the specific categories of documents and information Defendants should be compelled to produce.

**1.  Plaintiffs are Entitled to Documents Related to Plantation Security.**

Plaintiffs' discovery requests relating to security on the Plantation are Interrogatory Nos. 5-6, 8-9, 11, 15, 17 and Request for Production Nos. 18-19, 21, 23-25, 27-40, 43-50, 52 and 127. Defendants do not dispute that security on the Plantation is relevant to the issue of child labor. In fact, Defendants state in their response to Plaintiffs' Interrogatory No. 2:

> Firestone has worked diligently to enforce its prohibition against child labor. All employees are frequently reminded of the policy and the consequences of violation same, and headman, overseers, superintendents and other Firestone management are constantly on the lookout for children in the field. In addition, *members of the Company's Plant Protection Department ("PPD") routinely patrol the nearly 200 square miles of the farm, with one of their assigned duties being to watch for underaged individuals working on the farm…*

*See* Ex. 3, at pp. 13-14 (emphasis added).  Similarly, Firestone has produced several documents indicating that its security force conducts investigations into the use of child labor on the Plantation.  *See, e.g.,* Ex. 13, DEFS 4041; 4048(a); 4052.

Yet, despite Defendants' admission, on the basis of irrelevance and over breadth, Defendants refuse to provide any documents relating to security that do not explicitly reference children laboring on the Plantation.  Defendants accuse Plaintiffs of engaging in an "obvious ploy to link Defendants (and, in particular, Firestone's Plant Protection Department ("PPD")) to a much-despised political/military figure [Charles Taylor] rather than legitimate[ly] request[ing] . . . documents that could bear on the issue of whether Firestone condones and encourages the

use of the worst forms of child labor." Ex. 6, at p. 3.

Defendants mistake the nature of Plaintiffs' *forced* child labor claim.  Far from a ploy,
Plaintiffs have always alleged that Firestone currently employs, and has employed in the past, a
notoriously violent and intimidating security force.  Firestone openly maintained relations with
war criminal Charles Taylor before and after he became Liberia's president in 1997, and
Firestone appointed one of Taylor's key generals, Adolphus Dolo, as the Chief of Security for
the Firestone Plantation.  CT ¶ 62.  Firestone similarly filled other positions in the security force
with Taylor operatives. *Id.*

The manner in which Firestone's security force carries out its duty to patrol for child
labor on the Plantation and to investigate reports of child labor has direct bearing on the climate
of fear perpetuated on the Plantation.  Plaintiffs are obviously engaged in a battle against an
exploitative system of labor that uses and encourages the use of children so that it may profit.
Plaintiffs, therefore, allege that they fear violent retaliation for speaking out about the conditions
on the Firestone Plantation.  *Id.* ¶¶ 7-8.  Firestone's security force created a climate of fear, and
this has prevented Plaintiffs from refusing to continue the daily labor that they, as children, and
those before them have been required to provide for generations. *Id.* ¶ 43.

Moreover, by Defendants' own characterization, the security force both patrols for child
labor and conducts investigations into child labor.  Thus, members of the security force,
including rank and file members, are likely to have information concerning the extent of child
labor used on the Plantation, the duties the children performed, and injuries they may have
sustained while working, among other relevant information.

In addition, Defendants' connection to Charles Taylor's key general and other operatives

13

demonstrates a level of state action that Defendants have previously argued is necessary to

sustain a child labor claim under the ATS.  *See e.g.,* Defendants' Motion to Dismiss, at pp. 18-

19.  In fact, documents Firestone produced reference "a joint team of security comprised of

UNMIL Police, PSU/LNP and PPD Task Force" who arrested a 15 year-old boy for working on

the Plantation. Ex. 13, DEFS 4056(a).  To be clear, although Plaintiffs have alleged that joint

action or a co-venturer relationship exists, Plaintiffs contend that the worst forms of child labor

and forced child labor constitute jus cogens international norms of such magnitude and of such a

specific, obligatory, and universally condemned nature that state action is not required.  *See, e.g.,*

CT ¶¶ 62, 90-91, 97, 103, 108; *see also* Argument *infra*, Section C.2.

In light of Plaintiffs' allegations and Defendants' own admissions that Firestone's

security force plays a key role in patrolling for and investigating child labor, Plaintiffs are

entitled to information concerning Firestone's notorious security force.[3]  Plaintiffs have limited

the breadth and scope of the discovery requests on which they move to compel to:

- Documents related to negotiations between Defendants and the Charles Taylor regime concerning security and payment of security on the Plantation (18-19, 24-25, 52);
- Documents related to the payment for security forces for the Plantation involving any Liberian government entity or its agent (45);
- Documents concerning the identity of persons who had decision-making authority to hire security since 1995, including the years during the Charles Taylor regime; the identity of heads, chiefs, or supervisors of the Plantation's security;[4] the location of security check points (27-30);
- Documents related to, and including, policies related to the hiring, qualifications, training and authority of the security forces on the Plantation, and documents disseminated to security personnel regarding human rights obligations (31-35);
- Documents related to the Government's "Guidelines to Organize and Operate

---

[3] In each instance, unless otherwise noted, Plaintiffs have requested information for the liability period of 1995 to 2005 or the present.  Defendants have unilaterally imposed a temporal restriction on their discovery responses and document production from 1999 to the present.  Plaintiffs address this restriction *supra,* Section B.
[4] Plaintiffs have even further limited their requests and no longer seek the identity of all security personnel, but rather only those who were security chiefs, heads, or supervisors, or the equivalents (Request Nos. 27-30).

Private Security Agencies"( 37);
- Documents related to the detention or arrest of children under the age of 18 on the Plantation (38);
- Personnel files for chiefs, heads, or supervisors of security personnel (39, 127);[5] and
- Documents related to any disciplinary measures and complaints, formal or informal, warning, or counseling taken against security forces relating to individuals conducting tapping activities and/or children (46, 48, 49, 50).

For all the reasons stated above, Plaintiffs are entitled to responses to the above document requests and interrogatories, which Defendants have not provided, because they seek information that goes to the manner and extent to which the security forces carry out their duties and their authority, which includes patrolling and investigating for child labor.

**2. Plaintiffs are Entitled to Documents Related to State Action.**

Plaintiffs' discovery requests related to state action are Interrogatory Nos. 13 and Request for Production Nos. 1-12, 17, 20-22, 26, 51-52, 61-64.  With the exception of the 1976, 2005 and 2008 Concession Agreements, Defendants refuse to provide documents related to state or governmental action that do not explicitly reference child labor, stating that Plaintiffs are on a fishing expedition and the additional documents Plaintiffs seek are not relevant as they "merely prove the fact of the ongoing business of Firestone in Liberia [and] are clearly not designed to lead to the discovery of admissible evidence."  Ex. 6, at pp. 4-5.  Additionally, Defendants accuse Plaintiffs of having failed to adequately plead the requisite state action.  *See id.*

Defendants' argument misses the mark.  Although Plaintiffs maintain that "state action" is not an element of child slavery, Defendants implicated the relevance of documents related to such an inquiry in their Motion to Dismiss.  *See* Motion to Dismiss, at pp. 18-19.  If Defendants

---

[5] Defendants have raised privacy concerns regarding personnel files as they relate to tappers and other individuals. Plaintiffs are amenable to working with Defendants concerning any necessary protective orders.

concede, as they should, that forced child labor does not require state action, then discovery on this issue would not be necessary.  Since Defendants, however, have raised the issue as a defense, Plaintiffs are entitled to discovery on "state action." As the landmark decision in *Kadic v. Karadzic*, 70 F.3d 232, 239-40 (2d Cir. 1995),  reminded, "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." Such conduct, the Court made explicit, involves those offenses considered to be of "universal concern," including piracy, slave trading, genocide, and war crimes.  *Id.* at 240.  *See also Tel Oren v. Libyan Arab Republic*, 726 F.2d 774, 794-95 (D.C. Cir. 1984). Forced labor as slavery is one of the norms of international law, along with crimes against humanity and genocide, that is of "universal concern," and does not require "state action." *See* Restatement (Third) of Foreign Relations Law § 404 (1987).  *See also United States v. Matta- Ballesteros*, 71 F.3d 754, 764 n. 5; *NCGUB v. Unocal, Inc.,* 176 F.R.D. 329, 348-49 (C.D. Cal. 1997).

The fact that Defendants raised this issue in their pleadings entitles Plaintiffs to information related to actions by the various Liberian governments, concerning whether it is/was a co-venturer and whether it ratified the acts of Defendants.  *See* Fed. R. Civ. P. 26(b)(1); *Sanyo Laser Prods.,* 214 F.R.D. at 502; *Adams v. Target*, 2001 WL 987853, at *1.  Regardless, Plaintiffs in fact did plead facts supporting state action in their complaint.  *See* CT ¶¶ 62, 90-91, 97, 103, 108.  Plaintiffs allege that Defendants' actions occurred under color of law and/or in conspiracy or on behalf of those acting under color of official authority, such that the injuries inflicted on these Plaintiffs as a result of the forced labor were inflicted deliberately and intentionally through the acts and/or omission of responsible state officials and/or their agents. *See id.*  Of the various tests to establish that a private party was acting under color of law,

16

Plaintiffs' allegations constitute "joint action" between a state actor and a private party. *See, e.g.,*

*Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). In ATS litigation, allegations of joint action

between corporations and government officials responsible for human rights violations are

relevant to demonstrate potential liability.  *See Drummond Co., Inc.,* 256 F. Supp.2d 1250 (N.D.

Ala. 2003); *SINALTRAINAL v. The Coca-Cola Co.,* 256 F. Supp.2d 1345 (S.D. Fla. 2003);

*Abdullahi v. Pfizer, Inc.,* No. 01 CIV. 8118, 2002 WL 31082956 (S.D.N.Y. 2002); *Wiwa v Royal*

*Dutch Petroleum Co.*, No. 96 Civ. 8386 (KMW), 2002 WL 319887 (S.D.N.Y. 2002); *Unocal I*,

176 F.R.D. 329 (C.D. Cal. 1997).

The 1976, 2005 and 2008 Concession Agreements, produced by Defendants, demonstrate

multiple ways in which the government of Liberia has a partial stake in the Harbel Plantation.  In

fact, directly relevant to the allegations in Plaintiffs' case, Firestone has the right to establish

security checkpoints within the Production area while the Government "has the right to assign

security personnel to join with Firestones' Plant Protection Department to monitor any such

security gates and checkpoints . . ."  Ex. 11, (2008 Concession Agreement, at DEFS 00000188).

Similarly, Firestone PPD must coordinate with the Government's police, law enforcement, and

security authorities and periodically report to the Ministry of Justice on the activities of the PPD.

 *See id.* at DEFS 00000192.  Additionally, Government workers assigned to the Production area

receive health and educational benefits from Firestone, among other benefits.  *See id.* DEFS

00000192-193.  Moreover, Firestone and the Government have established a "Coordination

Committee" "for the purpose of discussing medical, health, safety, educational, environmental,

labor, personnel and any other matters related to Firestone Activities, in order to coordinate the

needs and plans of Firestone Liberia with the needs and plans of Government in matters affecting

or related to any of the above matters." *Id.* at DEFS 00000201.  In fact, Firestone is exempt from import duties, prior to January 1, 2042, on "goods and materials to meet its social obligations including approved medical and educational materials." *Id.* at DEFS 00000204.

It is clear from the 2008 Concession Agreement, with similar provisions in the previous agreements, that the Government of Liberia has knowledge of conditions on the Plantation and it daily ratifies the acts Plaintiffs allege to have occurred on the Plantation. This involvement makes the government a co-venturer with Defendants.  Moreover, the Plantation is, and has been, protected by government officials either through the provision of security services or payments made to such officials, which has allowed the Plantation to continue the use of forced labor of the children Plaintiffs.  *See* CT ¶¶ 90-91, 97,103,108; *see also supra*, Section C.1. (Security).

Finally, Plaintiffs' forced child labor claim is currently in the discovery stage.  Whether Defendants believe Plaintiffs adequately pled state action is irrelevant to the propriety of Plaintiffs' discovery requests.  State action ultimately is a factually-intensive issue, and thus "the proper time for addressing the state action requirement is at the summary judgment phase." *Drummond Co., Inc.,* 256 F. Supp. 2d  at 1262. Discovery on this fact-intensive issue, therefore, is now ripe.  Genuine evaluation of the nexus between the state and private defendants in this context requires a careful analysis of facts on a complete evidentiary record. Such a record can only be achieved after discovery. *See Unocal I,* 176 F.R.D. at 346 ("the state-action inquiry is more easily resolved on summary judgment than on a motion to dismiss because the court must review the facts and 'circumstances surrounding the challenged action in their totality.'") (quoting *Collins v. Womancare,* 878 F.2d 1145, 1150 (9th Cir. 1989)). *See also Aldana,* 416 F.3d

1242, 1249-50 (11th Cir. 2005).

For all these reasons, Plaintiffs are entitled to additional documents and interrogatory responses related to state action.  Plaintiffs have limited their requests to the following:[6]

- Documents related to negotiations of the concession agreements, other agreements and contracts between the Charles Gyude Bryant Administration, the Charles Taylor regime, and present government and Defendants concerning the security on the Plantation and payment of security for/on the Plantation, the provision of education, healthcare, housing for tappers, and import duties/revenue for basic subsistence food items (1-13, 17);
- Documents and communications related to negotiations concerning agreements between Defendants and the Charles Taylor regime concerning the Defendants ability to continue operating the Plantation in Liberia during the civil crisis (17);
- Documents related to *this* lawsuit exchanged between the defendants and the current or transitional governments of Liberia (4, 12);
- Documents between Councilor Varney G. Sherman and/or the Liberian law firm Sherman & Sherman, Gerald Padmore, and David Kpomakor and the Charles Taylor regime and successive Liberian governments related to the security on the Plantation and payment of security for/on the Plantation, the provision of education, healthcare, housing for tappers, and import duties/revenue for basic subsistence food items (20-22, 52);
- Documents related to the provision of any goods/services to the Charles Taylor regime related to the Plantation (26);
- Documents related to payment or benefits provided by Defendants to the Liberian government for work on the Plantation (118);
- Documents related to the shipments through the Plantation of timber and/or harvested wood for commercial sale (51);[7]
- Documents that identify persons involved in decision-making concerning negotiations between Defendants and the government of Liberia for an extension of the lease agreement (61);
- Documents identifying assets/properties in Liberia utilized by Defendants and

---

[6] Defendants have made clear in the parties' meet and confers that they will continue to search for and produce documents that fall into any category of request relating directly to child labor on the Plantation.  It is, therefore, unnecessary for Plaintiffs to move to compel the production of documents related specifically to child labor, as Defendants do not contest the relevance of such documents.  Defendants have, however, limited their responses and document production related to child labor to 1999 and after.  Plaintiffs do move to compel all documents prior to 1999, beginning in 1995.  *See* Argument, *supra*, Section B.

[7] Plaintiffs seek information concerning the shipments through the Plantation for timber or harvested wood for commercial sale during the Charles Taylor regime because it demonstrates the state's involvement in the operation of the Plantation, specifically in light of reports that Charles Taylor funded the war with the sale of timber during the time of the UN-imposed ban on such sales.  *See* Ex. 29, "LIBERIA: Lifting of UN Timber Ban Gives Hope for Economic Revival, June 21, 2006.

documents related to loans and financing entered into between Firestone
Plantation Co. (FPC) and Defendants (62-63);

- Documents related to any materials or supplies purchased for or loaned to FPC
  by/for Defendants (64).

### 3. Plaintiffs are Entitled to Supplemental Documents Related to Education.

Plaintiffs' discovery requests related to education for which Plaintiffs move to compel
are Interrogatory No. 20 and Request for Production Nos. 94-96.  Defendants have produced or
made available school attendance records to the extent they exist, maps showing the current
location of schools, and documents listing the number of schools, classrooms, students, and
teachers.  Defendants refuse, however, to provide memoranda, communications, or reports, for
example, concerning when/why new schools were built, shortages of schools, the new high
school and why it was built, among other relevant documents.

Defendants minimize Plaintiffs' child labor claim, characterizing it, in part, as consisting
of allegations "that tappers' children are deprived of the right to attend school because their
parents make them work due to the alleged demands of the job."  Exhibit 6, at p. 6.  Plaintiffs do
allege, among other education-related arguments, that the grueling work children perform
compromises their ability to attend school regularly and/or to complete school without
interruption.  In fact, many of the named child plaintiffs testified in recent depositions that
because of the work and long hours, their education is compromised.  For example, James Roe
XV began attending a Firestone school this year at the age of 16.  *See* Ex. 21 (G. P. Dep. at
128:15-129:9; 213:9-15).  He testified that he often misses school because the work is too hard,
and if he arrives late he is punished and not allowed to sit for class.  *See* Ex. 19 (James Roe XV
Dep. at 34:9-39:20). James Roe I's education has been slowed considerably – at the time of his

20

deposition, he was 17 and only in the fifth grade.  Ex. 26 (James Roe I Dep. at 16:11-12; 33:15-16).   James Roe VII is currently 13 years old, but is only in the second grade in school.  *See* Ex. 16 (James Roe VII Dep. at 25:23-26:1; 78:16-19).  In the past, James Roe VII did not go to school when the work was too plentiful and hard.  *See* Ex. 22 (J. F. Dep. at 87:2-25).

As the above testimony demonstrates, Plaintiffs also contend that the location of where a child works, lives, and the nearest kindergarten, primary school, middle school, or high school, has a great impact on whether she attends school regularly and whether the work she does impacts her ability to attend a grade level-appropriate school.  *See* Ex. 32, at p. 17.

Additionally, Plaintiffs contend that although Firestone had paper policies against child labor in effect since approximately 2000, Firestone made little or no genuine attempts to enforce or implement the policies until 2006 and 2007 – after the lawsuit was filed.  *See e.g.,* Ex. 18 (E. F. Dep. at 157:13-158:14); Ex. 23 (J. F. Dep. at 51:5-52:25); Ex. 27 (S. F. Sr. Dep. at 23:5-25:25); Ex. 22 (J. F. Dep. at 197:22-201:1); Ex. 17 (James Roe VI Dep. at 214:11-215-15).   In fact, in documents Defendants recently produced, the numbers of students enrolled in school in 2004 was only 8,436 and in 2007 – after Firestone reportedly began to enforce its child labor policies – the student enrollment rate rose to 13,239.  *See* Ex. 39, at DEFS 00004496.

Defendants cannot deny legitimately the relevance of educational documents to Plaintiffs' child labor claim.  In their Motion to dismiss they acknowledge that Liberian law, which they are bound to follow pursuant to the Concession Agreements, mandates that under some circumstances children may work below the age of 16, "so long as their work does not interfere with their education."  Defs' Motion to Dismiss, at p. 24.   As the Court and Defendants are aware, Plaintiffs contend that "under 18" is the universally-condoned age under

which children may not work in hazardous conditions or engage in tasks that constitute the worst

forms of child labor.  Nevertheless, Defendants cannot argue that education and the interference

with that education by work children perform is not relevant to Plaintiffs' forced child labor

claim – it is.           Defendants can argue all they want about the reasons for the increased

student enrollment for the children of adult workers who otherwise have no access to education.

The fact remains, however, that Plaintiffs have demonstrated their entitlement to the following

documents related to education because there is a close correlation between the availability of

education and the grueling nature of the work:

- Memoranda, communications, reports, and other responsive documents related to the location of schools, the number of schools/students, the level of schools, and the registration of children in schools (96 and 97).
- Documents related to the school "activity fee" of 50 cents and negotiations surrounding its recent abolishment, and cost for school uniforms and supplies (95).
- Documents identifying persons enrolled or registered for education on the Plantation, or communications, memoranda, etc. concerning children's enrolment in school (94).

**4.  Plaintiffs are Entitled to Supplemental Documents Related to Living Conditions.**

Plaintiffs' discovery requests related to living conditions on the Plantation and for which

Plaintiffs are moving to compel production are Requests for Production 81-82, 84, 149, and 153.

Defendants accuse Plaintiffs of attempting to link their discovery requests regarding living

conditions with a "modern-day form of slavery."  Ex. 4, at p. 6.  Defendants' attempts to

mischaracterize Plaintiffs' case as a wage and hour case that is not actionable under international

law fails.  Plaintiffs clearly allege a "modern-day form of slavery" that forces children to

perform hazardous work on the Plantation.

As Plaintiffs have argued in their allegations and throughout this brief, forced child labor

continues on the Plantation because Firestone maintains an exploitative system that is perpetuated by: (1) forcing children and their families to live in substandard dilapidated structures that largely have not been renovated since the 1920s or 1930s when they were built with inadequate space, light, and ventilation; (2) paying workers inhumanely low working wages knowing that this gives tappers no other choice but to have their children work with them because they cannot afford to pay helpers and they cannot complete their tapping tasks alone each day; and (3) maintaining production practices such as forced double tapping, which only serve to increase the tappers' daily work load, without choice, which further necessitates the need for children to work. *See, e.g.,* Ex. 18 (E. F. Dep. 64:8-65:17); Ex. 21 (G. P. Dep. at 256:20-258:5); Ex. 14 (A. K. Sr. Dep. at 38:16-41:2); Ex. 20 (F. M. Dep. 56:22-57:16).

Evidence even suggests the work load for tappers has increased over the years due to the rubber trees' diminishing productivity. As a result, Firestone has increased the size of the tasks (rubber trees tappers must tap and from which they collect raw latex and cup lump) that must be completed on any given day. *See, e.g.,* Ex. 31, *Human Rights in Liberia's Rubber Plantations: Tapping into the Future*, May 2006, p. 46. As the work load has increased, wages prior to 2007 rose only incrementally to $3.38, which further necessitates the use of children who are family members to complete the daily tasks. *See, e.g.,* Ex. 12, 2004 CBA, at DEFS 00000310.

Regarding living conditions on the Plantation, Defendants have agreed to provide only limited documents concerning Firestone's *recent* efforts to rebuild or provide additional housing for tappers, which have only occurred since the filing of this lawsuit. Exhibit 4, at p. 6. Plaintiffs, however, are entitled to:

- Documents and communications related to policies, practices, and procedures concerning the conditions of housing provided to tappers, including memoranda,

reports, communications related to renovations, decisions to renovate the housing, location and dates of renovations.  (81and 82)[8];

- Documents concerning children's access to safe drinking water in the living camps (84);
- Documents and communications related to the provision of housing for tappers, including negotiations concerning new housing (149); and
- Internal or external reports, memoranda, minutes of meetings referring to living conditions (153).

### 5. Plaintiffs are Entitled to Supplemental Documents Related to Tappers' Wages, and Tapper Benefits.

Plaintiffs' discovery requests relating to tappers' wages and benefits for which they seek supplemental documents are Request Nos. 77-79; 150-151.  These requests seek documents related to tappers' wages, benefits, working hours, conditions, as a group; and the sale or loan of supplies to tappers, including those items needed for conducting the work associated with tapping, the supply of electricity, fuel, coal, oil gas and/or wood, and clothing, including school uniforms that children are required to wear and school and household supplies.

Defendants have provided or made available for inspection documents related to production and compensation, and 2006 re-tasking summaries.  Defendants' production, however, is not complete.  Defendants argue that Plaintiffs' Request Nos. 150 and 151 are examples of the unreasonable scope of Plaintiffs' discovery requests because "how the sale or lease of clothing and domestic supplies to tappers relates in any way to the allegation that young children are working on the Firestone farm is beyond [them]."  Exhibit 4, at p. 6.  To the contrary, just as "company towns" and exploitative prices in company stores are part of U.S. history here, Plaintiffs have made clear that children's isolation on the Plantation and their families' access to basic subsistence goods has a direct correlation with the real value of the

---

[8] The documents Defendants have produced, DEFS 4297-4406, do not show how many houses have been renovated or

tappers' wages.  Stated differently, if tappers and their children have only limited access to basic supplies at the Harbel Supermarket, the prices charged at that store, or any other store within the Concession area, has an important correlation with how far a tappers' daily wages go and whether tappers' are able to pay helpers to assist in carrying out their tapping duties, instead of using children for free.  Plaintiffs request that the Court compel Defendants to produce such documents because they are relevant to Plaintiffs' child labor claim.  Plaintiffs seek:

- Documents related to policies, procedures, practices, and/or guidelines concerning the wages of tappers as a group, deductions from the same, (77-78), working hours and conditions of tappers, including benefits (79).
- Inventory price lists for any sale or lease of supplies to tappers within the concession area or any communications regarding the pricing of such items (150-151).

Defendants' contend that the Collective Bargaining Agreements ("CBA") for 1999, 2004, and 2007 are completely responsive to these requests.  *See* Ex. 4, at p. 11.  Plaintiffs, argue, however, that other documents beyond the CBAs may be responsive, such as internal reports, memoranda, communications among management, and Defendants have made no representations that no others exist.  For all these reasons, Plaintiffs request that the Court compel Defendants to produce these requested documents.

### 6. Plaintiffs are Entitled to Supplemental Documents Related to Safety, Health Care, and Medical Treatment.

Plaintiffs' discovery requests related to safety provisions, and for which Plaintiffs seek more information in this motion to compel are Interrogatory No. 10 and Request for Production No. 147.  Defendants provided documents, including handling procedures, material safety data, and product data relating to chemicals used by tappers, but their production is not complete.

---

newly built.  Instead, Defendants have produced only pictures of the new housing and a few charts.

Both the International Labor Organization's ("ILO") Minimum Age Convention (No. 138) and Worst Forms of Child Labor Convention, 1999 (No. 182), set a minimum age of 18 for work "which by its nature or the circumstances in which it is carried out is likely to jeopardize the health, safety or morals of young persons . . ." Ex. 34 (Convention No. 138, Art. 3); Ex. 35 (Convention No. 182, Art. 3(d)). The Worst Forms of Child Labor R190 elucidates the kind of work referred to in Article 3(d) of Convention No. 182, and includes work that is:

> (b) at dangerous heights . . .; (c) work with dangerous machinery, equipment and tools, or which involves the manual handling or transport of heavy loads; (d) work in an unhealthy environment which may, for example, expose children to hazardous substances, agents, or processes, or to temperatures . . . damaging to their health.

Ex. 38 (Recommendation No. 190, ¶ 3(b)-(d)).

Documents related to safety precautions, trainings, and injuries received by individuals performing tapping duties from chemicals or tools used on the Plantation are relevant to demonstrating the hazardous nature of the work children perform. In response to Plaintiffs' request for documents related to exposure of tappers and children to chemicals used on the Plantation, including medical reports and death certificates and autopsies (147), Defendants have agreed to provide only summary documents showing injuries. Plaintiffs believe they are entitled to more than simply summary documents and concerns of privacy can be addressed with an appropriate protective order. Moreover, Plaintiffs are also entitled to know the identity of persons charged with the responsibility of formulating policies, procedures, etc. relating to safety measures for tappers on the Plantation (Interr. No. 10).

Plaintiffs' discovery requests related to health care on the Plantation and for which Plaintiffs move to compel supplemental production are Request Nos. 98 and 128. Defendants

26

have provided documents, including the CBAs, the Concession Agreements, medical files of

Plaintiffs' families, documents concerning the status of Firestone's efforts to rebuild the Duside

hospital, and documents related to work-related injuries suffered by Plaintiffs' guardians only.

Plaintiffs are entitled to further supplementation in two regards:

- Documents related to the location, hours of operation, and services provided at each health clinic or hospital located within the Concession Area (98); and
- Any accident/medical reports for children concerning injuries sustained in the course of working/helping tappers complete duties associated with tapping (128).

Children's access to medical treatment and work-related injuries, including chemical injuries,

cuts or other injuries obtained in the course of  collecting latex or cup lump, slashing, cleaning

cups, or otherwise performing tasks associated with tapping on the Plantation are relevant to the

hazardous nature of the work children perform.  For these reasons, Plaintiffs request that the

Court compel production of such documents, as limited above.

### 7.  Plaintiffs are Entitled to Documents Related to Human Rights Abuses on the Plantation and Crimes Committed Against Children.

Plaintiffs' discovery requests relating to human rights and labor policies on the Plantation

are Interrogatory Nos. 7, 11, 12 and Requests for Production Nos. 41-42.  Defendants argue that

human rights abuses have no bearing on Plaintiffs' child labor claim and Plaintiffs are fishing for

information "directed exclusively at claims that have been dismissed."  Exhibit 4, at p. 9.

Plaintiffs outlined in detail, *see supra* Section A, at p. 6, the allegations concerning forced child

labor.  Intimidation, coercion directed at children and their families, particularly when

committed by Firestone's notorious security force, physical threats, deprivation of food, shelter,

or other necessities, threats of retribution against guardians or family members if children speak

out about child labor or refuse to work, including extra fines for keeping quiet, etc. are all

coercive techniques used to perpetuate child labor on the Plantation.  *See* CT ¶¶ 3, 4, 8, 49, 52, 55; *see also, e.g.,* Ex. 26, at 86:12-19; Ex. 17, at  282:3-283:15; Ex. 24, at 14:3-17:11; Ex. 19, at 134:16-135:1; Ex. 25 (M. D. Dep. at 111:24-113:14); Ex. 15 (James Roe III Dep. at 102:24-104:11).  Many of the coercive or intimidating tactics constitute human rights abuses in their own right.  Nevertheless, human rights abuses and Firestone's response to human rights abuses directed at children or their families are relevant to Plaintiffs' forced child labor claim.  For these reasons, Plaintiffs are entitled to:

- Documents relating to Defendants' obligations to implement human rights standards and disseminate information pertaining to human rights to children and tappers on the Plantation, including policies, reports, memos, trainings (41-42);
- Documents, in lieu of interrogatory response, related to formal and informal complaints related to human rights abuses committed by Defendants' security forces on the Plantation (Interrogatory No. 11).
- The identification of persons who played a role with respect to decision-making about Defendants' monitoring of compliance with international human rights law and responses to complaints of violence, coercion, etc. directed at children and/or tappers who work on the Plantation (Interrogatory Nos. 7 and 12).

**8. Documents Related to the Identification of Registered Children on the Plantation.**

Plaintiffs' discovery requests relating to identifying information about registered children on the plantation are Interrogatory and 18 and Request for Production 71.  Defendants have agreed to grant Plaintiffs access to the tappers' personnel files, from which Defendants state the names of some registered children may be gleaned.

The documents Defendants have produced are not fully responsive to Plaintiffs' requests.  Plaintiffs are entitled to information concerning basic biographical information, including the names, dates of birth, and location of residence on the Plantation, to the extent this exists, for the putative class they represent.  Plaintiffs allege that the use of child labor is wide-spread on the Plantation, but Defendants have attacked the elements of numerosity and commonality in their

28

opposition to Plaintiffs' Motion for Class Certification.  Plaintiffs, therefore, are entitled to this information as it relates to identifying information for children in all reaches of the Plantation. *See, e.g., Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13, 254, n.20 (1978) (clarifying that class members' names and addresses are discoverable during the pre-certification stage where it is relevant to issues of numerosity or where contact with the class could yield information relevant to issues in the case).

Defendants have also argued at various points, including in Defendants' Motion to Dismiss, that under certain circumstances, children may work at younger ages when the work is not hazardous and *does not interfere with children's education.  See* Defs' Motion to Dismiss, at p. 24.[9]  Defendants' policy statements state that children should be in school instead of working on the Plantation, *see* Ex. 9, and that school attendance records and truancy will be monitored to determine whether children are attending schools.  *See* Ex. 10.  Defendants' own policies and arguments concede the nexus between child labor on the Plantation and children's education. Plaintiffs are entitled to review identifying information of registered children on the Plantation and to compare this with school/educational records concerning attendance, the latter of which Defendants have agreed to make available to Plaintiffs.

For these reasons, Plaintiffs are entitled to documents sufficient to identify registered children on the Plantation, including their names, date of birth, and housing/location from 1995 to the present (Interr. 18, Document Request No. 71).

## 9.  Documents Related to Tappers' Terminations.

---

[9] Even Defendants, however, concede that the kind of work performed on the Plantation, if performed by children, constitutes the worst form of child labor and as such children under the age of 18 should be prohibited from doing such work.  *See e.g.,* Ex. 9 (June 20, 2000 policy statement listing the "worst forms of child labour"); Ex. 10 (November 23, 2005 policy stating "there are no exceptions" to their prohibition of child labor, "child labor violates Liberian law, [and]

Plaintiffs' Request for Production No. 120 relates to the termination of tappers. Although Defendants have agreed to provide (or have provided) documents related to all terminations for failure to follow Firestone's policies prohibiting child labor, they refuse to produce documents related to involuntary separations from Firestone because they contend that "if a tapper is terminated for diluting latex as opposed to being intoxicated on the job, what possible relevance does that have to the issue of child labor?" Ex. 4, at p. 10.

As is evident already from testimony elicited during the depositions of various guardians, tappers are susceptible to termination when they either dilute latex because they cannot meet production quotas without resorting to such measures and without the use of their children, or when they do not meet their quotas because they cannot complete their tasks alone without the assistance of their children and they cannot afford to pay a helper. For example, Moses Dolo testified at length about his termination for diluting latex, which he admitted to doing *because* Firestone had (1) for the first time ever begun to enforce its prohibition on child labor in 2006 shortly before his termination and he could not complete his daily tapping job without the assistance of children family members as he had been doing with Firestone's knowledge and direction for years, nor could he afford to hire helpers; and (2) Firestone had recently *increased* the tappers' latex collection requirements from 200 to 300 pounds,[10] which made his daily tapping tasks even more unachievable. *See, e.g.,* Ex. 25., at 108:22-113:14; *see also* Ex. 18, at 157:13-158:14; Ex. 23, at 51:5-52:25; Ex. 27, at 23:5-25:25; Ex. 22, at 197:22-201:1; Ex. 17, at 214:11-215-15.

Thus, although Defendants contend they cannot possibly see the relevance between

---

international convention," and the no child labor rule applies to children under the age of 18) (emphasis in original).

30

terminations for diluting latex and child labor, at least one guardian has in fact testified explicitly

about the direct relationship.  In light of this, documents concerning tappers' forced resignations

or firing when they were the result of diluting latex or for failure to complete their daily tapping

requirements are directly relevant to Plaintiffs' claims.  For this reason, Plaintiffs are entitled to

documents, including but not limited to, Personnel Action Request forms ("PARs") submitted to

the Labor Department, and any other documents related to terminations for diluting latex or

failure to meet daily collecting/tapping requirements, including those kept in separate

termination or "labor files," which are responsive to Plaintiffs' Request for Production No. 120.

### 10.  Plaintiffs are Entitled to Documents Related to the 2005 Labor Dispute and Union Formation on the Plantation.

Plaintiffs' discovery Requests for Production related to the 2005 labor dispute on the

Plantation are 13 and 14; Nos. 15 and 16 relate to the formation of the workers' union. The

particular labor dispute to which Plaintiffs refer in requests 13 and 14 began in 2005 and ended

with a strike at the beginning of 2006 over salaries, working conditions, and child labor.  This

dispute included an issue concerning a 37.5% reduction from tappers' salaries that went toward

healthcare, education, and other benefits for tappers.  *See* Ex. 33, at p. 14 (*The Heavy Load*, Save

My Future Foundation, June 2008) (referring to 37.5% reduction and foreign exchange scheme

between Charles Taylor's rebel faction and Firestone).[11]

Defendants refuse to provide any documents related to this dispute because they argue

---

[10]  Although the testimony uses the word "gallons," it is likely that the witness stated or meant pounds.

[11] Documents related to the 37.5% reduction also have relevance to state action.

"[t]he labor disturbance that occurred in early 2006 was a wildcat strike by certain aggrieved

workers, and not an official strike declared by FAWUL." Ex. 4, at p. 14. Additionally,

Defendants disagree with Plaintiffs that the issue of child labor was at issue in this strike.

Plaintiffs base their requests on media reports, which explicitly cite child labor as one of the

issues sparking the strike and quote individuals who state that low wages and the inability to

complete their tasks alone in one day have caused them to use children to help them work on the

Plantation. The individuals quoted, incidentally, are not named Plaintiffs or the guardians of

named Plaintiffs. *See, e.g.,* Ex. 28 ("LIBERIA: Rubber plantation workers strike over

conditions, pay, child labour"); Ex. 30 ("Liberia: Bridgestone / Firestone hit by rubber tappers'

strike"). As a result of the relevance of such disputes, Plaintiffs seek:

- Documents related to negotiations, proposals, and agreements ending the dispute (13); and Documents related to the dispute, including communications between Defendants and unions representing workers during the dispute (14).

Regardless of whether the disturbance was a "wildcat" strike, Plaintiffs' requests sufficiently

encompass any documents that may exist concerning negotiations, proposals or agreements

ending the dispute.

Plaintiffs also seek documents related to the formation of the workers' union on the

Plantation (Request Nos. 15 and 16). Aside from the 1999, 2004, and 2007 Collective

Bargaining Agreements (CBAs), Defendants have not produced any documents relating to the

formation of unions purporting to represent workers, employees, and/or tappers. For all the

reasons addressed throughout this brief and in Plaintiffs' allegations, documents related to union

*formation* have relevance to negotiations concerning task size, the provision of health care and

education to tappers, and child labor. As Defendants have repeatedly drawn Plaintiffs' attention

32

to the CBAs, negotiated by the most recent workers' union, FAWUL, documents related to this union and any other union's formation are relevant to Plaintiffs' claim.

### 11. Plaintiffs are Entitled to Historical Documents Provided to the University of Akron's Firestone Archives.

Plaintiffs' discovery requests related to historical documents and the Firestone archive at the University of Akron are Requests Nos. 132-133, 162 and Interrogatory No. 22.  Defendants refuse to provide any historical documents, arguing they have no relevance to whether Defendants have "since 1999 or 1995, encouraged the children of tappers to engage in the worst forms of child labor."  Ex. 4, at p. 15.

As discussed previously, Plaintiffs allege that Defendants maintain a system of exploitation that is perpetuated by child labor – that is, Firestone exploits children by isolating and suppressing each successive generation of labor so that children begin to work when they are very young, attain limited education, and know no other life but tapping.  Documents related to the history of conscription and the Government of Liberia's long-established connection to the Plantation are relevant to Plaintiffs' child labor claim and the issue of state action, and could lead to additional relevant information.  Similarly, documents concerning the exemption of rubber and rubber-based products from import restrictions for goods made from forced child labor have present day relevance to Plaintiffs' claims.

As a result, Plaintiffs move to compel the following documents:

- Documents from 1915 to 1935 related to Defendants' leasing, acquisition, etc. of the land from the Liberian government for the establishment of the Plantation in 1926 (132);
- Documents for the same years regarding conscription, hiring or obtaining labor and/or laborers for the Plantation (133);
- Documents Defendants provided to the University of Akron Firestone Archives (162);

33

- documents related to lobbying efforts regarding provisions in the Tariff Act of 1930 exempting rubber and rubber-based products from importation bans (134); and
- identification of custodian of records at the University of Akron for documents related to formation and operation of the Firestone Plantation in Liberia (Interrogatory No. 22).

**12.  Plaintiffs are Entitled to Documents Related to Defendants' Financial Worth for      Punitive Damages Calculations and Board Minutes.**

Plaintiffs' discovery request related to the valuation of Defendants' businesses for the purposes of calculating punitive damages is Request No. 159 (documents related to taxes Defendants paid to the Liberian government based on yearly production and/or total yearly revenue for the Plantation).  Defendants argue that Plaintiffs have not alleged any claim that entitles them to punitive damages and Defendants' financial worth is not relevant at this stage of the proceedings.  Ex. 4, at p. 15.

Plaintiffs disagree.  Request No. 159 is relevant to damage exposure/calculations, valuation, as well as for demonstrating the level of governmental stake in the operation of the Plantation.  *See, e.g., United States v. Big D Enters.,* 184 F.3d 924, 932 (8th Cir. 1999) ("Under federal law, evidence of a defendant's financial worth is traditionally admissible for purpose of evaluating the amount of punitive damages that should be awarded."); *Mid Continent Cabinetry, Inc. v. George Kock Sons, Inc.*, 130 F.R.D. 149, 151 (D. Kan. 1990) ("When a punitive damages claim has been asserted by the plaintiff, a majority of federal courts permit pretrial discovery of financial information of the defendant without requiring plaintiff to establish a *prima facie* case on the issue of punitive damages.").  Discovery in this case has not been bifurcated.  Thus, Plaintiffs are entitled to documents related to financial worth during the pretrial discovery stage.

Plaintiffs also seek documents related to minutes of all meetings of Defendants' Board of Directors related to the management and operation of the Plantation (No. 59). Defendants have not provided any documents. Plaintiffs agreed to limit their request to those minutes related to child labor, which Defendants have represented they searched for but found none, and to security on the Plantation, payments to/from the governments of Liberia, education on the Plantation, healthcare, and task sizes and tappers' wages and benefits. In essence, Plaintiffs seek Board of Directors' minutes covering those topics for which Plaintiffs move to compel production. *See, e.g., Beauchem v. Rockford Products Corp.*, 2002 WL 100405, at *2 (N.D. Ill. Jan. 24, 2002) (noting the discoverability of BOD minutes relevant to the claims in the case).

## CONCLUSION

Defendants' overly-restrictive and narrow approach to discovery in this matter has significantly foreclosed Plaintiffs' ability to obtain discoverable information and documents as contemplated by the Federal Rules of Civil Procedure. Although Plaintiffs' remaining claim is for forced child labor on the Plantation, Plaintiffs are entitled to documents relating to the exploitative system that created the conditions in which child labor is encouraged and indeed required in order for Firestone to extract large amounts of raw latex and cup lump on a daily basis.

For all the foregoing reasons, this Court should grant Plaintiffs' Motion to Compel. Respectfully submitted on this 16th day of October, 2008 by:

**MACEY SWANSON AND ALLMAN**

35

s/Kimberly D. Jeselskis
Kimberly D. Jeselskis
Barry A. Macey
Nora L. Macey
445 North Pennsylvania Street
Suite 401
Indianapolis, Indiana 46204
Phone: (317) 637-2345
Fax:      (317) 637-2369
kjeselskis@maceylaw.com

Terry Collingsworth
Natacha Thys
Christian Alexandra Levesque
**CONRAD AND SCHERER**
731 8th Street SE
Washington, DC 20003
Phone:  202.543.4001
tc@conradscherer.com

Nicole Auerbach
Virginia Kim
Patrick J. Lamb
Mark D. Sayre
Hugh J. Totten
**THE VALOREM LAW GROUP**
35 East Wacker Drive
Suite 2900
Chicago, IL 60661

Benjamin Schonbrun
Paul L. Hoffman
**SCHONBRUN DESIMONE SEPLOW HARRIS
& HOFFMAN**
723 Ocean Front Walk
Suite 100
Venice, CA 90291

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2008 the foregoing was filed electronically.  Notice of

this filing will be sent to the following parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

**KREIG DEVAULT**
Mark J. R. Merkle
 mmerkle@kdlegal.com
Marc T. Quigley
 mquigley@kdlegal.com

**JONES DAY**
Michael L. Rice
mlrice@jonesday.com
Terence M. Murphy
tmmurphy@jonesday.com
Katie J. Colopy
kjcolopy@jonesday.com
Thomas A. Rector
tarector@jonesday.com

/s/Kimberly D. Jeselskis

37