UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| JOHN ROE I, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0627-DFH-JMS |
| | ) | |
| BRIDGESTONE CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |


ENTRY ON PLAINTIFFS' MOTION TO CERTIFY
CHILD LABOR CLASS


Plaintiffs James Roes I-XV and Jane Roes I-VIII are children or young adults

who allege that between 1995 and 2005, while all were under the age of eighteen,

they worked on a rubber plantation in Liberia harvesting latex.  When they

initially filed their claim, these plaintiffs, along with their fathers (John Roes I-XII),

brought allegations of forced labor, child labor, poor working conditions, and low

wages, asserting claims under international law pursuant to the Alien Tort Statute

(28 U.S.C. § 1350), the Thirteenth Amendment to the United States Constitution,

a federal statute authorizing actions for criminal forced labor violations (18 U.S.C.

§ 1595), and California law.  On June 26, 2007, the court granted the defendants'

(collectively, Firestone) motion to dismiss most claims, but Count Two, alleging

under the Alien Tort Statute that the work performed by the child plaintiffs on the

rubber plantation violated international law prohibitions on some forms of child

labor, survived dismissal.  See *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988 (S.D. Ind. 2007).  The plaintiffs now have moved for certification of a class they have redefined as:

> All current and former persons who worked on Defendants' Firestone Plantations Company in Harbel, Liberia under the age of eighteen (18) between November 17, 1995 through November 17, 2005.[1]

Pl. Br. 15.  (The court assumes that the unusual phrase "current and former persons" was intended to include those who worked on the plantation while under age eighteen at any time during the class period, regardless of whether they still work on the plantation.)  Plaintiffs estimate that the proposed class will include between 8,000 and 10,000 individuals.  Compl. ¶ 81.  For the reasons set forth below, their motion is denied.  Plaintiffs' motion to strike certain exhibits attached to Firestone's Response (Dkt. 154) is also denied.

---

[1]The plaintiffs originally proposed a class defined as all persons who, from November 17, 2005 to November 17, 2005, "were forced as children to work on the Firestone Plantation so that their families could meet their quota and be paid enough to allow the family to avoid starvation."  Compl. ¶ 80.  In its June 26, 2007 entry on Firestone's motion to dismiss, the court noted that the proposed class definition incorporated elements of the merits of plaintiffs' claims and thus had "an improper 'fail safe' character."  *John Roe I*, 492 F. Supp. 2d at 992, n.1 (citations omitted).

*Facts*

I.      *Plaintiffs' Claims and Firestone's Defenses Generally*

James Roes I-XV and Jane Roes I-VIII are children or relatives of Firestone employees (plaintiffs John Roes I-XII) who claim that they are all current or former child laborers on the Firestone plantation located in Harbel, Liberia, who were compelled to work on the plantation, performing dangerous tasks, because of Firestone's unreasonably high daily performance quotas for the adults.  Compl. ¶ 4.  Plaintiffs assert that Firestone set extremely high daily work quotas for each employee on the plantation.  If those quotas were not met, the employee's daily pay was cut in half.  Pl. Br. 3, citing Compl. ¶¶ 4, 48.  They allege that Firestone permitted and even encouraged its adult employees to enlist their children to assist them in meeting the quotas.  Pl. Br. 3, citing Compl. ¶¶ 4, 48.

At present, the named plaintiffs range in age from seven to twenty years old.  All allege that they worked on the Firestone Plantation generally between the ages of six and eighteen, and some began working as young as four or five.  As described in their Complaint:

> The Plantation Child Laborers begin their day at 4:30 a.m. by cleaning the 1,500 or more tapper cups their family will need to meet their daily quota. They then go to work with their families doing everything from tapping trees with a sharp tool, exposing their eyes to the blinding potential of raw latex, to applying by hand various dangerous pesticides and fertilizers to the rubber trees, to carrying, two at a time, 75-pound buckets filled with the latex that gets their family its food for the day.  The Plantation Child Laborers, like the adult workers, are not given any safety equipment in

performing their tasks, nor are they provided with warnings about the chemicals they are required to handle.

Compl. ¶ 4.   Plaintiffs also allege that the managers and overseers on the Firestone plantation:

> have specific knowledge that without the Plantation Child Laborers, no family could meet the family quota.  All of the Plaintiffs herein have had interactions with supervisors, overseers,  and/or  management of the Firestone Plantation in  which  these  representatives of the Firestone Plantation were able to see the Plantation Child Laborers performing various tasks necessary to meet the family quota, including cleaning tapper cups, tapping trees, helping with the collection of latex, applying fertilizers or pesticides to the trees by hand, or carrying the latex buckets to collection points.  Several of the Plaintiffs herein were directly told by management representatives of the Firestone Plantation that they should use more of their children if they were having trouble meeting the family quota.  For example, John Roe III was specifically told by a manager after he had complained that he can't meet his quota alone, "With the help of your children, you can produce it."

Compl. ¶ 55.

The plaintiffs' child labor claims allege that Firestone violated the law of nations by allowing them to perform dangerous work at the Firestone plantation. The legal basis for the claims is set forth in the entry on Firestone's motion to dismiss. *John Roe I*, 492 F. Supp. 2d at 1019-22.  To summarize that discussion, the plaintiffs' claim depends on their ability to demonstrate that Firestone's practices violated International Labour Organization (ILO), Worst Forms of Child Labour Convention (No. 182), June 17, 1999, 38 I.L.M. 1207, *available at* http://www.ilo.org/ilolex/english/convdisp 1/htm (last visited February 25,

2009) (hereinafter "ILO Convention 182"). ILO Convention 182 outlaws the "worst forms" of child labor, which include slavery, forced or compulsory labor, prostitution and production of pornography, drug trafficking, and "work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety, or morals of children." Art. 3. ILO Convention 182 leaves to member nations the identification of the jobs likely to harm the health, safety or morals, of children. Art. 4. The plaintiffs' claim survived Firestone's motion to dismiss under Rule 12(b)(6) based on the court's conclusion that ILO Convention 182 is a norm of international law that, as applied to at least some of the younger plaintiffs' allegations, is sufficiently specific, universal, and obligatory to satisfy the requirements of the Alien Tort Statute as interpreted in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734-37 (2004). *John Roe I*, 492 F. Supp. 2d at 1022.

Consistent with ILO Convention 182, Firestone has adopted policies prohibiting child labor on the plantation. On June 20, 2000, Firestone issued a policy entitled "Elimination of Worst Forms of Child Labour on the Estates." Levesque Decl. Ex. A. Firestone classified "tapping, cups cleaning, latex/cuplump collection, slashing, ring weeding, [and] difolatan and stimulant applications" as "some of the intolerable forms of Child Labour on the Estates," and stated that "any employee . . . found violating this policy will face disciplinary action and/or be summarily dismissed." *Id*. This policy was reinforced in July 2005, when Firestone established penalties for violations of its no-child-labor policy: a two week suspension for the first offense, a one month suspension for the second

offense, and dismissal for the third offense. Stuart Decl. Ex. 4. In a November 2005 policy statement, Firestone adopted a "zero tolerance" policy, insisting that "there are no exceptions" to the prohibition of child labor, which applied to any child under the age of eighteen, "regardless of the nature of the work, regardless of whether the child is paid or not, . . . regardless of who initiated the work, regardless of the reason for it, regardless of whether the child is working voluntarily or not, regardless of production targets, and regardless of any other circumstances whatever." Levesque Decl. Ex. D (emphasis omitted).[2]

Aside from Firestone's assertion that it has actively prohibited child labor by adopting and enforcing its no-child-labor policies, it also asserts that it does not tacitly encourage or promote child labor by setting impossibly high quotas, as the plaintiffs allege. Def. Response 12. The adult plaintiffs claim that they must tap two "tasks" of trees, totaling 1,125 trees per day, to earn their daily wage. Compl. ¶ 47. To dispute this number, Firestone refers to its own 2006 report showing that the adult plaintiffs' "task" sizes at the time of their depositions ranged in size from 513 to 600 trees, and that the average number of trees per adult plaintiff was 573. Hong Decl. ¶ 5, Ex. 2. In sum, Firestone contends that a single person, working alone, is able to complete the work of an adult tapper on its plantation, and though those adults may want to use child labor, Firestone

---

[2]This version of Firestone's no-child-labor policy was issued a few days after the close of the time period covered by plaintiffs' class definition.

both actively prohibits the practice and has done nothing to encourage the practice.  Def. Response 12-14.

II.    *Plaintiffs' Statements*

The declarations provided by the plaintiffs in support of their allegations are similar, even identical, in several respects.  See generally Pl. Ex. A1-A15 (James Roes I-XV Decl.); Pl. Ex. B1-B8 (Jane Roes I-VIII Decl.).  At the time of their declarations, the plaintiffs ranged in age from seven to twenty years old.  All attested that they worked on the plantation at some point in their lives between the ages of four and eighteen.  Based on their declarations, the child plaintiffs all began working on the plantation before they turned sixteen.  See, *e.g.*,  Pl. Ex. B2 ¶ 3 (Jane Roe II was fifteen years old when she began working on the plantation). Plaintiff James Roe X, who was seven at the time of his declaration, stated that he began working at the plantation at the age of four.  Pl. Ex. A10 ¶¶ 1,3.  Generally, the tasks they said they performed on the plantation included carrying very heavy loads, working with sharp tools, and/or applying chemicals.  Many suffered injuries.  Several of the plaintiffs confirmed in their declarations that Firestone supervisors saw them working on the plantation and encouraged them to work.

Firestone counters the plaintiffs' declarations with its own showing that, as discovery in this matter proceeded, many of the young plaintiffs made statements in their declarations that are inconsistent with their discovery responses or

deposition testimony, or with evidence provided by other plaintiffs. All told, Firestone raises doubts concerning the statements or testimony of James Roes I-VIII, James Roes X-XV, and Jane Roes I-VII. Some of these discrepancies and contradictions are outlined below. Firestone raises no concerns regarding the evidence put forward by James Roe IX or Jane Roe VIII.

For example, Jane Doe III's declaration states that she continues to work at Firestone. Pl. Ex. B3 ¶ 6. In her deposition, although she testified to injuries she received while working in 2006 and 2007, she also testified that she stopped working in 2004. Rice Decl. Ex. 20 at 165; Levesque Decl. Ex. 29 at 165, 224-28. Jane Roe V claimed in her interrogatory responses that Firestone supervisors saw her tapping trees. Rice Decl. Ex. 34, Interrog. 8. At their depositions, she and her father testified that Jane Roe V has never tapped trees. Rice Decl. Ex. 35 at 19-20; Rice Decl. Ex. 29 at 115.

James Roe I declared that he worked with his father, S.F. Sr., starting at the age of six in about 1996. Pl. Ex. A1 ¶ 3; Rice Decl. Ex. 3, Interrog. 1. In his interrogatory responses, James Roe I stated that he started working in 2002 at approximately the age of twelve. Rice Decl. Ex. 3, Interrog. 7. His brother, James Roe II, stated in his declaration that he was ten years old in 2007 but stated in his interrogatory responses that he was born in 1990. Pl. Ex. A-2 ¶ 1; Rice Decl. Ex. 6, Interrog. 1. At his deposition, his counsel stated that James Roe II was born in 1996, but at their depositions, James Roe II and his father each testified that

they did not know when James Roe II was born. Rice Decl. Ex. 7 at 6, 22; Rice Decl. Ex. 1 at 56. James Roe II first attested that he had not worked from age seven onward, but later in his deposition testified that he had been confused and worked from age five to twelve. Rice Decl. Ex. 7 at 40, 46, 61.

James Roe III's interrogatory responses state he was born in 1981. Rice Decl. Ex. 10, Interrog 1. In his deposition, however, he and his counsel asserted that he was born in 1988. Rice Decl. Ex. 11 at 6, 23. Jane Roe I's declaration states she started working at age seven. Pl. Ex. B1 ¶ 3. However, at her deposition, she was asked: "Did you start working on the Firestone Farm when you were 7 years old?" She answered "No." Rice Decl. Ex. 14 at 65-66. Her father says she started work in December 2004, when she would have been about five years old. Rice Decl. Ex. 8 at 30. In her interrogatory responses, Jane Roe I claimed she started working at age four. Rice Decl. Ex. 13, Interrog 7. In her declaration, Jane Roe I swore that she slashed grass and applied chemicals. Pl. Ex. B1 ¶ 3. In her deposition, she was asked: "do you know what slashing is?" She answered "No." Rice Decl. Ex. 14 at 30. She also testified that she did not apply chemicals to the trees. *Id.* at 42.

Jane Roe I's interrogatory responses stated that "Andrew Kolleh" informed her of Firestone's no-child labor policy in 2005 and her father told her to stop working that same year. Rice Decl. Ex. 13, Interrogs. 14, 15. In her deposition in May 2008, Jane Roe I stated that she had worked during the week of her

deposition and testified that "Kolleh" told her to work. Rice Decl. Ex. 14 at 13-17, 19-21. Firestone's records show that Andrew Kolleh has not been Jane Roe I's father's headman since June 2007. Singarajah Decl. ¶ 9, Ex. 5.

James Roe IV's declaration states, and he testified at deposition, that he started working for his father at age nine. Pl. Ex. A4 ¶ 3; Rice Decl. Ex. 24 at 22. In his interrogatory responses, he affirmed that he started working for his father on May 10, 2003, when he would have been twelve years old. Rice Decl. Ex. 23, Interrogs. 1, 7. But James Roe IV's father was not hired until February 2004. White Decl. Ex. 2. Also, James Roe IV stated in his interrogatories that Firestone supervisors saw him working in 2003 and that his father's headman, Saah Michael, saw him working and helped him to hide. Rice Decl. Ex. 23, Interrog. 8; Rice Decl. Ex. 24 at 76. But his father testified that James Roe IV was not working in 2003, and Firestone's records show that he has never had a headman named Saah Michael. Rice Decl. Ex. 21 at 23-24; Singarajah Decl. ¶ 10, Ex. 6; Hong Decl. ¶ 19, Ex. 13.

James Roe VI stated in his declaration and his deposition that he started working at age seven in 1998. Pl. Ex. A6 ¶ 3; Rice Decl. Ex. 43 at 138-43. But James Roe VI's father did not begin working for Firestone until January 2000 and did not begin working as a tapper until 2001 when James Roe VI was ten. White Decl. ¶ 5, Ex. 3; Rice Decl. Ex. 38 at 19-20. James Roe VI's father testified that James Roe VI did not start helping until 2003. Rice Decl. Ex. 38 at 81. Also, in

his declaration, James Roe VI stated that he had to stop his education to help his father, but he stated in his interrogatory responses that he has been in school consistently since 1997.  Pl. Ex. A6 at ¶ 4; Rice Decl. Ex. 42, Interrog 13.

James Roe VII's declaration states that he started working at age six.  Pl. Ex. A7, ¶ 3.  His interrogatory responses stated that he was born in April 1995 and started working in 2004 (at about age nine).  Rice Decl. Ex. 45, Interrogs. 1, 7.  In his deposition, he testified that he started working in 2005.  Rice Decl. Ex. 46 at 208.  His father testified that James Roe VII started work in 2003, and his brother testified that it was 2004.  Rice Decl. Ex. 38 at 86; Rice Decl. Ex. 43 at 270.  James Roe VII stated in his declaration that he worked from 4:00 a.m. to 4:00 p.m. on a typical day, but in his deposition he testified he worked from 4:00 a.m. to 11:00 a.m.  Pl. Ex. A7 ¶ 3; Rice Decl. Ex. 46 at 181-83.

James Roe XI stated in his declaration that he had a fifth grade education, that he "worked from 4:00 am to 3:00 pm," and that he "never attended the plantation school because I don't have an ID card."  Pl. Ex. A11 ¶¶ 3-4.  In his deposition, he testified that the declaration was wrong (Rice Decl. Ex. 55 at 57-59), that he had a 12th grade education (*id.*, at 7-8), and that he attended Firestone schools (*id.*, at 8-9).  James Roe XI's father testified that since 2005, James Roe XI has not worked with him in the field except to clean cups for one day in 2008 after he turned eighteen. Rice Decl. Ex. 47 at 11-20. However, James Roe XI testified Firestone supervisors saw him working in 2006.  Rice Decl. Ex. 55

at 40-41.  He also testified that in 2005, a headman saw him inhale ammonia at a tank, pass out, and hit his head, though earlier he testified  that in 2005 he was living with an aunt away from the Firestone plantation.  Rice Decl. Ex. 55 at 17-18, 29-31, 41-45.

In their reply brief, the plaintiffs argue that such inconsistencies, where they exist, are minor and explainable.  Pl. Reply 4-9.  One father testified that he was unsure when his son was born because the war in Liberia made it difficult to recall such dates.  Levesque Decl. Ex. 4 at 11-12.  The plaintiffs do not wear watches, use clocks, or follow calendars, and the plaintiffs argue that Firestone's only purpose in raising these innocent and immaterial inconsistencies is to urge the court "to delve into the merits of Plaintiffs' claims in an attempt to disavow liability."  Pl. Reply 2-3, citing Levesque Decl. Ex. 1 at 14, 20, 28; Ex. 2 at 180.

*Rule 23 Standard*

Estimating that their proposed class will include between 8,000 and 10,000 persons, the plaintiffs move for certification of a class now defined as all persons who worked, while under the age of eighteen years, on Defendants' Firestone Plantations Company in Harbel, Liberia between November 17, 1995 through November 17, 2005.

To certify a plaintiff class under Rule 23, the plaintiffs must first satisfy all four elements of Federal Rule of Civil Procedure 23(a) by demonstrating that: (1) the class is too numerous to join all members; (2) there are questions of law or fact common to the class; (3) the claims or defenses of representative parties are typical of those of the class members; and (4) the representative parties will fairly and adequately represent the class. As the Seventh Circuit has noted, the plaintiffs must satisfy the trial court, "after a rigorous analysis," that the prerequisites of Rule 23(a) have been satisfied. *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003), quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982). If these requirements are met, the plaintiffs must also satisfy at least one subsection of Rule 23(b). Here, the plaintiffs assert that their proposed class satisfies the requirements of either Rule 23(b)(2) or (b)(3) or a "hybrid" of the two. Rule 23(b)(2) applies if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the

class as a whole."  Rule 23(b)(3) applies if the court finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The parties seeking class certification bear the burden of proof in establishing each of the requirements under Rule 23.  *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir. 1977).  The failure to satisfy any one of these elements precludes certification.  *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993).  In deciding whether to certify a class, the court is not required to accept the allegations in the complaint as true.  The court should make any factual and legal inquiries needed to ensure that the requirements for class certification are satisfied, even if the underlying considerations overlap with the merits of the case.  *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001); *In re Bromine Antitrust Litigation*, 203 F.R.D. 403, 407 (S.D. Ind. 2001).  In evaluating class certification, the court must take into consideration the substantive elements of the plaintiff's cause of action, inquire into the proof necessary for the various elements, and envision the form that trial on the issues would take.  *Cima v. Wellpoint Health Networks, Inc.*, 250 F.R.D. 374, 377 (S.D. Ill. 2008).

Throughout this analysis, the court bears in mind that a principal purpose of class certification is to save the resources of both the courts and the parties by

permitting an issue potentially affecting every class member to be litigated in an economical manner. See *Falcon*, 457 U.S. at 155. Rule 23 gives the district courts "broad discretion to determine whether certification of a class-action lawsuit is appropriate" in doing so. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008) (internal quotation omitted). That said, "similarities of claims and situations must be demonstrated rather than assumed." *Szabo*, 249 F.3d at 677.

Firestone argues that plaintiffs are unable to satisfy the typicality and adequacy of representation requirements of Rule 23(a) and are unable to satisfy any subsection of Rule 23(b). As explained below, the court finds that at least two of the plaintiffs can satisfy Rule 23(a), but the plaintiffs do not satisfy any subsection of Rule 23(b). Accordingly, the motion for class certification is denied.

*Discussion*

I.    *Typicality under Rule 23(a)(3)*

Rule 23(a)(3) requires plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The named plaintiffs' claims are typical if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members and [their] claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).

The typicality requirement focuses on the class representatives and whether their pursuit of their own claims will work for the benefit of the entire class. *In re Prudential Ins. Co. of America Sales Practices Litigation Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996).

To oppose typicality, Firestone relies on the inconsistencies among the interrogatory responses, deposition testimony, and affidavits of John Roes I-X, James Roes I-VIII, James Roes X-XV, and Jane Roes I-VII. Def. Response 15-30. At times, the conflicts raised by Firestone were internal. For example, Firestone argues that James Roe VII's declaration stated that he started working at age six, his interrogatory responses stated he started working in 2004 (at age nine), and in his deposition he testified that he started working in 2005 (at age ten). Def. Response 26, citing Rice Decl. Ex. 44, ¶ 3, Ex. 45, Interrog. 7, Ex. 46 at 208. At times the conflicts arose between the testimony of the child plaintiff and his or her adult relative. For example, Jane Roe V testified that she knew about Firestone's no-child labor policy because her father had told her about it three years earlier. Her father testified that he did not learn of Firestone's policy until the time of his deposition. Def. Response 18-19, citing Rice Decl. Ex. 29 at 93-94, Ex. 35 at 41-42. Though Firestone says it has concerns regarding the veracity of most of the named plaintiffs' claims, Firestone has not raised any doubts regarding the veracity and consistency of the testimony and discovery responses of plaintiffs

James Roe IX and Jane Roe VIII. Assuming solely for purposes of argument that the sorts of inconsistencies and discrepancies identified by Firestone could undermine the typicality of the named plaintiffs' claims, the argument does not apply to James Roe IX and Jane Roe VIII. Their claims, at least, appear to be typical of the proposed class claims.

The court also is not persuaded that the inconsistencies Firestone has identified undermine the typicality of the other named child plaintiffs' claims. Generally stated, these plaintiffs contend that Firestone assigned its adult employees "tasks" of trees that were so great that they had no choice but to enlist children to perform tasks that amount to actionable child labor. The plaintiffs also contend that this practice occurred with the knowledge, encouragement, and approval of Firestone, notwithstanding Firestone's public and formal policies to the contrary. Firestone has challenged the veracity and consistency of the details submitted by many plaintiffs in support of their general claim that Firestone engaged in actionable child labor practices. Nevertheless, a witness or party may be vague or inconsistent about some details, even important details, while still offering testimony that is truthful and reliable as to the most important facts. Such problems provide the quintessential task for juries and other triers of fact. The court is conscious of the fact that the named plaintiffs are young farm workers with limited education who survived years of tumultuous civil unrest in one of the most dangerous places on earth, and who, as the plaintiffs assert, do not wear watches, follow calendars, or use clocks. See Pl. Reply 2, citing Levesque

Decl. Ex. 1 at 14, 20, 28; Ex. 2 at 180.  Some factual discrepancies concerning the plaintiffs and other witnesses about dates, times, or names or other details of the plaintiffs' claims may be set aside at the class certification stage and left to juries who must decide whose testimony to believe in a trial on the merits.  See *Veerkamp v. U.S. Security Assoc., Inc.*, 2006 WL 2850020, at *2 (S. D. Ind. Sept. 29, 2006) (allowing members of collective action for overtime wages to offer affidavits explaining mistaken answers on forms).[3]

For purposes of typicality, Firestone's attacks are premature and the plaintiffs' discrepancies may well be forgivable.  The named child plaintiffs' claims are typical for purposes of Rule 23(a)(3).  The merits of the plaintiffs' claims are under examination only to the extent needed to address their motion to certify a class but are not ripe for adjudication.  See *Szabo*, 249 F.3d at 676.  If and when the merits of the named plaintiffs' claim come before a finder of fact for full examination, the inconsistencies raised by Firestone might undermine their claims.  But at this stage, discrepancies in the specific details of those claims are not sufficient to defeat the plaintiffs' assertion that they have raised claims typical of those they seek to represent.

---

[3]The court also denies plaintiffs' motion to strike Jane Roe III's deposition transcript.  See Dkt. No. 134.  Her deposition was one of the first, before the attorneys, with the court's intervention, worked out how to manage depositions involving differences between American English and Liberian English.  The court's denial of the class certification may make the Jane Roe III issue moot, but in any event, the problem is better addressed on a question-by-question basis if and when there is an effort to use the deposition, rather than by striking the entire deposition.

II.     *Adequacy of Representation under Rule 23(a)(4)*

Rule 23(a) also requires that the named representatives fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy standard involves two elements. First, a class representative must have a sufficient stake in the outcome to ensure zealous advocacy and must not have claims antagonistic to or conflicting with claims of other class members. Second, counsel for the named plaintiffs must be experienced, qualified, and generally able to conduct the litigation on behalf of the class. *Susman*, 561 F.2d at 90. Parallel to its argument against typicality, Firestone argues that the named plaintiffs will be inadequate representatives of a class because of the inconsistencies among their statements. Firestone also contends that counsel for the plaintiffs lack the candor and fidelity required of class counsel and thus are inadequate under Rule 23(a)(4).

A.     *Adequacy of the Named Plaintiffs*

On the issue of adequate representation, Firestone's reliance on the discrepancies and inconsistencies among plaintiffs' statements has more weight. The honesty and credibility of a class representative is relevant to the court's adequacy determination under Rule 23(a)(4) because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims. See *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549-50 (1949); *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510 (N.D. Ill. 1990) (citing *Cohen*); *Lapin v. Goldman Sachs & Co.*,

254 F.R.D. 168, 176-77 (S.D.N.Y. 2008), quoting *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) ("To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff."). Attacks on a proposed representative's credibility are sufficient to render him or her inadequate only when they "are so sharp that they jeopardize the interests of absent class members . . . ." *Lapin*, 254 F.R.D. at 177 (omitting quotation and citing *In re Colonial Partnership Litig.*, 1993 WL 306526, *5 (D. Conn. Feb. 10, 1993) (Cabranes, J.)); see also *Cervantes v. Sugar Creek Packing Co.*, 210 F.R.D. 611, 626 (S.D. Ohio 2002) (finding "no credibility problems so serious as to compel a finding that the interest of the plaintiffs and the class are antagonistic"); see generally 1 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3:36 (4th ed. 2008). Where courts have found that credibility issues render the proposed representative inadequate, the representative's credibility has been dubious with respect to substantial issues directly relevant to the claims at issue. See *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983); see also *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998); *Lapin*, 254 F.R.D. at 176-78 (collecting cases).

Before following this trail any further, it again must be noted that Firestone does not attack the credibility of every named plaintiff. Even if the court accepted Firestone's argument that some or even most of the named plaintiffs are inadequate representatives because of inconsistencies within and between their various statements, James Roe IX and Jane Roe VIII remain unchallenged on this

score.  Firestone raises no argument concerning their adequacy as class representatives.

Countering Firestone's challenge to the adequacy of John Roes I-XII, James Roes I-VIII, James Roes X-XV, and Jane Roes I-VII, the plaintiffs contend that the inconsistencies Firestone has raised do not affect issues critical to the plaintiffs' claims and thus cannot defeat their adequacy because "no Plaintiff testified that she did *not* work on the Plantation while she was under 18; every Plaintiff consistently testified that she performed similar work, all of which is hazardous under international law; discrepancies concerning dates did not call into question whether the child worked while she was under 18; and discrepancies in exact dates are explainable and immaterial to Plaintiffs' class-wide allegations."  Pl. Reply 5.  The plaintiffs' assessment assumes a broader theory of liability than the court accepted in denying in part the motion to dismiss.  International law has not always drawn bright lines applicable to this case regarding what tasks at what ages do and do not constitute illegal child labor.  That determination, when it is made, will need to be made on a task-by-task and age-by-task basis.  Thus, some of the discrepancies in the plaintiffs' testimony (for example, their ages when they performed certain tasks, and whether they performed certain tasks at all) may well turn out to be critical to their claims.

The court does not pursue this issue to the end for two reasons. First, Firestone does not challenge the adequacy of two of the named plaintiffs, and second, the plaintiffs fail to satisfy Rule 23(b).

B.    *Adequacy of Counsel*

Plaintiffs' lead counsel have substantial experience in representing plaintiff classes in complex international litigation under the Alien Tort Statute. See, *e.g.*, *Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002), *rehearing en banc granted*, 395 F.3d 978 (9th Cir. 2003) (en banc), *appeal dismissed by stipulation*, 403 F.3d 708 (9th Cir. 2005) (en banc). Firestone attacks the adequacy of plaintiffs' counsel, attempting in essence to blame counsel for the plaintiffs' inaccurate and inconsistent statements. Firestone argues that "counsel's actions in this case provide no confidence that they may be entrusted with guarding the rights of the absent Liberian class members who lack the means to monitor this lawsuit." Def. Response 32. Firestone has failed to show that plaintiffs' counsel cooperated or colluded with the plaintiffs to produce these discrepant statements, which may well be attributable to innocent causes. The court does not blame counsel for the mis-statements of their clients without a much stronger showing that would amount to intentional misconduct. Firestone does not challenge plaintiffs' counsel's experience or competence to manage a class action and makes no other argument regarding the adequacy of plaintiffs' counsel. This argument fails. Accordingly, the court finds that at least plaintiffs James Roe IX and Jane Roe VIII

satisfy all the requirements of Rule 23(a), including having counsel who could represent the proposed class effectively.

II.     *Requirements of Rule 23(b)*

To proceed with a class action, the plaintiffs must satisfy the criteria of one of the subsections in Rule 23(b).  Plaintiffs contend that they can satisfy Rule 23(b)(2) or (3) or a hybrid of the two.  The court disagrees.[4]

---

[4]The concept of a "hybrid certification" under Rules 23(b)(2) and 23(b)(3) preceded the 2003 amendments to Rule 23.  The rule now allows a court that certifies a class under Rule 23(b)(1) or (b)(2) to order notice sent to class members.  See *Allen v. International Truck & Engine Corp.*, 358 F.3d 469, 470-71 (7th Cir. 2004); *Williams v. Burlington Northern, Inc.*, 832 F.2d 100, 103 (7th Cir. 1987). Plaintiffs here have not shown that certification is proper under either Rule 23(b)(2) or (b)(3).  Without such a showing, the court is not free to invent a new hybrid that has not actually been written into Rule 23.

A.      *Rule 23(b)(2)*

Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The rule functions "under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. International Union of Operating Engineers, Local 139*, 216 F.3d 577, 580 (7th Cir. 2000). Cohesiveness and homogeneity are particularly important for a Rule 23(b)(2) class because certification under this provision results in litigation that binds all class members "without guarantees of personal notice and the opportunity to opt out of the suit." *Lemon*, 216 F.3d at 580.

"A suit for money damages, even if the plaintiffs seek uniform, class-wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual plaintiff's claim." *Lemon*, 216 F.3d at 580. Thus, class certification of claims seeking monetary relief is not appropriate under Rule 23(b)(2) unless the demand is incidental to the request for equitable relief. *Id.* at 580-81 (reversing certification under Rule 23(b)(2) where requests for monetary damages were not merely incidental to

request for injunctive relief), citing *Jefferson v. Ingersoll International, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) (vacating class certification under Rule 23(b)(2) and adopting the Fifth Circuit's definition of "incidental" in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998): "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief" or damage claims that do not depend "in any significant way on the intangible, subjective differences of each class member's circumstances" and do not "require additional hearings to resolve the disparate merits of each individual's case").

The claims of the proposed plaintiff class here are not sufficiently cohesive or homogeneous to satisfy Rule 23(b)(2) even when viewed through the lens of injunctive relief. True, the plaintiffs have brought a child labor case, and as they have defined the class, its potential members all, while under the age of eighteen, labored on Firestone's plantation in some form. But, as discussed above, the scope of child labor that is actionable under the Alien Tort Statute is much narrower than all labor by children under the age of eighteen. Only the "worst forms" of child labor, defined in relevant part as "work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety, or morals of children," are prohibited by the ILO and may be legally pursued by the plaintiffs in a United States federal court under the federal Alien Tort Statute. See *John Roe I*, 492 F. Supp. 2d at 1021-22. Individual inquiries will be required to determine which children performed which tasks at what ages, for not all labor

performed by all of these individuals, regardless of age, would be actionable. For example, some, or perhaps even all, tasks performed by a six year old could be so likely to harm that child's health or safety as fall within the ILO's prohibition. Some of those same tasks performed by a thirteen, fourteen, fifteen, sixteen or seventeen year old child might not. The validity of individual claims will depend on the specifics of each child's circumstances. The court cannot assume that their situations are so cohesive or homogeneous as to support certification of a class under Rule 23(b)(2). See *Lemon*, 216 F.3d at 580.

In addition, the plaintiffs' demand for monetary relief is not merely "incidental" to the injunctive relief they have requested. Although the plaintiffs describe the injunctive relief they seek (including "systematic, effective, and mandatory training concerning child labor that every new employee, tapper and Firestone supervisor must attend; reduction in the task sizes or other duties associated with tapping so as to enable one tapper to accomplish a daily quota; [and] court-appointed monitoring"), it is clear to the court that the plaintiffs primarily seek monetary compensation for the work they performed and the individual injuries that they allege they suffered as a result of performing it. Pl. Reply 26, n. 52.[5] If this case were certified as a class action, any damages the

_____

[5]For instance, the plaintiffs have chosen to limit their class members to individuals who worked on the plantation as children during a ten-year period ending in November 2005, suggesting that the plaintiffs' claims for monetary compensation for past harms are not merely incidental to claims for injunctive relief to avoid present or future harm. Although the plaintiffs contend that twelve of their number are younger than eighteen "and are still subject to Firestone's
(continued...)

class members might recover would need to be addressed through thousands of individual determinations. The need for such individual damage determinations does not necessarily defeat class certification under Rule 23(b)(3). See, *e.g.*, *Carnegie v. Household International, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). But the monetary relief the plaintiffs seek would not flow directly from liability to the class as a whole, and would depend on the specific differences in each class member's individual circumstances. The need for the individualized damage determinations, for monetary relief that cannot fairly be described as incidental, shows that Rule 23(b)(2) treatment is not appropriate.

B. *Rule 23(b)(3)*

Rule 23(b)(3) applies to most classes seeking monetary relief. The two overarching requirements are that common issues predominate and that a class action is the superior method for resolving the controversy. Fed. R. Civ. P. 23(b)(3). In this case, the plaintiffs fail to meet both the predominance and superiority requirements.

1. *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*

---

[5](...continued)
systematic unlawful conduct," and that their class could be modified to extend into the present, they have not made an effort to do so. That failure is not consistent with their assertion that their primary goal is injunctive relief and money damages are only incidental to their claims.

*Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy . . . ." *Id.* The predominance analysis "call[s] for caution when individual stakes are high and disparities among class members [are] great." *Id.* at 625.

The fact that there may be some variation in the degree of pain and suffering and physical injuries experienced by class members, or that some questions peculiar to individual members of the class remain after common questions of the defendant's liability have been resolved, does not necessarily defeat a finding of predominance. See *Carnegie v. Household International, Inc.*, 376 F.3d at 661; *Simpson v. Flagstar Bank*, 2003 WL 22244789, *3 (S.D. Ind. Aug. 11, 2003), quoting *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("the mere fact that questions peculiar to each individual of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible"). Nevertheless, Firestone's potential liability here is not a common question that can be decided once and for all for all proposed class members.

Not all work by any individual under the age of eighteen violates international law. See *John Roe I*, 492 F. Supp. 2d at 1020-21. The plaintiffs' proposed class definition certainly includes individuals who performed tasks on the plantation that did not constitute illegal child labor under international law,

either because the task performed will be found by a finder of fact not to be inherently dangerous or because the task will be found not to have been dangerous or harmful to a child of a certain age. The point is that the plaintiffs' proposed class definition goes beyond any actionable claims the plaintiffs may have against Firestone for allowing the "worst forms" of child labor. Separating individuals who have actionable claims from those who do not will require individualized inquiries into each plaintiff's situation and circumstances. If the plaintiffs can show that Firestone managers were in fact aware of some unlawful child labor on the plantation, there will still be individual questions about individual circumstances. Inquiries such as these would involve different witnesses and proofs for various putative class members to enable the fact finder to determine, among other things, what labor that individual performed, at what age, how frequently, and whether that task was performed with Firestone's outright or tacit approval. The depositions of the named plaintiffs show how involved and difficult this inquiry might be for just one plaintiff. "If the class certification only serves to give rise to hundreds of thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate . . . ." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) (reversing class certification). The court concludes that common issues do not predominate here, and Rule 23(b)(3) is not satisfied.

2.      *Superiority*

A class action should proceed under Rule 23(b)(3) only if it is superior to other methods for adjudicating the claims of the members of the proposed class. Considerations relevant to the superiority of the class action device include: "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties to be encountered in managing a class action." Fed. R. Civ. P. 23(b)(3). "Commonly referred to as 'manageability,' this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 164 (1974). The prospect of managing, from Indianapolis, Indiana, a class of between 8,000 and 10,000 individuals, many of whom are unknown and all of whom reside in Liberia, gives the court pause, to say the least. There is little reason to concentrate the litigation of these claims in this particular forum.

To support their argument that a class action is the superior method of proceeding on their claims, the plaintiffs state only: "Having each current or former child laborer at the Firestone Plantation bring his or her own separate lawsuit regarding defendants' practices, which would result in thousands of trials on the same issue, would be both unwieldy and impractical and certainly would not promote the interests of judicial economy." Pl. Br. 33. In reply, the plaintiffs provide little additional insight as to how this case might actually be managed,

asserting, by footnote and without reference to any prior filing, that they "have suggested several ways in which this Court may handle the class claims. Should the Court desire more, Plaintiffs would of course present the Court with a suitable plan for trying any claims for compensatory damages after class-wide relief is determined." Pl. Reply at 34 n. 58.[6] Managing this case presents a real concern, one that the plaintiffs have not satisfactorily addressed. The plaintiffs suggest that, if their motion to certify the class is granted, the class may consist of upwards of 8,000 individuals who all live in Liberia and for whom travel for trial would be difficult if not impossible. Firestone has already raised significant questions regarding the credibility and veracity of the details surrounding the work performed by most of the named plaintiffs. At trial, Firestone would have the right to raise those doubts directly with the finder of fact. The result might not be thousands of separate trials, as the plaintiffs assert, but from what the court has seen so far, it is possible that the result would be dozens or hundreds or more trials within this trial, or in individualized trials about each class member's work history, an equally unmanageable outcome. Plaintiffs have failed to show that class-wide adjudication is the superior method of resolving their claims under Rule 23(b)(3).

---

[6]In the approved Case Management Plan, the plaintiffs stated that they would not be able to appear for trial in Indiana. They proposed to videotape trial testimony in Liberia and to show the tapes at trial (a suggestion Firestone opposed.) Dkt. 29 at 17. Plaintiffs did not offer further suggestions for managing a trial in this matter.

The court recognizes that this decision may mean, as a practical matter, that the claims of the plaintiff class simply cannot be litigated in the United States. (The court cannot comment on prospects for litigating these claims in Liberia itself.) Although the Alien Tort Statute provides an unusual extension of jurisdiction for the United States courts, it does not provide a warrant to oversee labor practices all over the world, and the statute does not mean that the court must open its doors to address the plights of thousands of people who will never come anywhere near the United States or this court. Not all the world's problems can be fixed in the courts of United States. The limits of civil procedure must be respected if the courts are to preserve their proper role in adjudicating controversies within their jurisdiction according to law. Though the court is sympathetic to the allegations brought by these child plaintiffs, if true, these plaintiffs have not demonstrated that this case is viable as a class action under Rule 23.

*Conclusion*

The plaintiffs have satisfied the required showing of numerosity, commonality, typicality and adequacy under Rule 23(a) but have failed to satisfy either Rule 23(b)(2) or Rule 23(b)(3).  Their motion to certify a class is denied. Plaintiffs' motions to strike (Dkt. No. 134 and 154) are also denied.

So ordered.

Date: March 4, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Nicole N. Auerbach
THE VALOREM LAW GROUP
nicole.auerbach@valoremlaw.com

Terrence P. Collingsworth
CONRAD & SCHERER
tc@conradscherer.com

Katie J. Colopy
JONES DAY
kjcolopy@jonesday.com, jastone@jonesday.com

C. Christopher Groves
JONES DAY
cgroves@jonesday.com, lwood@jonesday.com

Kimberly Denise Jeselskis
MACEY SWANSON AND ALLMAN
kjeselskis@maceylaw.com, mdicken@maceylaw.com, jmilner@maceylaw.com

Patrick J. Lamb
THE VALOREM LAW GROUP, LLC
patrick.lamb@valoremlaw.com, sixlambs1@gmail.com

Christian Alexandra Levesque
CONRAD & SCHERER
cl@conradscherer.com, rp@iradvocates.org

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com, mdicken@maceylaw.com, twhitton@maceylaw.com

Nora L. Macey
MACEY SWANSON AND ALLMAN
nmacey@maceylaw.com, mdicken@maceylaw.com

Mark J. R. Merkle
KRIEG DEVAULT LLP
mmerkle@kdlegal.com

Terence M. Murphy
JONES DAY
tmmurphy@jonesday.com

Marc T. Quigley
KRIEG DEVAULT LLP
mquigley@kdlegal.com, kvanloton@kdlegal.com

Thomas A. Rector
JONES DAY
tarector@jonesday.com, mlandsborough@jonesday.com

Michael L. Rice
JONES DAY
mlrice@jonesday.com

Mark D. Sayre
THE VALOREM LAW GROUP LLC
mark.sayre@valoremlaw.com

Benjamin Schonbrun
SCHONBRUN DeSIMONE SEPLOW HARRIS & HOFFMAN, LLP
schonbrun.ben@gmail.com

Natacha Thys
CONRAD & SCHERER
nt@conradscherer.com

Hugh J. Totten
THE VALOREM LAW GROUP
hugh.totten@valoremlaw.com

Paul L. Hoffman
SCHONBRUN DESIMONE SEPLOW HARRIS & HOFFMAN
723 Ocean Front Walk
Suite 100
Venice, CA 90291

Virginia Kim
THE VALOREM GROUP, LLC
35 East Wacker Drive, Suite 2900
Chicago, IL 60601