UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BOIMAH FLOMO, *et al.*,                    )
    *Plaintiffs*,                              )
                            )
    *vs.*                                      )          1:06-cv-00627-JMS-TAB
                            )
FIRESTONE NATURAL RUBBER COMPANY,          )
    *Defendant.*                               )
                            )

## <u>SUPPLEMENTAL OPINION</u>

This action began when a group of Liberian employees of a rubber plantation, and their children, sued various members of the Firestone corporate family over allegedly illegal working conditions. In response to a motion to dismiss, the Court dismissed all the claims, except for one: the children's claim that they had been subject to an internationally prohibited "worst" form of child labor, made actionable here via the Alien Tort Statute ("<u>ATS</u>"), 28 U.S.C. § 1350. [Dkt. 40]. That statute authorizes claims by aliens for a "violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

For various reasons, as the litigation wore on, the Defendants in this action were also whittled down to just Firestone Natural Rubber Company ("<u>FNRC</u>").[1] Recently, however, the Court entered summary judgment in favor of FNRC with respect to the remaining claim in this action. [Dkt. 604]. Relying on the comprehensive opinion recently issued by the Second Circuit Court of Appeals in *Kiobel v. Royal Dutch Petroleum Co.*, 2010 U.S. App. LEXIS 19382 (2d

---

[1] Plaintiffs have argued that the actions and inactions of FNRC's subsidiary that operated the plantation are attributable to FNRC. The Court will assume without deciding that those actions and inactions are actually attributable to FNRC because that assumption doesn't alter the conclusion here. The Court notes that FNRC has filed a separate motion for summary judgment challenging the validity of that assumption, a motion which the Court has denied as moot. [*See* dkt. 607].

Cir. 2010), the Court held that international law, which governs ATS claims, doesn't recognize corporate liability. Thus, Plaintiffs cannot recover against FNRC because it is a corporation. Instead the proper cause of action, if any, lies directly against the individuals who allegedly subjected them to worst forms of child labor. In the Court's ruling on FNRC's motion for summary judgment, the Court indicated that it would, through a supplemental opinion, address several other alternative bases for entering summary judgment, bases which the Court couldn't address originally given the need for an expedited ruling before the parties' impending travel to Liberia. This is the supplemental opinion.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial and cannot rely upon the mere allegations or denials in the pleadings. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. 317. The key inquiry is the existence of evidence to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

## II. MATERIAL FACTS

Before considering the evidentiary record in the light most favorable to Plaintiffs, the Court notes that Plaintiffs' response to the motion for summary judgment fails to comply with Local Rule 56.1(b). Among other things, that rule requires a "Statement of Material Facts in Dispute," which Plaintiffs failed to provide. Despite Plaintiffs' failure, the Court has tried to sort through the large evidentiary record (and the needlessly complicated citation methods that the parties employed). Nonetheless, the Court is entitled to "assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts: are specifically controverted in the opposing party's 'Statement of Material Facts in Dispute' by admissible evidence…." L.R. 56.1(e). To the extent that Plaintiffs' noncompliance with the Local Rules has obscured a dispute as to a material fact, that dispute has been forfeited and cannot preclude summary judgment. *See Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010) ("[A] district court may strictly enforce compliance with its local rules regarding summary judgment motions." (citation omitted)).

### A. The Plaintiffs and Their Fathers

The child Plaintiffs here all claim to have been between six and sixteen when their fathers, as their guardians, filed this action in 2006. [*See* dkt. 557-1].[2] Plaintiffs' fathers work as "tappers" for an FNRC subsidiary, meaning that their primary job consists of harvesting latex from rubber trees. Plaintiffs live with their fathers on the Liberian rubber plantation, which is "situated on approximately 200 square miles of wooded land….There are tens of thousands of

---

[2] Some minors have since attained majority and now litigate in their own capacity. Another change in party representative occurred when DNA evidence established that the man purporting to be Johnny Myciaga's father in the Complaint turned out to have no biological relationship to "Johnny." Instead, evidence showed that "Johnny" goes by the name Joseph Fahn. His mother Nancy Fahn has substituted herself in as the guardian. [Dkt. 561]. For simplicity, the Court will refer to the guardians as "fathers."

people, both employees and non-employees, living on and around the Firestone farm." [Dkt. 144-2 ¶2].

## B. The Tappers' Work

Tappers are paid based upon the amount of and quality of work actually performed, not the mere time spent working. [*See* dkt. 144-9 ¶12]. If a tapper collects his full quota of latex for the day, he receives a full day's pay, which as of the date of the Complaint was US$3.19 (an amount increased to US$3.38 in 2006). [Dkt. 2 ¶47; dkt. 2-29 at 45]. If a tapper doesn't complete his full quota, or performs sub-standard work, he receives only a half-day's pay. [Dkt. 144-9 ¶12]. Tappers also have the opportunity to perform extra work that, if completed, results in an extra half-day's pay. [*See id.*]. Since 1989, the tapper's work quota has been established through a collective bargaining process, [*see* dkt. 144-8 (attaching collective bargaining agreements)], although Plaintiffs contend that FNRC is not currently honoring the 2008 collective bargaining agreement that reduced the required work and increased tapper pay, [dkt. 230-58 ¶12].[3]

Plaintiffs' fathers have indicated to the Court that they desperately want to keep their jobs, otherwise they will "join the ranks of the starving unemployed." [Dkt. 2 ¶49]. For despite the nominally low wage in American dollars, a tapper's wage is relatively valuable in Liberia— one of the poorest countries on Earth and one with an 85% unemployment rate as of 2003. *See* https://www.cia.gov/library/publications/the-world-factbook/geos/li.html (last visited October 14, 2010). In 2007, the average take-home pay for a tapper was US$129.92 per month, [*see* dkt.

---

[3] Plaintiffs additionally complain that their union leadership wasn't very effective before 2007— before the membership decided to change its leadership in a contested labor election that went all the way to the Liberian Supreme Court. [*See id.*]. They don't indicate whether Liberian law required the members to ratify the collective bargaining agreements.

144-10 ¶15], while "many [Liberian] government salaries [were] less than $20 USD per month," [dkt. 2-41 at 4].

The parties have submitted conflicting evidence as to whether one tapper can physically complete all his work by himself so as to receive full pay. Consistent with the standard of review, the Court will, therefore, assume that quotas are too high for a tapper to receive full pay without assistance. That assistance may take the form of adult helpers. Given the high unemployment rate, at least one father was able to hire a worker to help him complete his quota at the rate of "20 cups of rice and US$20.00 each month." [Dkt. 144-16 at 324]. FNRC has asserted, and Plaintiffs haven't denied, that "[e]very father in this case admits that he had at least one adult to assist in the field—*i.e.* one of his wives, a hired 'helper' or both." [Dkt. 209 at 15 (footnote collecting evidentiary citations omitted)]. The assistance for Plaintiffs' fathers has also taken the form of unpaid child labor: They have directed, and in several instances continue to direct their children, Plaintiffs, to assist in them in the fields. [*See* dkt. 295 at 30-40 (collecting evidentiary citations)].

Some of the activities that tappers must either perform themselves or delegate are dangerous and physically demanding. [*See id.* at 30-36 (describing activities that Plaintiffs contend constitute "worst" forms of child labor)]. Others aren't: for example, washing out the cups that are used to collect latex from the trees. [*See* dkt. 144-17 at 68¶3].

FNRC has asserted that Plaintiffs' fathers set the hours Plaintiffs work, what days they work, what work they perform, and the age at which Plaintiffs first began working. [*See* dkt. 209 at 16]. Apart from arguing that the quota system itself necessarily required tappers to use their children and noting that a low-level field supervisor, called a "headman," once showed a Plaintiff how to scrape dried latex from a cup, wash the cup, and where to deposit the latex collected from

the cups, [*see* dkt. 230-22 at 13-14], Plaintiffs don't dispute the factual accuracy of that claim. [*See* dkt. 295 at 30].  No Plaintiff is on FNRC's payroll.

### C.  ILO Convention 182

In 1999, the United Nation's International Labor Organization promulgated an international agreement, effective in November 2000, that directed ratifying member states to "take immediate and effective measures to secure the prohibition and elimination of the worst forms of child labour as a matter of urgency."  International Labor Organization Convention 182, Art. 1, *available at* http://www.ilo.org/public/english/standards/relm/ilc/ilc87/com-chic.htm ("Convention 182") (last accessed October 14, 2010).  While the United States ratified Convention 182 in February 1999, Liberia didn't ratify it until February 2003.  http://www.ilo.org/ilolex/cgi-lex/ratifce.pl?C182 (last accessed October 14, 2010).[4]

### D.  Policies Against Child Labor on the Plantation

Anticipating the effective date of Convention 182, even though Liberia hadn't yet ratified it, FNRC issued a policy in June 2000 that prohibited "the use of under-aged children" in work that might fall within the definition of "worst" forms of child labor, including "tapping, cup[] cleaning, latex/cup lump collection, slashing, ring weeding, difolatan and stimulant applications."  [Dkt. 144-1 at 25].  FNRC has maintained, and Plaintiffs don't dispute, that the original policy was written broadly enough such that it prohibited "any and all" use of tappers' children, no matter how innocuous the work.  [Dkt. 209 at 20].  In July 2005, management re-promulgated the policy.  [Dkt. 144-4 at 18].  A few months later, in November 2005, management revised it to a "zero-tolerance" policy, unlike the previous policies that had called for graduated discipline. [*Id.* at 20].

---

[4] 172 countries have now ratified Convention 182.  But several countries still haven't done so—including India, a country with over one billion people.  *Id.*

Despite having had policies in place against child labor since June 2000, Plaintiffs have presented evidence that FNRC devoted little to no resources to enforcing those policies, at least until after this litigation began.[5] The earliest disciplinary reports for using child labor occurred only in the months right before this litigation began, [dkt. 144-8 at 253-78], and FRNC admits that it never terminated an employee for using child labor before January 2005, [dkt. 230-44 at 7]. At least some of Plaintiffs' fathers claim to not have even known about the prohibition until after the November 2005 zero tolerance policy was issued (and this litigation had already begun). [*See* dkt. 295 at 37-38 (collecting citations)]. Yet at least one Plaintiff admits that her father told her about the prohibition in 2001, [*see* dkt. 144-16 at 231 (testifying that her father told her about the policy when she was twelve); dkt. 557-1 (listing Plaintiffs' dates of birth)]. Another admits that a headman told her about the policy in 2003. [Dkt. 144-17 at 117].

Since this litigation began—and the zero tolerance policy has been more actively enforced—Plaintiffs who have helped their fathers have hidden when FNRC management passes by. [*E.g.*, dkt. 144-16 at 247 ("Q: All right. Did your father tell you to hide when you were pouring chemicals on the tree?....A: Yes, he tell me to hide. Q: From who? A: From Firestone people…because Firestone said they never wanted children to work on the farm.")].

### III.   DISCUSSION

Besides being entitled to summary judgment on the ground that the ATS doesn't recognize corporate liability, the Court finds that FNRC is also entitled to summary judgment because Plaintiffs have been unable to present evidence that, if admitted and credited, would establish the

---

[5] At one point during this litigation, Plaintiffs' guardians asked the Court to enjoin FNRC from enforcing the zero-tolerance policy against them if their discovery responses revealed that they were continuing to violate the policy by making their children work. [Dkt. 246]. The Court declined to do so because enforcing that policy would "achieve what is ostensibly the core goal of this litigation—protecting the Plaintiffs from the dangers of the worst forms of child labor (if they are, in fact, engaged in such work)." [Dkt. 352 at 5].

allegations that the Court previously held stated a claim for illegal worst forms of child labor.  In the alternative, the Court concludes that Convention 182's Article 3(d) cannot form the basis of an ATS claim at all, thus revisting in part its earlier ruling on the motion to dismiss.  Finally, to whatever extent any evidence could establish a violation of the ATS, the liability period would be limited to the period after June 2003, not back to 1995 as Plaintiffs have argued should apply.

### A.  The Allegations in the Complaint Compared to the Actual Proof

As the Court has explained on several occasions, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), places very strict requirements on the types of violations of international law that can support a claim under the ATS.  *Sosa* permits ATS claims only for "violations of safe conducts, infringement of rights of ambassadors,…piracy," *id.* at 724, and for violations of international norms that are "specific, universal, and obligatory" enough so as to "render the perpetrator *hostis humani generis*, an enemy of all mankind," [dkt. 604 at 6 (quoting *Sosa*)].  With respect to that last category—the one that Plaintiffs claim applies here—the Supreme Court has directed the lower courts to exercise "vigilant doorkeeping."  *Sosa*, 542 U.S. at 729.

When ruling upon the earlier motion to dismiss, the Court held that Convention 182 represented a specific, universal, and obligatory international norm for the purposes of *Sosa* because it had been broadly ratified, including by the United States and Liberia.  Although Plaintiffs argued that Convention 182 was but the latest manifestation of an international consensus against child labor such that their claim shouldn't be limited to proving a violation of Convention 182, the Court rejected that argument.  [Dkt. 40 at 66 (calling Convention 182 "the key source of international child labor standards" for this action)].  Plaintiffs' argument about a broader binding norm was impermissibly premised upon other international conventions that the United States had never ratified.  [*See id.* at 54 ("It would be odd indeed if a United States court were to

treat as universal and binding in other nations an international convention that the United States government has declined to ratify itself.”)].[6]

Convention 182 outlaws only “worst” forms of child labor, which it defined in four ways, only two of which Plaintiffs claimed apply here.  Under Article 3(a), worst forms include “all forms of slavery or practices similar to slavery, such as the sale and trafficking of children, debt bondage and serfdom and forced or compulsory labour, including forced or compulsory recruitment of children for use in armed conflict.”  Convention 182.  And Article 3(d) stipulates that worst forms of child labor also include “work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children.”  *Id.*[7]  That latter definition was intentionally vague.  Recognizing that acceptable child labor norms may vary from country to country, ILO Convention 182 specified that an Article 3(d) worst form of child labor “shall be determined by national laws or regulations or by the competent authority, after consultation with the organizations of employers and workers concerned.”  *Id.* at Art. 4(1).

Accepting the Complaint’s allegations as true—as the Court was required to do, [*see* dkt. 40 at 13-14]—the Court held that Plaintiffs may be able to establish a violation of Convention 182 and thus the ATS.  But, based upon the evidentiary record presented to the Court here, Plain-

---

[6] To the extent that Plaintiffs again attempt to expand their claims beyond Convention 182, the Court rejects that attempt for the reasons previously stated.

[7] Articles 3(b) and 3(c) label as a worst forms of child labor activities related to sexual exploitation of minors and related to child drug trafficking or drug production.

tiffs haven't been able to come up with evidence to support their claims in several critical respects, as they needed to do to survive summary judgment.[8]

### 1. Article 3(a)

In their Complaint, Plaintiffs alleged that they lead a "slave-like existence," forced to help their fathers in the fields despite their young age, [dkt. 2 ¶64], in violation of Convention 182 Article 3(a).

At oral argument, however, Plaintiffs' counsel conceded that the only force in the evidentiary record here is "economic coercion" given the high quotas their fathers must meet to keep otherwise scare jobs in Liberia. [Dkt. 590 at 67]. No one associated with FNRC ever threatened Plaintiffs, or their fathers, with force if Plaintiffs didn't work. [*Id.*].

Plaintiffs' concession eliminates their forced labor claim. In rejecting Plaintiffs' fathers' own "forced" labor claims, the Court previously held that "pure economic necessity, as when a worker feels unable to leave a job because of the real or perceived absence of employment alternatives…is not forced labor under international law." [Dkt. 40 at 51 (quotation omitted)]. Plaintiffs' forced labor claim here depends upon the following argument: FNRC forced Plaintiffs' fathers to either meet high quotas or face termination, and Plaintiffs' fathers had no choice but to turn their children to work to help meet those quotas; therefore, FNRC forced Plaintiffs to work. But because FNRC didn't actually "force" Plaintiffs' fathers to work within the meaning of international law, Plaintiffs' argument fails. They cannot, therefore, establish a violation of Article 3(a).

---

[8] The Court notes that Plaintiffs continue to maintain here that "Plaintiffs' allegations…must be taken as true" in connection with this motion. [Dkt. 295 at 13]. Because the Court previously announced that it would treat FNRC's motion as entirely one for summary judgment even though it also partially sought judgment on the pleadings, [dkt. 234], Plaintiffs are incorrect. Fed. R. Civ. Pro. 56(e)(2) ("[A] party may not rely merely on allegations or denials in its own pleading [in response to a motion for summary judgment]").

## 2. Article 3(d)

With respect to Article 3(d), the Court previously found a potentially viable cause of action in that the Complaint included "allegations that [FNRC is] encouraging and even requiring parents to require their children as young as six, seven, or ten years old to do…heavy and hazardous work." [Dkt. 40 at 69]. That work was, Plaintiffs alleged, the "necessary and inevitable" consequence of the high production quotas, [*id.* at 68], and was keeping them out of school, [*id.* at 40].

In connection with the present motion, FNRC has argued, and Plaintiffs haven't disputed, that FNRC can only be held liable under Article 3(d) if it set up a quota system deliberately designed to cause Plaintiffs to perform work that would "likely…harm the[ir] health, safety or morals," Convention 182, Art. 3(d). [Dkt. 209 at 42 ("No court has ever found that negligence or recklessness makes one an enemy of all mankind for purposes of the ATS. Instead, every tort claim that has been recognized under the ATS has involved deliberate wrongdoing." (citations and footnote omitted))]; *see also* dkt. 295 at 8 (claiming that FNRC "deliberately created and implemented a plantation system…of exploitation based on forced child labor")].

Despite the allegations in the Complaint, Plaintiffs haven't come forward with any evidence suggesting that FNRC actually wanted any tapper to use his child in the fields at all, thereby precluding a finding of deliberateness. While Plaintiffs repeatedly accuse FNRC of having an informal policy in favor of child labor, the formal policies in the record, beginning with the one adopted in June 2000, specifically prohibit tappers from using their children to help with their work. [*E.g.* dkt. 144-1 at 25]. Indeed, for that reason, one Plaintiff testified that he knew that he needed to hide if he "hear[d] or [saw] a Firestone car approaching." [Dkt. 230-23 at 8]. FNRC obviously wanted the tappers to meet their work quotas—quotas established, since 1989, through

a series of collective bargaining agreements with the tappers' union.  [*See* dkt. 144-8].  But at worst, the evidence submitted regarding FNRC's lackluster attempts to enforce the child-labor prohibition—which would have long ago caused Plaintiffs' fathers to "join the ranks of the starving unemployed," [dkt. 2 ¶49]—demonstrates a mere indifference to the possibility of child labor.  No evidence indicates that Firestone deliberately wanted Plaintiffs' fathers to use their young children, as opposed to using adult children, their wives, or paid help.[9]

Even if some headmen or other managers "continued to allow children to work because the job was too big for one person" despite the formal prohibition on child labor, [dkt. 296-26 ¶15],[10] Plaintiffs haven't established that the "necessary and inevitable" consequence of FNRC's acquiescence was a worst form of child labor within the meaning of Article 3(d).  As indicated previously, Article 3(d) expressly indicates that local law supplies its contours.  The only Liberian law relating to child labor that either party has cited only places one restriction on employment of minors below sixteen years of age:  Any work performed must not occur "during the hours when he is required to attend school."  [Dkt. 2-31 at 5].[11]  Thus, insofar as Plaintiffs complain that their fathers put them to work "very early" in the morning so they would have time to "return[] home to get ready for school," or put them to work on "Saturdays and Sundays," [dkt.

---

[9] Given the high rate of unemployment (i.e. a large supply of willing workers to choose from), FNRC might have refused to even employ tappers who had school-aged children, or else refused to let families live on the plantation with the tappers.  Either outcome would have avoided the potential for child labor and would have saved FNRC the costs of operating a school system for the tappers' children.  That outcome would have resulted in worse economic consequences for Plaintiffs, which may be why Plaintiffs' fathers have indicated that they want to keep their jobs, no matter how difficult they may be.

[10] The Court has significant doubts as to the admissibility of this particular statement in that it is premised upon what is "common knowledge," rather than on what the affiant himself apparently saw or heard.  [*Id.*].  Because the statement, even if admitted, doesn't preclude summary judgment, the Court won't definitively resolve its admissibility.

[11] The law includes a civil fine for any employer who employs any child during school hours— and a fine for any parent who permits the child to work.  [*Id.*].

295 at 46], Plaintiffs' work didn't violate Liberian law. Plaintiffs haven't directed the Court to any evidence that any FNRC employee—other than Plaintiffs' fathers—specifically encouraged Plaintiffs to work during school hours, rather than before or after school.

Because *Sosa* requires both specificity and universality, however, the Court previously indicated that merely establishing a violation of Liberian child labor law won't suffice for an ATS claim; the nature of the work and the age at which it was performed matter too. [*See* dkt. 40 at 68 (requiring any child labor to cross a "bright line" under international law)]. Nonetheless, Plaintiffs have taken the untenable position here that any "hazardous" work by any minor constitutes an internationally recognized "worst" form of child labor. Thus, Plaintiffs ask the Court to label every Indiana farmer who has a minor perform any hazardous work an enemy of all mankind, [dkt. 590 at 51 (contending that the work violates international law)], even though such work may be fully compliant with United States labor law. *See* 29 U.S.C. § 213(c)(2) (permitting minors under 16 to perform agricultural work that is not "particularly hazardous," subject to certain qualifications). The Court cannot, as Plaintiffs suggest, infer an actionable ATS claim, or a specific and universal international norm based on age alone, particularly when such claim would contravene Congress' policymaking judgment.

For present purposes, the Court will assume that there is some core international consensus about what constitutes a "worst" form of child labor beyond those specifically delineated in Convention 182 Article 3(a) to 3(c), even though Plaintiffs' own expert in international law denies the validity of that assumption. [*See* dkt. 580-1 at 30 ("Q: And I believe you testified earlier that there is, in fact, no agreement on how likely an injury has to be before it must be listed under article 3(d)? A: That's right.").] If any core exists, it would be represented by the lowest common denominator among all laws promulgated to comply with Article 3(d). *See United*

*States v. Smith*, 18 U.S. 153, 161 (1820) (noting that while various authorities define piracy somewhat differently, "all…concur, in holding, that robbery, or forcible depredations upon the sea, *animo furandi*, is piracy" and then applying that core agreement in a criminal prosecution for piracy).

Yet despite that assumption, summary judgment is still appropriate. FNRC's opening brief specifically argued that "plaintiffs certainly cannot establish that **every** element [of a tapper's job] constitutes the 'worst form' for a child of any age" under international law, [dkt. 209 at 17-18 (original emphasis)], and that Plaintiffs' fathers alone "told them which jobs to do," [*id.* at 16]. As to the first point, Plaintiffs only respond by saying that the activities that they performed were listed on FNRC's June 2000 anti-child labor policy. [*See* dkt. 590 at 50]. But that policy went well beyond Article 3(d) by prohibiting all child labor, not just its worst forms. What constitutes a worst form of child labor for *Sosa* purposes is a question of law, *see Doe v. Qi*, 349 F. Supp. 2d 1258, 1322 (N.D. Cal. 2004), not a fact that can be established by an admission of a party opponent. Having young children wash cups may not be ideal, but—absent specific legal authority that Plaintiffs have been unable to provide—the Court cannot find it universally condemned. As to FNRC's second point, Plaintiffs haven't come forth with evidence that anyone other than Plaintiffs' fathers selected the activities that Plaintiffs would perform. [*See, e.g.*, dkt. 207-8 at 3 ("Q: And is your father the one who would tell you what to do? A: Yes.")]. Because not all of a tapper's work would qualify as a worst form of child labor if performed by a child and because FNRC played no role in selecting which types of work the tappers would assign their children, Plaintiffs cannot establish that FNRC deliberately set up a system that would result in worst forms of child labor, whatever that term may mean.

## B. Revisiting Whether Article 3(d) Can Satisfy *Sosa*

FNRC also suggests that the Court's ruling on the motion to dismiss was in error with respect to Article 3(d).[12]  Plaintiffs correctly point out that the Court could invoke the law-of-the-case doctrine and refuse to revisit its prior ruling—the law discourages piecemeal argumentation.  But FNRC correctly argues too that the doctrine is technically inapplicable insofar as the issues weren't actually raised to the Court.  *See Bone v. City of Lafayette*, 919 F.2d 64, 66 (7th Cir. 1990) ("Subjects an appellate court does not discuss, because the parties did not raise them, do not become the law of the case by default.").  Further, whether originally presented or not, the law-of-the-case doctrine is a purely discretionary one designed to facilitate judicial economy.  *See United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008).  Given that—but for the reasons outline above—the parties and the Court would be confronted with  an incredibly expensive and prolonged trial, the Court will entertain FNRC's meritorious arguments.

With respect to *Sosa*'s requirement of a binding international norm, FNRC argues that "[t]he U.S. Senate ratified Convention 182 on the understanding that it was non-self-executing." [Dkt. 209 at 23 (citing S. Treaty Doc. No. 106-5, 1999 WL 33292717 at *13)].  Plaintiffs don't contend otherwise.  In *Sosa*, the Supreme Court refused to permit the International Covenant on Civil and Political Rights to establish a binding international norm for ATS purposes because "the United States ratified the Covenant on the express understanding that it was not self-executing and so [the Covenant] did not itself create obligations enforceable in the federal courts."  542 U.S. at 735 (citation omitted).  Because Convention 182 was also non-self-executing, it likewise cannot form a basis for an ATS claim.

---

[12] The Court remains confident that child slavery and other claims of truly "forced" child labor satisfy *Sosa*, whether framed under Convention 182 or otherwise.  [*See* dkt. 40 at 44-47 (collecting cases finding ATS violations where the plaintiffs were held as slaves or near slaves)].

Article 3(d) also fails *Sosa*'s specificity and universality requirements.  As indicated above, Article 3(d) directs each nation to decide what constitutes labor that will likely harm the "health, safety or morals of children."  When first considering the motion for summary judgment, the Court itself struggled to articulate a definition of conduct that, if true, would always violate Article 3(d), no matter where the conduct occurred.  To that end, the Court directed the parties to submit proposed jury instructions on that topic for the Court's consideration—because, if summary judgment were denied, a jury trial would be necessary, and the jury would need to be instructed.[13]  Plaintiffs proposed that the jury be given a non-exhaustive list of five factors to use when considering each work activity that Plaintiffs claimed to have performed.  [*See* dkt. 581 at 2].  Thus, apart from their argument—which the Court has rejected—that any hazardous work by a minor automatically qualifies as a violation of Article 3(d), Plaintiffs essentially threw up their hands, proposing that the jury simply sort out international law and decide for itself what conduct makes a corporation an enemy of all mankind.

While the Court has a great deal of respect for the men and women from this District who answer the call of jury duty, it is improper to ask the jury to make the kind of line drawing decisions best left to the political branches of their government; jury instructions should provide answers, not questions.  How young is too young to perform weeding?  How heavy is too heavy for a ten year old to lift?  Those questions are practically impossible for a jury to answer regarding conduct here in this country.  Those questions are actually impossible for the jury to answer regarding conduct occurring in one of the poorest countries on Earth, located a continent away, where inhabitants face perils unimaginable in this country—including, for example, having to

---

[13] Indeed, the specificity and universality problems in the context of jury instructions also constitutes a "practical consequence" that may suggest that no cause of action should lie absent legislative guidance.  *See Sosa*, 542 US at 732-33.

worry that if children aren't taken into the fields with their parents that they will be kidnapped and impressed into military service. [*See* dkt. 144-16 at 180 (expressing fears over potential kidnapping of any children left alone in the homes while their fathers worked in the fields)]; http://www.state.gov/g/drl/rls/hrrpt/2003/27735.htm (last visited October 14, 2010) (describing child soldiers recruited to join militias). Indeed, those questions are impossible even for this judge, absent clear legislative guidance from Congress or international agreements—both of which are lacking here.

FNRC also raises another problems with Plaintiffs' attempt to invoke the ATS here: Plaintiffs have previously maintained that FNRC's conduct is directly actionable under various Liberian common-law causes of action, [*see* dkt. 206].[14] Inasmuch as an ATS claim is most closely related to a *Bivens* claim in that they both spring from federal common law, *see Sosa*, 542 U.S. at 743 (Scalia, J., concurring), the availability of other remedies may preclude the ability to invoke the ATS. *See Alba v. Montford*, 517 F.3d 1249, 1254 (11th Cir. 2008) (rejecting *Bivens* claim where plaintiff had "alternative remedies" to recover against the defendant); *Holly v. Scott*, 434 F.3d 287, 296-97 (4th Cir. 2006) (same). Furthermore, the Seventh Circuit has suggested in dicta—which although not technically binding still merits considerable deference—that a failure to exhaust alternative remedies is required by international law and, if not followed, would preclude reliance on the ATS. *See Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) ("It may be that a requirement for exhaustion is itself a basic principle of international law."). The Court finds no basis upon which to disagree with the Seventh Circuit's dicta.

---

[14] The Court has denied Plaintiffs leave to amend their Complaint to assert Liberian claims in part because Plaintiffs waited too long to file their motion to amend. [Dkt. 548].

Accordingly, the Court now concludes that a violation of Convention 182's Article 3(d) cannot give rise to an ATS claim under *Sosa*. FNRC is thus entitled to summary judgment on that claim.[15]

## C. Potential Liability Period

Finally, assuming that any evidence in the record could establish a violation of the ATS, the parties disagree as to the appropriate period of potential liability. FNRC argues that international law doesn't permit Convention 182 to be applied retroactively. Thus, it contends that it cannot be held liable for conduct occurring before June 2003, the date when Liberia ratified Convention 182; or, in the alternative, for conduct occurring before November 2000, when Convention 182 became effective (for those countries that had already ratified the convention). [Dkt. 209 at 30]. For their part, Plaintiffs don't dispute the no-retroactivity principle. [*See* dkt. 295 at 15 n.8]. Instead, they contend that Convention 182 merely "affirmed a long-standing consensus prohibiting child labor, going back to at least the adoption of Convention 138 in 1973," [*id.*], where various member states agreed to prohibit all work by children under fourteen years of age (and in many cases by older children as well), *see* International Labor Organization Convention

---

[15] To facilitate any appellate review, the Court notes that FNRC has raised two other arguments that the Court rejects. FNRC incorrectly claims that an ATS claim requires a defendant to have acted "under color of law." The ATS provides a civil cause of action only against a defendant whose conduct makes the defendant, like the pirate, an enemy of all mankind. *Sosa*, 542 U.S. at 732. Such a miscreant commits an offense of "universal concern" and may thus be punished whether or not the action is performed under color of law. *See Kadic v. Karadzic*, 70 F.3d 232, 239-40 (2d Cir. 1995) (summarizing international law and additionally noting that "[t]he Executive branch has emphatically restated in this litigation its position that private persons may be found liable under the Alien Tort Act for acts of genocide, war crimes, and other violations of international humanitarian law"). Insofar as FNRC claims that the ATS is limited to violations of international law actually committed within the territorial jurisdiction of the United States, that view impermissibly constricts the longstanding—and likely original—understanding of the ATS. *See* 1 Op. Atty Gen. 57 (1795) (opining that the ATS would permit a cause of action against Americans assisting the French in raids against British shipping off the coast of Sierra Leon).

138 ("Convention 138"), Art. 2, http://www.ilo.org/ilolex/cgi-lex/convde.pl?C138. Based on 9th Circuit caselaw, therefore, they argue that FNRC's liability period goes back to 1995, ten years before they filed this action. [Dkt. 146 at 11 (citing *Deutsch v. Turner Corp.*, 324 F.3d 692, 717 (9th Cir. 2003) (finding a ten-year limitations period for ATS claims)].

The Court agrees with FNRC that June 2003 would represent the proper liability period in this action, if there were any liability at all. As indicated above, when ruling on the motion to dismiss in this action, the Court was clear that the "key source of international child labor standards" in this action is Convention 182, [dkt. 40 at 66], if in fact there is any actionable international standard. Whatever may be said of the views of other countries with respect to the principles articulated in Convention 138, the United States has never ratified it, so it cannot form the basis of an international consensus for the purposes of *Sosa*.[16] Likewise with respect to Convention 182, no sufficient international consensus could exist to support an ATS claim for these Liberian Plaintiffs vis-à-vis this American Defendant until both the United States and Liberia ratified the convention, which didn't occur until June 2003.

## IV.   CONCLUSION

For the reasons stated in the Court's original ruling on FNRC's motion for summary judgment, [dkt. 604], and for those reasons stated above, summary judgment in favor of FNRC is appropriate.

Now that all claims in this action have been resolved, final judgment will issue. Given the undisputed present poverty of both the child Plaintiffs and their fathers, given the improbability that that poverty will materially improve in the future, and given the difficulties associated with collecting costs from litigants a continent away anyway, no costs will be taxed. *See Rivera*

---

[16]   Liberia hasn't yet ratified Convention 138 either. http://www.ilo.org/ilolex/cgi-lex/ratifce.pl?C138 (last visited October 14, 2010).

*v. City of Chicago*, 469 F.3d 631, 634 (7th Cir. 2006) ("Since 1983, this Court has held that it is within the discretion of the district court to consider a plaintiff's indigency in denying costs under Rule 54(d)." (quotation and citations omitted)).

10/19/2010

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via CM/ECF only:**

Terrence P. Collingsworth
CONRAD & SCHERER
tc@conradscherer.com

Katie J. Colopy
JONES DAY
kjcolopy@jonesday.com

Rafael S. Garcia
CONRAD & SCHERER, LLP
rgarcia@conradscherer.com

C. Christopher Groves
JONES DAY
cgroves@jonesday.com

Piper M. Hendricks
CONRAD & SCHERER LLP
phendricks@conradscherer.com

Paul L. Hoffman
SCHONBRUN DESIMONE SEPLOW HARRIS & HOFFMAN
723 Ocean Front Walk
Suite 100
Venice, CA 90291

Kimberly D. Jeselskis
JESELSKIS LAW OFFICES, LLC

kjeselskis@kdjlegal.com

Christian Alexandra Levesque
CONRAD & SCHERER
cl@conradscherer.com

Mark J. R. Merkle
KRIEG DEVAULT LLP
mmerkle@kdlegal.com

Robert A. Mittelstaedt
JONES DAY
ramittelstaedt@jonesday.com

Marc T. Quigley
KRIEG DEVAULT LLP
mquigley@kdlegal.com

Thomas A. Rector
JONES DAY
tarector@jonesday.com

Michael L. Rice
JONES DAY
mlrice@jonesday.com

Benjamin  Schonbrun
SCHONBRUN DeSIMONE SEPLOW HARRIS & HOFFMAN, LLP
schonbrun.ben@gmail.com

Kasper  Sorensen
CONRAD & SCHERER, LLP
ksorensen@conradscherer.com

David L. Wallach
JONES DAY
dwallach@jonesday.com